**UNITED STATES COURT OF INTERNATIONAL TRADE**
**NEW YORK, NEW YORK**

| | |
|---|---|
| ELITE QUARTZ MANUFACTURING, ARIZONA TILE, LLC, M S INTERNATIONAL INC., CAESARSTONE USA, INC., and WISENBAKER BUILDER SERVICES, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT in his official capacity as Commissioner of U.S. Customs and Border Protection, UNITED STATES INTERNATIONAL TRADE COMMISSION, DEPARTMENT OF HOMELAND SECURITY, and MARKWAYNE MULLIN in his official capacity as Secretary of the Department of Homeland Security,<br><br>Defendants. | Case No. 26-03719<br><br>Before: Unassigned.<br><br>Three-Judge Panel Requested |

**COMPLAINT**

Pursuant to Rule 3 of the Rules of the U.S. Court of International Trade ("CIT"), Elite Quartz Manufacturing ("Elite Quartz"), Arizona Tile, LLC ("Arizona Tile"), M S International Inc. ("MSI"), Caesarstone USA, Inc. ("Caesarstone"), and Wisenbaker Builder Services, Inc. ("Wisenbaker") (collectively, "Plaintiffs"), by and through counsel, bring this Complaint against the United States of America, United States Customs and Border Protection, Commissioner of Customs Rodney S. Scott in his official capacity, the United States International Trade Commission, the Department of Homeland Security, and Homeland Security Secretary Markwayne Mullin in his official capacity (collectively, "Defendants"), and allege as follows:

## INTRODUCTION

1. Plaintiffs are companies headquartered in the United States in the Quartz Surface Products ("QSP") industry. Plaintiffs Arizona Tile, MSI, Caesarstone, and Wisenbaker all import QSP into the United States. Plaintiff Elite Quartz is a U.S. premium manufacturer of subject QSP slabs in Latta, South Carolina. Elite Quartz sells QSP slabs to distributors that then sell Elite's slabs across the United States in the same distribution channels alongside imported slabs from other suppliers.

2. The U.S. International Trade Commission ("ITC" or the "Commission") conducted a safeguard investigation under Section 202 of the Trade Act of 1974 as amended (the "Trade Act" or "Safeguard Statute"), 19 U.S.C. § 2252, to determine whether imported QSP are a substantial cause of serious injury to the United States industry, and if so, to recommend a remedy to the President. Plaintiffs bring this action to challenge the legality of the ITC's "affirmative finding regarding serious injury," which is a statutory condition precedent to the President's issuance of a safeguard measure. 19 U.S.C. § 2253(a)(1)(A).

3. The safeguard investigation began on September 15, 2025, when the Quartz Manufacturing Alliance of America ("QMAA" or "Petitioner") filed a Petition requesting safeguard remedies (the "Petition").

4. Two days later, a leading domestic slab producer, Elite Quartz, contested the QMAA's standing to bring the Petition. Elite Quartz explained to the Commission that the Petition was not supported by U.S. producers of the domestic like or directly competitive product sufficient to be "representative of an industry" in accordance with the requirements of Section 202(a)(1) of the Trade Act. Elite Quartz's submission in opposition and subsequent submissions in opposition prior to the institution of the investigation were supported by nearly 750 sworn declarations from

U.S. fabricator manufacturers voicing opposition to the Petition. These fabricator manufacturers accounted for approximately 71 million square feet of annual U.S. production of QSP.

5. Leading fabricator manufacturer industry group, the Rockheads Group, also opposed the Petition prior to the institution of the investigation. The Rockheads Group represents more than 100 fabricator manufacturers across the United States and employs approximately 10,000 American workers who produce approximately 14 million square feet of QSP annually. Leading fabricator manufacturer, Stone Suppliers, also separately opposed the Petition prior to institution.

6. Nonetheless, over this vehement, substantial opposition and following a lengthy delay, the ITC formally instituted the safeguard investigation on December 1, 2025. In its notice of institution, the ITC construed the Petition as properly filed on November 17, 2025, the date of the most recent supplementary filing by Petitioner. *Quartz Surface Products; Institution of Investigation, Scheduling of Public Hearings, and Determination That the Investigation Is Extraordinarily Complicated*, 90 Fed. Reg. 55165 (Int'l Trade Comm'n Dec. 1, 2025). The notice of institution provided no explanation for why the Petitioner satisfied the statutory standing requirement.

7. The Commission then conducted a serious injury investigation, comprising the issuance and collection of questionnaires, briefing, and a full-day hearing. On April 1, 2026, the ITC made an affirmative finding regarding serious injury by a 2-1 vote. Then-Chair Karpel and Commissioner Kearns voted in the affirmative and determined that QSP were being imported into the United States in such increased quantities as to be a substantial cause of serious injury to the domestic industry producing an article like or directly competitive with the imported article. Commissioner Johanson made a negative finding regarding serious injury.

8. The ITC issued its report containing its findings and recommendations to the President on May 18, 2026. The Commission determined, pursuant to section 202(b) of the Trade Act of 1974, that "quartz surface products are being imported into the United States in such increased quantities as to be a substantial cause of serious injury to the domestic industry producing an article like or directly competitive with the imported article." *Quartz Surface Products*; *Publication of summary of the Commission's report on the investigation*, 91 Fed. Reg. 29980, 81 (Int'l Trade Comm'n May 21, 2026) (the "Commission Determination").

9. Among other legal findings, the ITC majority found that fabricator manufacturers are not part of the U.S. producers of QSP and are not part of the domestic QSP industry. *Quartz Surface Products*, Inv. No. TA-201-79, USITC Pub. 5738 (May 2026) ("ITC Report") at 16–26. Commissioner Johanson authored a blistering 40-page dissent and found, among other deficiencies in the majority's finding, that fabricator manufacturers are U.S. producers of QSP and are part of the domestic industry. *Id.* at 69–108.

10. On July 31, 2026, the President issued Proclamation 11051 and an accompanying Annex. Proclamation No. 11051, 91 Fed Reg. 50645 (July 31, 2026) (the "Proclamation"). The President imposed a safeguard measure that entered into force at 12:01 AM Eastern Time on August 15, 2026 (the "Safeguard Measure"). The Safeguard Measure comprises a tariff-rate quota ("TRQ"), which in year one imposes a tariff of 25 percent up to a specified quarterly quantitative threshold, and then a tariff of 50 percent for all imports above that threshold. The Safeguard Measure exempts imports from certain countries from the safeguard measure due to Free Trade Agreement or developing country exemptions.

11. Plaintiffs are being harmed by the tariffs imposed under the Safeguard Measure. Importers Arizona Tile, MSI, Caesarstone, and Wisenbaker now must pay high tariffs on QSP

imports. Elite Quartz is also being harmed because the demand for QSP is declining and its customers' ability to purchase QSP has been diminished.

12. The ITC majority committed multiple legal errors in its investigation and in the Commission's Determination. These legal errors include, among others:

- The ITC majority unlawfully found that the QMAA had demonstrated standing to institute and proceed with the investigation. Section 202(a)(1) of the Trade Act requires that a petition seeking relief from import-related injury may only be filed by an "entity" which is "representative of an industry," and the statutory definition of the domestic industry in safeguard proceedings is broadly defined as "the producers as a whole of the like or directly competitive article or those producers whose collective production of the like or directly competitive article constitutes a major proportion of the total domestic production of such article." 19 U.S.C. § 2252(c)(6)(A)(i). The ITC erroneously failed to consider independent fabricator manufacturers when assessing Petitioner's standing. Fabricator manufacturers are part of the domestic QSP industry in accordance with the governing statute. In fact, the Commission found in four previous antidumping and countervailing duty ("AD/CVD") determinations, including as recently as December 2025, that QSP fabricator manufacturers are U.S. producers of QSP and part of the domestic QSP industry. ITC Report at 26, n.102.[1] Thus, the Commission erred in finding that those supporting the Petition are representative of the domestic industry.

[1] The ITC determinations are as follows: *Quartz Surface Products from China*, Inv. Nos. 701-TA-606 and 731-TA-1416 (Final), USITC Pub. 4913 (June 2019); *Quartz Surface Products from India and Turkey*, Inv. Nos. 701-TA-624-625 and 731-TA-1450-1451 (Final), USITC Pub. 5061 (June 2020); *Quartz Surface Products from China*, Inv. Nos. 701-TA-606, and 731-TA-1416 (Review), USITC Pub. 5578 (Jan. 2025); *Quartz Surface Products from India and Turkey*, Inv. Nos. 701-TA-624-625 and 731-TA-1450-1451 (Review), USITC Pub. 5691 (Dec. 2025).

- The ITC majority unlawfully determined to exclude fabricator manufacturers from the domestic industry in its serious injury and substantial causation analysis. If fabricator manufacturers had been included in the domestic industry, a large majority of the domestic industry would have opposed trade-restrictive safeguard measures on QSP and the domestic industry would have been even more successful.
- The ITC's vote and issuance of the ITC Report to the President were made outside of the required statutory timeline.
- The ITC majority's interpretation of the statutory term "substantial cause of serious injury" and its application of that statutory test is erroneous and unlawful.
- The ITC majority improperly and unreasonably disregarded sworn statements from Caesarstone regarding the closure of its global manufacturing facilities, including in the United States.

The Commission Determination thus must be reversed and remanded to the Commission for further proceedings, consistent with the views of this Court.

13. To be clear, Plaintiffs are not alleging in this litigation that the Proclamation contains legal error. Rather, an ITC "affirmative finding regarding serious injury" is a legal prerequisite to the Safeguard Measure. 19 U.S.C. § 2253(a)(1)(A); *see Corus Grp. PLC.* v. *Int'l Trade Comm'n.*, 352 F.3d 1351, 1354 (Fed. Cir. 2003).

14. As such, due to the unlawful Commission Determination, Plaintiffs request that the this Court declare the Commission Determination contrary to law, set the Commission Determination and the Proclamation aside as null and void, and permanently enjoin enforcement of the Proclamation and Safeguard Measure generally, as well as specifically with regard to Plaintiffs.

**PARTIES**

15. Plaintiff Elite Quartz is a leading U.S. producer of QSP that manufactures QSP at its facility in South Carolina, and is headquartered at 4461 Hwy 301 South, Latta, South Carolina 29565.

16. Plaintiff MSI is an importer of QSP into the United States, and is headquartered at 2095 N. Batavia Street, Orange, California 92865.

17. Plaintiff Arizona Tile is an importer of QSP into the United States, and is headquartered at 8829 S. Priest Drive, Tempe, Arizona 85284.

18. Plaintiff Caesarstone is an importer of QSP into the United States, and is headquartered at 1401 W. Morehead St., Charlotte, North Carolina 28208.

19. Plaintiff Wisenbaker is an importer of QSP into the United States, and is headquartered at 1703 Westfield Loop Rd., Houston, Texas 77073.

20. Defendant United States of America is the federal government of the United States of America.

21. Defendant United States International Trade Commission is an independent agency of the U.S. Government, and is headquartered at 500 E St., SW, Washington, DC 20436.

22. Defendant United States Customs and Border Protection ("CBP") is an executive agency of the U.S. Government and a component of the Department of Homeland Security. It is headquartered at 1300 Pennsylvania Avenue, NW, Washington, DC 20229.

23. Defendant Commissioner Rodney S. Scott is the Commissioner of U.S. Customs and Border Protection. He is sued in his official capacity.

24. Defendant Department of Homeland Security ("DHS") is an executive agency of the U.S. Government. It is headquartered at 2707 Martin Luther King Jr Ave SE, Washington, DC 20528.

25. Defendant Markwayne Mullin is the Secretary of Homeland Security and is sued in his official capacity.

**JURISDICTION AND STANDING**

26. The CIT has jurisdiction pursuant to 28 U.S.C. § 1581(i)(1)(B)-(D), the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 704, 706, and 28 U.S.C. § 2631(i).

27. Section 1581(i) provides, in relevant part, that "the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . (B) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue; (C) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or (D) administration and enforcement with respect to the matters referred to in paragraphs (A)-(C) of this subsection and subsections (a)-(h) of this section." 28 U.S.C. § 1581(i)(1).

28. The Trade Act is a law "providing for . . . tariffs, duties, fees" on "the importation of merchandise for reasons other than the raising of revenue" and "quantitative restrictions" on "the importation of merchandise for reasons other than the protection of the public health or safety," as well as for the "administration and enforcement with respect to" those tariffs, duties, fees, and quantitative restrictions. 28 U.S.C. § 1581(i)(1).

29. On July 31, 2026, the President issued the Proclamation setting forth the Safeguard Measure. On August 15, 2026, CBP (part of DHS) began to administer and collect duties in

accordance with the Safeguard Measure. The ITC instituted and conducted a safeguard investigation and issued the Commission Determination on which the Safeguard Measure is premised.

30. This suit "arises out of" these acts and omissions: It seeks a declaration that Defendants' acts and omissions are unlawful, both in general and as applied to Plaintiffs, and a permanent injunction setting aside the Proclamation under the Administrative Procedures Act ("APA") and prohibiting Defendants from enforcing the Safeguard Measure.

31. The APA provides that "{a} person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702; *see id.* §§ 704, 706. Section 2631(i) provides that "{a}ny civil action of which the Court of International Trade has jurisdiction, other than an action specified in subsections (a)-(h) of this section, may be commenced in the court by any person adversely affected or aggrieved by agency action within the meaning of section 702 of title 5." 28 U.S.C. § 2631(i).

32. The Commission, CBP, and DHS are "agenc{ies}" as defined by the APA. 5 U.S.C. § 551(1). Plaintiffs are adversely affected and aggrieved by Defendants' acts and omissions in causing, adopting, implementing, and enforcing the Safeguard Measure, and are within the "zone of interests" protected by the Safeguard Statute.

33. Plaintiffs have standing to challenge the Defendants' unlawful acts and omissions in causing, adopting, implementing, and enforcing the Safeguard Measure. Plaintiffs are manufacturers, importers, and purchasers of QSP. The importers are legally responsible for the payment of tariffs on their imports. The Proclamation is inflicting injury on Plaintiffs, including by imposing a tariff on Plaintiffs' goods, compelling Plaintiffs to forgo business opportunities, and

harming Plaintiffs' customers, thereby harming Plaintiffs' customer relations. These injuries are directly traceable to the challenged Commission Determination and would be redressed by a decision of this Court declaring the Commission Determination and resulting Safeguard Measure unlawful and, consequently, enjoining enforcement in general and specifically against Plaintiffs.

## TIMELINESS

34. An action under 28 U.S.C. § 1581(i) must be commenced within two years after the cause of action first accrues.

35. The claims asserted by Plaintiffs accrued on August 15, 2026, the date on which the Safeguard Measure entered into force. This action is therefore timely filed.

## BACKGROUND

### A. The Merchandise at Issue: QSP

36. QSP products are engineered stone products used in residential and commercial applications consisting primarily of crushed quartz or silica and resin binders. ITC Report at 1.12. QSP competes in the U.S. market primarily with quarried stone materials such as granite, marble, and quartzite, as well as other manufactured surface products such as laminate and solid surface. *Id*. at 1.19.

37. QSP production generally occurs in two stages. First, the engineered mixture of quartz or silica and a resin binder is molded and compressed into a raw slab ("slab manufacturing"). Second, the slab is cut, edged, polished, and finished by fabricator manufacturers to meet the specifications required for installation ("fabrication manufacturing"). Each of these two production stages contributes significant value-added to the finished product. *See, e.g.,* ITC Report at 76, Tbl. I.1. In addition to finishing the slab, fabricator manufacturers often install the finished product into homes and commercial buildings, adding even more value to the as-installed finished product.

38. Plaintiffs Arizona Tile, MSI, Caesarstone, and Wisenbaker all import QSP into the United States, serve as importers of record for QSP, and are responsible for the payment of U.S. duties on the imported products. Plaintiff Elite Quartz produces QSP slabs from its Latta, South Carolina facility while relying on distributors to distribute, market, and sell its premium products alongside imported slabs from import sources.

**B. The Safeguard Statute**

39. Sections 201-202 of the Safeguard Statute set forth the process and the legal requirements that the Commission must adhere to as a prerequisite to authorizing the President to impose a global safeguard measure. Section 203 sets forth the President's authority and the process he must follow to impose a safeguard measure.

40. As an initial matter, Section 202(a)(1) requires that a safeguard petition may only be filed with the Commission by an "entity . . . which is representative of an industry." 19 U.S.C. § 2252(a)(1).

41. Once the industry support standing requirement is satisfied, Section 202(b) provides that ***the Commission*** must "make an investigation to determine" whether "the article" at issue "is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or threat thereof, to the domestic industry" (emphasis added). 19 U.S.C. § 2252(b)(1)–(2). A "substantial cause" is "a cause which is important and not less than any other cause." *Id*. In other words, the Commission, when making an affirmative determination, is required to find that no other cause was a more significant cause of serious injury than the surge in imports.

42. The Federal Circuit recognizes that "the President may not take action {under Section 201} unless the Commission makes an affirmative injury determination" and that "{t}he statute only gives the President authority to impose a duty if the Commission makes 'an affirmative

finding regarding serious injury.' " *Corus Grp.*, 352 F.3d at 1354 (quoting 19 U.S.C. § 2253(a)(1)(A)). Specifically, Section 201 states:

> ***If*** the . . . {Commission} determines under section 2252(b) that an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article, the President, in accordance with this chapter, shall take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs.

19 U.S.C. § 2251(a) (emphasis added). Section 203(a) likewise provides that the President may impose a safeguard measure only "{a}fter receiving a report . . . containing an affirmative finding regarding serious injury." *Id.* § 2253(a)(1)(A).

43. Thus, an affirmative finding by the ITC is a condition precedent to imposing a safeguard measure. The ITC must find—in an action properly commenced under the statute's industry support standing requirement—that an article is being imported into the United States in such increased quantities as to be "a substantial cause of serious injury" or the threat thereof to the domestic industry "producing an article like or directly competitive with the imported article." Otherwise, the President lacks the legal authority to act.

44. The Commission is also tasked with recommending a remedy that would be the "most effective in facilitating the efforts of the domestic industry to make a positive adjustment to import competition." 19 U.S.C. § 2252(e)(1).

### C. The Petition, Industry Support for Standing, and Institution

45. On September 15, 2025, the QMAA filed a Petition with the Commission seeking a trade-restrictive safeguard measure applied to imports of QSP from all countries. **Exhibit 1**, Letter from Schagrin Associates to the U.S. International Trade Commission, *Quartz Surface*

*Products – Petition for Safeguard Relief Pursuant to Sections 201 and 202 of the Trade Act of 1974*, Inv. No. TA-201-79 (Sep. 15, 2025) (the "Petition"). In its Petition, the QMAA was comprised of U.S. producers Cambria Company LLC ("Cambria"), Guidoni USA, and Dal-Tile LLC. Cambria is a leading QSP producer that caters to the luxury segment of the surface products market and which operates a QSP slab manufacturing facility in Minnesota and multiple QSP fabrication facilities. Guidoni USA operates a QSP manufacturing facility in Georgia as the U.S. affiliate of the Brazilian Guidoni Group. Dal-Tile LLC, a subsidiary of the global Mohawk Industries conglomerate, operates a QSP manufacturing facility in Tennessee. Distributor Architectural Surfaces, Inc. was also included as a QMAA member in the Petition but later withdrew. *See* ITC Report at 6, n.6.

46. Petitioner's chosen scope includes both slab QSP and fabricated QSP. Petition at 16–17.

47. Petitioner defined the domestic industry as "integrated U.S. producers of QSP slabs" and did not include independent fabricator manufacturers. Petition at 27. Petitioner asserted that it had standing to file the Petition based on estimated U.S. QSP production, as measured by the number of manufacturing lines of each known domestic QSP slab producer. Petition at 29.

48. On September 17, 2025, two days after the filing of the Petition, U.S. QSP slab producer Elite Quartz filed a letter opposing the institution of a safeguard investigation on QSP. **Exhibit 2**, Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Opposition to Institution of Sections 201-202 Petition on Quartz Surface Products*, Inv. No. TA-201-79 (Injury) (Sep. 17, 2025). Elite Quartz explained that the QMAA lacked standing because it did not accurately and wholly represent the domestic industry. Elite Quartz requested that the Petition be dismissed for lack of standing, or at minimum delayed for the Commission to

investigate whether the Petition was supported by sufficient domestic production to be representative of the ***whole*** domestic industry producing QSP.

49. On September 19, 2025, Elite Quartz supplemented its letter in opposition to instituting a safeguard investigation by submitting 493 declarations from U.S. quartz fabricator manufacturers opposing the Petition. **Exhibit 3**, Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Fabricator Opposition to Institution of Sections 201-202 Petition on Quartz Surface Products*, Inv. No. 201-3847 (Injury) (Sep. 19, 2025).

50. On September 22, 2025, Elite submitted additional declarations demonstrating further opposition to the Petition, bringing the total number of opposing fabricator manufacturers to 670. **Exhibit 4**, Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Further Evidence Demonstrating that the Commission should not Institute a Safeguard Investigation on Quartz Surface Products*, Inv. No. 201-3847 (Injury) (Sep. 22, 2025).

51. On September 22, 2025, Stone Suppliers, Inc., a leading U.S. fabricator manufacturer of QSP, and its subsidiaries submitted a letter opposing the institution of the investigation and supporting the letters filed by Elite Quartz. **Exhibit 5**, Letter from Sidley Austin LLP to the U.S. International Trade Commission, *Opposition to Institution of Investigation on Quartz Surface Products Submitted on behalf of Stone Suppliers, Inc.*, Inv. No. TA-201-3847 (Injury) (Sep. 22, 2025).

52. On September 22, 2025, Caesarstone Ltd. filed an objection to the Petition. In its letter, Caesarstone Ltd. explained that QMAA incorrectly cited to the closure of Caesarstone's affiliated production facility in Georgia as key evidence of weakening domestic QSP production at the hands of import in its Petition. Caesarstone Ltd. explained that it had closed its plant in Georgia in 2023 not because of import competition, but because of a company-wide shift in

strategy away from manufacturing. *See* **Exhibit 6**, Letter from Caesarstone Ltd. to the U.S. International Trade Commission, *Objection to Petition for Safeguard Measures on Quartz Surface Products*, Inv. No. TA-201-79 (Sep. 22, 2025).

53. Petitioner submitted additional support for the Petition on September 23, 2025, a letter from E-Stone USA Corporation, a domestic producer of QSP. Letter from Schagrin Associates to the U.S. Int'l Trade Commission, *Quartz Surface Products – Additional Support for the Petition for Safeguard Relief Pursuant to Sections 201 and 202 of the Trade Act of 1974*, Inv. No. TA-201-3847 (Sep. 23, 2025). E-Stone is a small producer of QSP in Florida and is owned by the Italian-based TREND S.p.A. group.

54. On September 25, 2025, Elite Quartz submitted additional evidence (including declarations from 47 additional fabricator manufacturers) opposing the Petition. **Exhibit 7**, Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Additional Evidence Demonstrating that the Commission should not Institute a Safeguard Investigation on Quartz Surface Products*, Inv. No. TA-201-3847 (Injury) (Sep. 25, 2025).

55. On October 1, 2025, the U.S. Government (including the Commission) shut down due to lapse of funding. During the 43-day government shutdown lasting from October 1, 2025 to November 12, 2025, the Commission did not accept any filings. The Commission began accepting filings again beginning November 17, 2025.

56. On November 17, 2025, Elite Quartz submitted additional evidence (23 more fabricator declarations) opposing the Petition. In total, Elite Quartz had submitted declarations from nearly 750 fabricator manufacturers opposing the Petition, collectively accounting for approximately 71 million square feet of QSP production in the United States. **Exhibit 8**, Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *More Evidence*

*Demonstrating that the Commission Should Not Institute a Safeguard Investigation on Quartz Surface Products*, Inv. No. TA-201-3847 (Injury) (Nov. 17, 2025).

57. Also on November 17, 2025, The Rockheads Group USA ("Rockheads") submitted a letter opposing the institution of the safeguard investigation. Rockheads, a leading association of more than 100 of the largest U.S. QSP fabricator manufacturers across the country, stated that its member companies employ more than 10,000 workers nationwide and formally opposed the Petition on behalf of the domestic fabrication industry. **Exhibit 9**, Letter from The Rockheads Group USA to the U.S. International Trade Commission, *Opposition to Institution of Safeguard Case on Quartz Surface Products*, Inv. No. TA-201-3847 (Injury) (Nov. 17, 2025).

58. Also on November 17, 2025, QMAA provided Petition support letters from LX Hausys America, Inc. and Hendrix Industries, Inc. and noted that Hyundai L&C USA became a member of the QMAA and supported the safeguard petition. LX Hausys America is the U.S. subsidiary of the South Korean building materials manufacturer LX Hausys Ltd. and produces quartz slabs in Georgia. Hendrix Industries is a Texas-based quartz slab producer with manufacturing operations in Texas. **Exhibit 10**, Letter from Schagrin Associates to the U.S. International Trade Commission, *Quartz Surface Products – Additional Support for Petition for Safeguard Relief Pursuant to Sections 201 and 202 of the Trade Act of 1974*, Inv. No. TA-201-3847 (Nov. 17, 2025).

59. The Commission instituted the safeguard investigation on December 1, 2025, by publishing the Notice of Institution in the Federal Register. **Exhibit 11**, *Quartz Surface Products; Institution of Investigations, Scheduling of Public Hearings, and Determination That the Investigation is Extraordinarily Complicated*, 90 Fed. Reg. 55165 (Int'l Trade Comm'n Dec 1, 2025). The Commission stated that the Petition was not properly supported until QMAA filed

supplemental submissions on September 23, 2025, and November 17, 2025.[2] The Commission then construed November 17, 2025 as the effective filing date of the Petition. The Commission acknowledged that the record contained more than 700 declarations from fabricator manufacturers opposing institution of the investigation, but nevertheless concluded that the Petition, as supplemented, satisfied the statutory requirements for institution, without further explanation or justification for its finding. ITC Report at 6, n.7. The Commission also determined that the investigation was "extraordinarily complicated" and extended the deadline for its serious injury determination by 15 days beyond the ordinary 120-day period, setting a date of April 1, 2026 for its determination and vote on injury.

**D. The Commission's Injury Investigation**

60. The Commission issued questionnaires on December 8, 2025. The Commission received questionnaire responses from U.S. slab producers, U.S. fabricator manufacturers, U.S. importers, U.S. purchasers, and foreign producers of QSP.

61. Parties, including Plaintiffs,[3] filed prehearing briefs on February 17, 2026, attended the injury hearing on February 24, 2026, and filed posthearing briefs on March 3, 2026. Other parties who participated in the proceeding included Casablanca Vietnam Joint Stock Company, Wilsonart LLC, Technistone, S.R.O., Global Surfaces FZE, Madhav Surfaces FZC LLC, Hyundai L&C Canada, Inc., the Federation of Indian Quarts Surface Industry, the Alliance of Vietnamese

---

[2] *See also* the Commission's statement: "Petition initially submitted to U.S. International Trade Commission (Commission) on September 15, 2025," available at https://www.usitc.gov/investigations/import_injury/fact_sheets_usitc_global_safeguard_investigations/quartz_surface_products_ta-201-79.

[3] The reference to "Plaintiffs" when discussing briefing in the ITC investigation includes only Elite Quartz, Arizona Tile, and MSI. Caesarstone was not a party to the briefs but entered an appearance, submitted questionnaires, and appeared at ITC hearings. Wisenbaker was also not a party to the briefs but submitted questionnaires and appeared at the ITC hearing.

Quartz Surface Products Manufacturers, Stone Showcase, Inc., MXM Surfaces Inc., EOS Surfaces, and government representatives from Spain, Canada, Vietnam, China, India, Korea, Malaysia, Turkey, and Mexico. The Leading Builders of America, a trade association comprising 22 of the nation's largest production homebuilders, also made written submissions and testified in opposition to the safeguard petition.

62. During the injury phase of the investigation, additional fabricator manufacturers voiced opposition to the Petition, including in writing and hearing testimony. In total, by the end of the injury phase of the investigation, more than 1,000 U.S. fabricator manufacturers submitted declarations opposing the Petition, representing more than 100 million square feet of annual production and more than 7,000 American jobs. The extent of the evidence of those opposed to the Petition went unreported in the ITC Report. *See* **Exhibit 12**, Excerpt of Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Quartz Surface Products Global Safeguard Investigation: Prehearing Brief of Arizona Tile LLC, Elite Quartz Manufacturing, and M S International, Inc.*, Inv. No. TA-TA-201-79 (Injury) (Feb. 18, 2026).

63. On March 11, 2026, Plaintiffs requested that the Commission extend the deadline for its determination by 15 additional days in light of the complexity of the investigation, the need to analyze new questionnaires that had been placed on the record following the filing of posthearing briefs, and to permit parties to submit final comments in the injury phase of the proceeding. **Exhibit 13**, Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Quartz Surface Products Global Safeguard Investigation: Request That the Commission Extend the Injury Determination by 15 Additional Days and Allow for Final Comments*, Inv. No. TA-201-79 (Injury) (Mar. 11, 2026). Plaintiffs specifically explained that, after the posthearing briefs, Commission Staff released 17 additional fabricator producer

questionnaires or revisions and several revisions to U.S. slab producers' questionnaires that were material to the Commission's serious injury determination. The Commission denied the request to extend the deadline but granted parties an opportunity to submit written final comments. Plaintiffs, Petitioner, and the Alliance of Vietnamese Quartz Surface Products Manufacturers filed final comments on March 23, 2026. In those final comments, Plaintiffs urged the Commission to consider the new fabricator responses in addition to the other questionnaire responses submitted previously in the proceeding.

**E. The Commission's Vote**

64. On April 1, 2026, the Commission, by a 2-1 vote, determined that "quartz surface products are being imported into the United States in such increased quantities as to be a substantial cause of serious injury to the domestic industry producing products like or directly competitive with the imported products." Then-Chair Karpel and Commissioner Kearns voted in the affirmative, and Commissioner Johanson voted in the negative.

65. The ITC majority's affirmative determination moved the investigation to the remedy phase, during which the ITC majority considered what, if any, safeguard remedy should be recommended to the President.

**F. The Commission's Remedy Phase**

66. The Commission proceeded with its remedy phase of the investigation. Parties filed prehearing remedy briefs on April 7, 2026 and posthearing remedy briefs on April 21, 2026. The Commission held a public hearing on remedy on April 14, 2026. Plaintiffs participated in these proceedings.

67. Throughout the remedy phase the Commission refused to make clear whether fabricator manufacturers would be considered part of the domestic industry. For instance, immediately following the injury vote, ITC Staff sent an email to parties to the investigation stating

that "the Commission requests that you specifically address the following: Please address how a determination that independent fabricators are not part of the domestic industry would affect the remedy that the Commission recommends." **Exhibit 14**, Email from Alejandro Orozco, *RE: USITC Investigation No. TA-201-79 (Safeguard): Quartz Surface Products (Remedy)*, (Apr. 2, 2026).

68. On May 5, 2026, the ITC majority voted on its recommended remedy following its affirmative serious injury determination. Only then-Chair Karpel and Commissioner Kearns participated in the remedy phase proceeding and vote. Dissenting Commissioner Johanson did not participate in the remedy phase, as only those Commissioners that vote affirmative can recommend a remedy. The ITC majority recommended a safeguard action by the Commission in the form of a TRQ for four years, with year one tariffs of 25 percent up to a quantitative threshold and then 40 percent tariffs for imports above that threshold. ITC Report at 1.

**G. The ITC Report**

69. On May 18, 2026, the Commission issued the ITC Report, which was the first time on which the Commission majority explained the reasoning for its determination.

70. The ITC majority excluded independent fabricator manufacturers from its definition of the domestic industry. ITC Report at 19. The ITC majority reasoned that fabricator manufacturers, despite producing the like or directly competitive product, do not do enough production to "produce" the article under the Safeguard Statute. The Commission engaged in a six-factor analysis typically employed in ITC AD/CVD investigations—that same analysis had, in all prior AD/CVD investigations on QSP, led the ITC majority to conclude that fabricator manufacturers were part of the domestic industry. ITC Report at 16–26. The ITC majority found that the six-factor test, as applied in the QSP safeguard investigation, contributed to a finding that fabricator manufacturers are not part of the domestic industry. The Commission majority asserted

that the ITC's "domestic industry determinations in {prior} antidumping and countervailing duty investigations are not, however, dispositive or binding on the determination of the domestic industry in this safeguard investigation." ITC Report at 26, n.102.

71. Commissioner Johanson dissented from the Commission's affirmative determination. Commissioner Johanson determined that imported QSP are not causing substantial injury to the domestic industry. ITC Report at 69. In Commissioner Johanson's view, the industry remained generally healthy throughout the period of investigation, citing continued profitability, price increases, capacity expansions, new market entrants, and substantial investments by domestic producers. ITC Report at 69–70, 87–101. Commissioner Johanson also disagreed with the majority's exclusion of independent fabricator manufacturers from the domestic industry, observing that fabrication manufacturing adds meaningful value to a finished surface product and fabricator manufacturers employ a significant number of people. ITC Report at 77. Commissioner Johanson determined that there was no serious injury facing the QSP industry, because there was no significant idling of productive facilities, no significant unemployment or underemployment, no inability of a significant number of firms to carry out domestic production at a reasonable level of profit, and no evidence of injury based on other economic factors. ITC Report at 88–101.

### H. The Administration's Assessment of Remedy and the President's Proclamation

72. After receiving the ITC Report, the Office of the United States Trade Representative ("USTR"), on behalf of the Trade Policy Staff Committee ("TPSC"), issued Federal Register Notice 2026-09809. *Request for Comments and Public Hearing About the Administration's Action Following a Determination of Import Injury With Regard to Quartz Surface Products (QSP)*, 91 Fed. Reg. 28096 (Office of the U.S. Trade Representative May 15,

2026). The TPSC established a schedule for the submission of written comments and a public hearing to address general remedy issues.

73. On June 2, 2026, USTR requested additional information from the ITC under Section 203(a)(5) of the Trade Act. On July 2, 2026, the ITC provided a response that identified unforeseen developments that led to the importation of QSP into the United States in such increased quantities as to be a substantial cause of serious injury.

74. The public response to the Commission's recommended safeguard measures demonstrated overwhelming opposition to the proposed remedy. Of the 112 affirmative comments submitted to the USTR, only the QMAA's comment supported the imposition of a safeguard remedy outright. The remaining 111 comments opposed the proposed safeguard measures and emphasized the significant economic harm they would inflict on domestic fabricator manufacturers, downstream manufacturers, workers, consumers, and other participants in the U.S. QSP supply chain. These comments, when considered alongside the nearly 1,000 sworn declarations submitted by domestic fabricator manufacturers opposing safeguard relief during the Commission's investigation, demonstrated broad and consistent opposition from the very businesses and workers that would be most directly affected by the proposed measures. Collectively, the record established that the recommended safeguard remedy would impose substantial economic harm on American companies, workers, and consumers.

75. On July 31, 2026, President Trump issued the Proclamation, which imposed the Safeguard Measure. The Safeguard Measure takes the form of a TRQ, with a tariff of 25 percent up to the quarterly quantitative threshold recommended by the ITC majority, and then a tariff of 50 percent for all imports above that threshold. The Safeguard Measure is global but exempts imports from various countries due to Free Trade Agreement or developing country exemptions.

The scope of the Safeguard Measure is identical to the scope of the investigation as proposed by Petitioner.

76. CBP began enforcing the Safeguard Measure and collecting tariffs as of 12:01 a.m. on August 15, 2026.

**COUNT 1**

**The Petition Lacked Sufficient Industry Support and Therefore the Safeguard Measure Is Unlawful by Reason of Lack of Industry Standing**

77. Plaintiffs hereby incorporate by reference paragraphs 1 through 76 of this Complaint.

78. Under Section 202(a)(1) of the Trade Act, "{a} petition requesting action . . . may be filed with the Commission by an entity . . .***which is representative of an industry***." 19 U.S.C. § 2252(a)(1) (emphasis added). Thus, for a Petitioner to have standing under the statute, it must represent the relevant industry.

79. Section 202(c)(6)(A) of the Trade Act defines "domestic industry" as "the ***producers*** as a whole of the like or directly competitive article or those producers whose collective production of the like or directly competitive article constitutes a major proportion of the total domestic production of such article." 19 U.S.C. § 2252(c)(6)(A)(i) (emphasis added). This definition is broader than in the AD/CVD statutory construct because it covers domestic producers of the domestic like product ***and*** the directly competitive article, in contrast with the AD/CVD regime which is limited to domestic producers of the domestic like product. *See* ITC Report at 16–17, n.56.

80. The Commission correctly concluded that the "like or directly competitive article" includes fabricated QSP. ITC Report at 15.

81. Fabricator manufacturer are "producers" of fabricated QSP because they make or produce fabricated QSP. A Petitioner has standing only if it is "representative of an industry" that includes QSP fabricator manufacturers. The QMAA is not so representative. The Petition was not supported by a single independent fabricator manufacturer, even though such fabricator manufacturers constitute the vast majority of domestic QSP production.

82. Under Supreme Court precedent, courts owe no deference to agencies' interpretation of law and instead must determine the "best reading" of the statute. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 373 (2024). Courts "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Id.* at 412. The Supreme Court's directive to the courts applies to issues of law, as well as issues of mixed law and fact. *Id.* at 431 (Gorsuch, J., concurring) (the "Court toyed with a form of deference akin to *Chevron*, at least for so-called mixed questions of law and fact. But, as the Court details, even that limited experiment did not last." (citations omitted)); *Id.* at 469 (Kagan, J., dissenting) (the majority cannot be read to preserve *Chevron* deference in mixed questions of law and fact "because that approach would preserve *Chevron* in a substantial part of its current domain," which was not the Court's intent).

83. The ITC majority's conclusion that QSP fabricator manufacturers are not "producers" of fabricated QSP such that they are not part of the "domestic industry"—which dictated its conclusion that the petitioning slab producers are "representative of {the} industry" under Section 202(a)(1)—clearly misconstrues the statute.[4]

[4] At ITC Report 6–7, n.8, the ITC majority states that "if the domestic industry consisted of production of slab and fabricated QSP in the United States, firms supporting the petition constituted a major proportion of the value of domestic production of slab and fabricated QSP." We understand that, in accordance with its institution notice, the Commission is referring to firms producing slabs and producing both slabs and fabricated QSP. *Quartz Surface Products;*

84. Failing to adhere to the plain meaning of the Safeguard Statute, the Commission relied on the six-factor test typically employed by the ITC in the AD/CVD context to assess whether producers should be considered part of the domestic industry. ITC Report at 19–23, 72, n.17 (including (1) source and extent of the firm's capital investment; (2) technical expertise involved in U.S. production activities; (3) value added to the product in the United States; (4) employment levels; (5) quantity and type of parts sourced in the United States; and (6) any other costs and activities in the United States directly lading to production of the like product). Neither this test nor any of its component factors is set forth in the text of the Safeguard Statute.

85. The ITC majority acknowledges that the Commission found fabricator manufacturers to be part of the domestic industry on four prior occasions in AD/CVD proceedings, including as recently as December 2025—the same month when the safeguard investigation was instituted. The Commission's sole explanation for this disparity is that those prior findings "are not . . . dispositive or binding on the determination of the domestic industry in the safeguard investigation." ITC Report at 26, n.102.

86. For these reasons, the ITC's institution of the safeguard investigation is a clear misconstruction of the governing statute's standing requirement in Section 202(a)(1), which in turn is tied to the governing statute's standard for determining the domestic industry in Section 202(c)(6)(A). As the QMAA did not lawfully establish standing, both the Commission Determination and the Safeguard Measure are unlawful. *Corus Grp.*, 352 F.3d at 1354.

---

*Institution of Investigations, Scheduling of Public Hearings, and Determination That the Investigation is Extraordinarily Complicated*, 90 Fed. Reg. 55165 (Int'l Trade Comm'n Dec 1, 2025) ("The Commission determined that the petition, as supplemented, was supported by entities representative of a domestic industry producing QSP, including an industry producing QSP slabs, and an industry producing both QSP slabs and fabricated QSP."). If the ITC majority is referring to independent fabricators, this finding is clearly false and lacks support in the record.

## COUNT 2

## The ITC Majority Unlawfully Disregarded Fabricator Manufacturers as Members of the Domestic Industry in Determining Whether There Is Serious Injury Substantially Caused by Imports

87. Plaintiffs hereby incorporate by reference paragraphs 1 through 86 of this Complaint.

88. The Commission may issue an affirmative safeguard determination only if it concludes that "an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, ***to the domestic industry producing an article like or directly competitive*** with the imported article." 19 U.S.C. §§ 2251, 2252(b)(1)(A) (emphasis added). The statutory "substantial cause of serious injury" requirement thus necessitates an accurately defined "domestic industry." *See* ITC Report at 11 ("Before considering whether the three statutory criteria are satisfied, the Commission first defines the domestic industry.").

89. As explained in Count 1, above, the Commission misconstrued "domestic industry" to exclude the independent fabricator manufacturers that constitute the vast majority of domestic QSP production.

90. This erroneous interpretation of the statute fatally undermines the Commission's determination, including on the issues of "serious injury" and "substantial cause." Because the Commission did not consider fabricator manufacturers as domestic producers, it did not consider the performance of the entire domestic industry when assessing whether imports (including slab imports used by the large majority of fabricator manufacturers) are a substantial cause of serious injury to the entire domestic industry. If fabricator manufacturers were properly considered part of the domestic industry, then subject imports could not have been a substantial cause of serious injury to the entire domestic industry.

91. The Commission's exclusion of fabricator manufacturers from the domestic industry also led it to violate Section 202(c) of the Trade Act, which requires the Commission to take into account the view of the domestic industry. The ITC gave no weight to the views of the 1,000-plus sworn fabricator manufacturer statements opposing the Petition. It also discarded substantial evidence provided by 26 fabricator manufacturers through questionnaires filed well before the record closed. *See* ITC Report at 70, n.5.

92. The Commission's exclusion of fabricator manufacturers from the domestic industry means that the Safeguard Measure failed to be compatible with statutory intent. Fabricator manufacturers are properly part of the domestic industry, but the Commission acknowledged that a safeguard remedy "could potentially negatively impact" fabricator manufacturers without factoring that negative impact into its finding of whether imports substantially cause serious injury to the domestic industry. ITC Report at 131. In fact, the Commission accepted this potential harm to the large majority of domestic producers:

> {T}he point of our recommended relief is to grow production and sales of domestically produced QSP and improve the price competitiveness of domestically produced QSP vis-à-vis U.S. imports of QSP, thereby allowing the domestic QSP industry to increase its shipments and prices and generate the revenue and profitability needed to make the investments that will enable it to make a positive adjustment to import competition.

*Id*.

93. For these reasons, the Commission's serious injury and substantial cause findings are contrary to law, arbitrary, and lacking rational explanation. As such, both the Commission Determination and the Safeguard Measure are unlawful. *Corus Grp.*, 352 F.3d at 1354.

## COUNT 3

## The Commission's Vote and Report Were Too Late, in Violation of the Statute

94. Plaintiffs hereby incorporate by reference paragraphs 1 through 93 of this Complaint.

95. Section 202(b)(2) of the Trade Act requires that "the Commission shall make the {injury} determination under paragraph (1) within 150 days" after "the date on which the petition is filed." 19 U.S.C. § 2252(b)(2).

96. Section 202(f)(1) of the Trade Act requires that the Commission "shall submit to the President a report . . . not later than 180 days . . . after the date on which the petition is filed . . ." 19 U.S.C. § 2252(f)(1).

97. The Commission received the Petition from the QMAA on September 15, 2025.

98. The Commission made its injury vote on April 1, 2026. This was 198 days after the Petition was filed, in violation of Section 202(b)(2)'s 150-day deadline.

99. The Commission issued the ITC Report to the President on May 18, 2026. This was 245 days after the Petition was filed, in violation of Section 202(f)(1)'s 180-day deadline.

100. The Commission construed the Petition as having been filed on November 17, 2025. Petitioner had not withdrawn and refiled its Petition. Instead, the Commission arbitrarily decided that the Petition date was a different date than its filing date.

101. For these reasons, the Commission Determination and the issuance of the ITC Report to the President were made outside of the statutorily required maximum timelines and thus were invalid. As such, both the Commission Determination and the Safeguard Measure are unlawful. *Corus Grp.*, 352 F.3d at 1354.

## COUNT 4

## The Commission's Affirmative Finding on Serious Injury Was Arbitrary and Unlawful Because the Commission Improperly Interpreted "Substantial Cause of Serious Injury"

102. Plaintiffs hereby incorporate by reference paragraphs 1 through 101 of this Complaint.

103. The term "serious injury" is defined in Section 202(c)(6)(C) of the Trade Act to mean "a significant overall impairment in the position of the domestic industry." 19 U.S.C. § 2252(c)(6)(C).

104. The term "substantial cause" is defined in Section 202(b)(1)(B) of the Trade Act to mean: "a cause which is important and not less than any other cause." 19 U.S.C. § 2252(b)(1)(B).

105. Under *Loper Bright v. Raimondo*, as explained above, the CIT owes no deference to agencies' interpretations of law, including on issues of mixed law and fact, but instead must determine the "best reading" of the statute.

106. The ITC majority in making its affirmative determination misinterpreted "substantial cause of serious injury."

107. On "serious injury," the ITC majority unlawfully found that the domestic industry's strong financial performance amounts to serious injury. The ITC majority acknowledged that the domestic QSP slab industry's operating profits ranged from 3.9 percent to 9.0 percent during the period of investigation ("POI") but still found that this level of profitability was "poor," that "a significant number of firms were unable to carry out domestic production operations at a reasonable level of profit during the POI," and that the domestic industry was experiencing "a significant overall impairment." ITC Report at 44–50. The record evidence does not show a "significant overall impairment." As Commissioner Johanson aptly explained in dissent: "{T}his profitable and growing industry, which increased prices throughout the POI, expanded and added

new entrants during the POI, and is the subject of further significant investment post-POI does not fit the statutory requirements of serious injury or threat of serious injury in the clearly imminent future." ITC Report at 69–70.

108. On "substantial cause," there are several reasons why U.S. slab producers' performance was unrelated to imports, and other causes are at least as important to their performance as imports. The ITC majority unlawfully disregarded these causes contrary to the statutory requirement that the Commission find that no other cause was a more significant cause of serious injury than the surge in imports. The ITC majority discarded, for instance: (1) evidence of broader U.S. market demand declines impacting the entire market, not just U.S. slab producers; (2) that the QSP trends should be viewed in the context of the broader surface product market and not just QSP; (3) that there was significant intra-industry competition including major new entrants and expansion of legacy producers' production capacity; (4) that this is a design-based industry and that some U.S. producers did not focus enough on the in-trend designs; (5) that imports were not a cause of Caesarstone's closure and the related impact on aggregate financial results of the domestic industry; and (6) that litigation and regulatory issues related to alleged silicosis lung disease have been the biggest issue in this industry recently; and that other tariffs on U.S. slab producers' inputs had an impact on performance. ITC Report at 54-57. These were more significant causes of serious injury to the domestic industry than imports.

109. For these reasons, the Commission Determination was arbitrary and unlawful. As such, both the Commission Determination and the Safeguard Measure are unlawful. *Corus Grp.*, 352 F.3d at 1354.

**<u>COUNT 5</u>**

**The Commission Improperly and Arbitrarily Contradicted the Evidence Provided by Caesarstone Ltd. to Support its Determination**

110. Plaintiffs hereby incorporate by reference paragraphs 1 through 109 of this Complaint.

111. The ITC "shall" under Section 202(c) of the Trade Act, among other things, "take into account all economic factors which it considers relevant, including (but not limited to)—(A) with respect to serious injury—(i) the significant idling of productive facilities in the domestic industry." 19 U.S.C. § 2252(c).

112. The ITC majority found that there was a significant idling of productive facilities in major part because Caesarstone closed its U.S. plant, and that the domestic industry data trends "to a degree . . . are due to the exit of Caesarstone from the domestic industry in 2024." ITC Report at 41–42. The ITC inaccurately attributed Caesarstone's closure, "at least in part due its deteriorating financial condition in a market increasingly dominated by imports, and reflects injury caused by imports." *Id.*

113. This finding is contrary to multiple sworn statements, sworn testimony, and public statements in audited financial statements made by Caesarstone Ltd. regarding the ***actual*** reasons for its decision to shut down its U.S. production operations. At the Commission's injury hearing, Caesarstone Ltd.'s CEO testified unequivocally and under oath: "I want to state clearly Caesarstone did not close its U.S. manufacturing operations because of import competition." *Id.* at 89. Commissioner Johanson in his dissent explained that Caesarstone Ltd. "supported {its CEO's} testimony with substantial evidence and explanation," that is "credible and well supported," and confirms that "{t}his business decision is consistently described throughout Caesarstone's quarterly reports and SEC filings . . ." *Id.* at 90–91. Commissioner Johanson accurately explained: "The evidence shows that Caesarstone's actions were undertaken in

connection with a restructuring plan across its global operations, not as a response to an increase in volume of U.S. QSP imports." *Id*. at 89.

114. For these reasons, the ITC's findings on whether there was significant idling of productive facilities in the domestic industry—a key element of its injury finding—are arbitrary and unlawful. As such, both the Commission Determination and the Safeguard Measure are unlawful. *Corus Grp.*, 352 F.3d at 1354.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the CIT:

(1) Hold and declare that the Commission Determination and the resultant Safeguard Measure are unauthorized by and contrary to the laws of the United States;

(2) Set aside the Commission Determination and resulting Safeguard Measure as null and void, both in general and as applied to Plaintiffs;

(3) Enjoin Defendants from implementing or enforcing the Safeguard Measure, both in general and specifically against Plaintiffs;

(4) Refund any and all duties paid by Plaintiffs, plus interest, under the authority of the unlawful Safeguard Measure; and

(5) Grant Plaintiffs such further and additional relief as the CIT may deem just and proper.

Respectfully submitted,

/s/ Jonathan T. Stoel
Jonathan T. Stoel
Jared R. Wessel
Michael G. Jacobson
Joshua E. Kurland
Michael J. West
Lyric E. Galvin

HOGAN LOVELLS CADWALADER US, LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-6634

*Counsel to Plaintiffs Elite Quartz, Arizona Tile, MSI, and Caesarstone.*

/s/ Edward M. Lebow

Edward M. Lebow
Jonathan Keller

HAYNES AND BOONE, LLP
888 Sixteenth Street, N.W., Suite 300
Washington, DC 20006
(202) 654-4514

*Counsel to Plaintiff Wisenbaker.*

Dated: August 21, 2026

**ELITE QUARTZ MANUFACTURING ET AL. v. UNITED STATES**
**Case No. 26-03719**

**Exhibit List**

| Exhibit No. | Description | Status |
|---|---|---|
| **Exhibit 1** | Letter from Schagrin Associates to the U.S. International Trade Commission, *Quartz Surface Products – Petition for Safeguard Relief Pursuant to Sections 201 and 202 of the Trade Act of 1974*, Inv. No. TA-201-79 (Sep. 15, 2025) | **Public Version** |
| **Exhibit 2** | Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Opposition to Institution of Sections 201-202 Petition on Quartz Surface Products*, Inv. No. TA-201-79 (Injury) (Sep. 17, 2025) | **Public Version** |
| **Exhibit 3** | Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Fabricator Opposition to Institution of Sections 201-202 Petition on Quartz Surface Products*, Inv. No. 201-3847 (Injury) (Sep. 19, 2025) | **Public Version** |
| **Exhibit 4** | Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Further Evidence Demonstrating that the Commission should not Institute a Safeguard Investigation on Quartz Surface Products*, Inv. No. 201-3847 (Injury) (Sep. 22, 2025) | **Public Version** |
| **Exhibit 5** | Letter from Sidley Austin LLP to the U.S. International Trade Commission, *Opposition to Institution of Investigation on Quartz Surface Products Submitted on behalf of Stone Suppliers, Inc.*, Inv. No. TA-201-3847 (Injury) (Sep. 22, 2025) | **Public** |
| **Exhibit 6** | Letter from Caesarstone Ltd. to the U.S. International Trade Commission, *Objection to Petition for Safeguard Measures on Quartz Surface Products*, Inv. No. TA-201-79 (Sep. 22, 2025) | **Public** |
| **Exhibit 7** | Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Additional Evidence Demonstrating that the Commission should not Institute a Safeguard Investigation on Quartz Surface Products*, Inv. No. TA-201-3847 (Injury) (Sep. 25, 2025) | **Public Version** |
| **Exhibit 8** | Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *More Evidence Demonstrating that the Commission Should Not Institute a Safeguard Investigation on Quartz Surface Products*, Inv. No. TA-201-3847 (Injury) (Nov. 17, 2025) | **Public Version** |

| Exhibit No. | Description | Status |
|---|---|---|
| **Exhibit 9** | Letter from The Rockheads Group USA to the U.S. International Trade Commission, *Opposition to Institution of Safeguard Case on Quartz Surface Products*, Inv. No. TA-201-3847 (Injury) (Nov. 17, 2025) | **Public** |
| **Exhibit 10** | Letter from Schagrin Associates to the U.S. International Trade Commission, *Quartz Surface Products – Additional Support for Petition for Safeguard Relief Pursuant to Sections 201 and 202 of the Trade Act of 1974*, Inv. No. TA-201-3847 (Nov. 17, 2025) | **Public Version** |
| **Exhibit 11** | *Quartz Surface Products; Institution of Investigations, Scheduling of Public Hearings, and Determination That the Investigation is Extraordinarily Complicated*, 90 Fed. Reg. 55165 (Int'l Trade Comm'n Dec 1, 2025) | **Public** |
| **Exhibit 12** | Excerpt of Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Quartz Surface Products Global Safeguard Investigation: Prehearing Brief of Arizona Tile LLC, Elite Quartz Manufacturing, and M S International, Inc.*, Inv. No. TA-201-79 (Injury) (Feb. 18, 2026) | **Public Version** |
| **Exhibit 13** | Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Quartz Surface Products Global Safeguard Investigation: Request That the Commission Extend the Injury Determination by 15 Additional Days and Allow for Final Comments*, Inv. No. TA-201-79 (Injury) (Mar. 11, 2026) | **Public** |
| **Exhibit 14** | Email from Alejandro Orozco, *RE: USITC Investigation No. TA-201-79 (Safeguard): Quartz Surface Products (Remedy)*, (Apr. 2, 2026) | **Public** |

# Exhibit 1

Letter from Schagrin Associates to the U.S. International Trade Commission, *Quartz Surface Products – Petition for Safeguard Relief Pursuant to Sections 201 and 202 of the Trade Act of 1974*, Inv. No. TA-201-79 (Sep. 15, 2025)

SCHAGRIN ASSOCIATES
900 SEVENTH STREET, N.W. - SUITE 500 - WASHINGTON, D.C. 20001
P: (202) 223-1700 LMEISNER@SCHAGRINASSOCIATES.COM F: (202) 429-2522

September 15, 2025

USITC Inv. No. TA-201- ___

**PUBLIC VERSION**

Confidential Treatment Requested for Information on Pages 2, 33-34, 37-42, 44-45, 50, & 53-56 and Exhibits 9, 12, and 18.

**BY ELECTRONIC FILING**
The Honorable Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street S.W., Room 112
Washington, D.C. 20436

**Re: Quartz Surface Products – Petition for Safeguard Relief Pursuant to Sections 201 and 202 of the Trade Act of 1974**

Dear Secretary Barton:

On behalf of the Quartz Manufacturing Alliance of America (the "QMAA" or "Petitioner"), we hereby submit to the U.S. International Trade Commission (the "Commission") a petition for safeguard relief from the serious injury that has been caused to the entire U.S. domestic industry by imports of quartz surface products ("QSP"). This is a petition under Sections 201 and 202 of the Trade Act of 1974, as amended (19 U.S.C. §§ 2251 and 2252), and Subpart B of part 206 of the rules of practice and procedure of the Commission.

Petitioner is an alliance of domestic producers of QSP that is representative of the domestic industry and thus may file this petition pursuant to 19 U.S.C. § 2252(a)(1) and 19 C.F.R. § 206.13. The Petition includes all the information required by 19 C.F.R. § 206.14 and demonstrates that QSP is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry.

Pursuant to 19 U.S.C. § 2252(i) and 19 C.F.R. § 206.7, Petitioner requests confidential treatment for information designated as confidential in the Petition. The bracketed information in the Petition is highly sensitive confidential business information warranting confidential treatment. The information for which Petitioner requests confidential treatment, and the location of same, is as follows:

- Pages 2, 33-34, 37-42, 44-45, 50, & 53-56 and Exhibits 9, 12, and 18 contain proprietary capacity, production, shipment, capacity utilization, and apparent domestic consumption and market share data.

- Pages 2, 33-34, 37-42, 44-45, 50, & 53-56 and Exhibits 9, 12, and 18 contain trade, employment, financial, and investment data.

The information for which confidential treatment is requested constitutes the type of information normally treated as confidential business information pursuant to 19 C.F.R. § 201.6(a), is not publicly available, and would cause substantial harm to the competitive positions of the submitters if it were released to the public.

A nonconfidential version of the Petition has been prepared and is being filed simultaneously with this submission in accordance with 19 C.F.R. § 201.8(f). The information for which Petitioner is requesting confidential treatment cannot be adequately summarized in a public version because it is so specific that any attempt to provide a nonconfidential summary of the information would effectively result in its disclosure to the public, as contemplated by 19 C.F.R. § 206.7(b).

Attached to this cover letter is a counsel certification regarding the completeness and accuracy of the information contained in the Petition, as required by 19 C.F.R. § 206.8(a).

*         *         *

Please do not hesitate to contact the undersigned should you have any questions regarding this Petition.

Respectfully Submitted,

/s/ Luke A. Meisner
Roger B. Schagrin
Luke A. Meisner
Saad Y. Chalchal*
Maliha Khan
Amanda G. Swenson
Rui Fan, *Consultant*

SCHAGRIN ASSOCIATES

*Counsel to the Quartz Manufacturing Alliance of America*

* Admitted only in New York and New Jersey. Practice limited to matters before federal courts and agencies.

**CERTIFICATION OF COUNSEL**

In accordance with Section 206.8 of the Commission's rules of practice and procedure (19 C.F.R. § 206.8), I, Luke A. Meisner of Schagrin Associates, hereby certify that (1) I have read the enclosed submission dated September 15, 2025, and (2) based on the information made available to me by Petitioner, I have no reason to believe that this submission contains any material misrepresentation or omission of fact, and (3) the information contained in this submission is accurate and complete to the best of my knowledge.

In accordance with Section 201.6(b)(3)(iii) of the Commission's rules of practice and procedure (19 C.F.R. § 201.6(b)(3)(iii)), I further certify that information substantially identical to the information for which confidential treatment has been requested in this submission is not available to the general public.

This certification is made in accordance with 28 U.S.C. § 1746. I declare under penalty of perjury of the laws of the United States of America that the foregoing statements are true and correct to the best of my information and belief.

Date: September 15, 2025

Luke A. Meisner

Luke A. Meisner

**BEFORE THE**
**UNITED STATES INTERNATIONAL TRADE COMMISSION**

USITC Inv. No. TA-201- ___

**PUBLIC VERSION**
Confidential Treatment Requested for Information on Pages 2, 33-34, 37-42, 44-45, 50, & 53-56 and Exhibits 9, 12, and 18.

---

# QUARTZ SURFACE PRODUCTS

---

## PETITION FOR SAFEGUARD RELIEF PURSUANT TO SECTIONS 201 AND 202 OF THE TRADE ACT OF 1974

---

Roger B. Schagrin
Luke A. Meisner
Saad Y. Chalchal*
Maliha Khan
Amanda G. Swenson
Rui Fan, *Consultant*

SCHAGRIN ASSOCIATES
900 Seventh Street, N.W.
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel to the Quartz Manufacturing Alliance of America*

* Admitted only in New York and New Jersey. Practice limited to matters before federal courts and agencies.

September 15, 2025

PUBLIC VERSION

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

A. Background on Original AD/CVD Investigations on QSP ........ 2

1. Investigations on QSP from China ........ 4

2. Investigations on QSP from India and Turkey ........ 6

3. Import Trends Following Issuance of the AD/CVD Orders ........ 9

B. Evasion of Existing Relief ........ 10

C. Five-Year ("Sunset") Reviews ........ 13

II. PRODUCT DESCRIPTION AND DOMESTIC LIKE ARTICLE (19 C.F.R. § 206.14(a)) ........ 15

A. Name and Definition of the Imported Article ........ 15

B. Description of the Imported Article ........ 18

C. Current Tariff Treatment of the Imported Article ........ 19

D. Name and Description of the Like or Directly Competitive Domestic Article ........ 20

1. Domestic and Imported QSP Have Substantially Identical Physical Properties and End Uses Pursuant to the Commission's Regulations ........ 22

2. Domestic and Imported QSP Are Produced Using the Same Production Processes ........ 24

3. Domestic and Imported QSP Are Sold Through the Same Marketing Channels ........ 25

4. Customs Treatment of the Imported Article Under Classification Rules Demonstrates That It Is Substantially Identical to Domestic QSP ........ 26

5. Both Slabs and Fabricated Products Are Part of the Same Like Product ........ 26

E. Domestic Industry ........ 27

III. PETITIONER'S REPRESENTATIVENESS (19 C.F.R. § 206.14(a)) ........ 28

A. Petitioner (19 C.F.R. § 206.14(b)(1)) ........ 28

B. Other Known Domestic Producers of QSP (19 C.F.R. § 206.14(b)(3)) ........ 31

IV. QSP IS BEING IMPORTED IN INCREASED QUANTITIES ........ 32

A. Legal Standard ........ 32

B. The Volume of U.S. Imports of QSP Increased Significantly Over the 2020 to 2024 Period in Both Absolute and Relative Terms ........ 32

V. THE DOMESTIC INDUSTRY IS SUFFERING SERIOUS INJURY AND IS THREATENED WITH FURTHER SERIOUS INJURY ........ 35

A. Legal Framework ........ 35

B. The Domestic Industry Is Seriously Injured Under the Safeguards Standard ...... 36

1. Significant Idling of Production Facilities (19 C.F.R. § 206.14(e)(1)(i)) ........ 36

2. Inability of a Significant Number of Domestic Producers to Carry Out Domestic Production at a Reasonable Level of Profit (19 C.F.R. § 206.14(e)(1)(ii)) ........ 38

3. Significant Unemployment or Underemployment in the Domestic Industry (19 C.F.R. § 206.14(e)(1)(iii)) ........ 39

C. The Domestic Industry Is Threatened with Further Serious Injury ........ 40

1. Decline in Sales and/or Market Share (19 C.F.R. § 206.14(e)(2)(i)) ........ 40

2. Downward Trend in Production (19 C.F.R. § 206.14(e)(2)(i)) ........ 41

3. Declining Profits and Productivity (19 C.F.R. § 206.14(e)(2)(i)) ........ 41

4. Declines in Employment and Wages (19 C.F.R. § 206.14(e)(2)(i)) ........ 42

5. A higher and growing inventory (19 C.F.R. § 206.14(e)(2)(i)) ........ 42

6. Inability to Generate Capital for Investment and Research and Development (19 C.F.R. § 206.14(e)(2)(ii)) ........ 42

7. Exports Are Driven to the U.S. Market (19 C.F.R. § 206.14(e)(2)(iii)) ........ 43

8. Changes in Levels of Prices, Production, and Productivity (19 C.F.R. § 206.14(e)(3)) ........ 43

D. Conclusion on Injury ........ 46

VI. IMPORTS OF QSP ARE A SUBSTANTIAL CAUSE OF SERIOUS INJURY, OR THREAT THEREOF, TO THE DOMESTIC INDUSTRY ........ 46

A. Legal Framework ........ 46

B. Conditions of Competition ........ 47

1. Demand Conditions ........ 48

2. Supply Conditions ........ 50

3. Substitutability ........ 52

C. Imports Are a Substantial Cause of Serious Injury and Threat of Serious Injury to Domestic Producers ........ 53

1. Imports Have Captured Sales and Market Share at the Direct Expense of the Domestic Industry ........ 54

2. Imports Have Undersold Domestically Produced QSP by Substantial Margins ........ 54

3. Imports Are the Most Important Factor Causing Serious Injury to the Domestic Industry ........ 56

VII. RELIEF SOUGHT AND PURPOSE THEREOF (19 C.F.R. § 206.14(g)) ........ 57

VIII. THE INCREASE IN IMPORTS RESULTED FROM UNFORESEEN DEVELOPMENTS AND FROM OBLIGATIONS INCURRED UNDER THE WTO AGREEMENT ..... 58

IX. EFFORTS TO COMPETE (19 C.F.R. § 206.14(h)) ..... 62

X. IMPORTS FROM USMCA COUNTRIES (19 C.F.R. § 206.14(i)) ..... 63

XI. CRITICAL CIRCUMSTANCES (19 C.F.R. § 206.14(i)) ..... 66

XII. CONCLUSION ..... 66

## I. INTRODUCTION

On behalf of the Quartz Manufacturing Alliance of America (the "QMAA" or "Petitioner"), the petitioner and an alliance of U.S. producers of quartz surface products ("QSP") and thus producers of the domestic like product, we hereby submit this petition pursuant to Sections 201 and 202 of the Trade Act of 1974, as amended (the "Trade Act"), for relief for the entire U.S. domestic industry from a massive surge of imports of QSP.[1]

This is not the first time that the domestic industry has sought relief from the injurious impact on the U.S. domestic industry of imports of QSP. In fact, the domestic industry has twice previously sought relief under the U.S. trade remedy laws to level the playing field for U.S. domestic producers – first in antidumping ("AD") and countervailing duty ("CVD") investigations against the People's Republic of China ("China") and later in AD/CVD investigations against India and the Republic of Turkey ("Turkey"). Imports of QSP from China, India, and Turkey have been subject to the imposition of AD/CVD duties for more than five years and the AD/CVD orders remain in effect today. Unfortunately, the orders have not prevented serious injury to the domestic industry from an onslaught of imports from countries across the globe, including a substantial volume of imports that have been transshipped through third countries or misclassified in a way to evade the payment of the AD/CVD duties. This evasion of existing remedies on unfairly traded imports of QSP by countries such as Cambodia, Malaysia, Thailand, and Vietnam is a critical reason that the domestic industry now seeks safeguards relief.

---

[1] 19 U.S.C. §§ 2251-2252.

As discussed below, as foreign producers continue to target building materials as an opportunity to take advantage of U.S. consumers' spending on homes and other construction projects, imports of low-priced QSP have continued surging into the U.S. market since 2020, seizing market share from domestic producers even though the domestic industry has heavily invested to build production capacity and create new jobs. From 2020 to 2024, as demand for QSP in the U.S. continued to grow [ ], imports of QSP from all sources grew from [ ] of the U.S. market to [ ] of the U.S. market by 2024. The cumulative impact of this relentless influx of imports has seriously injured the domestic industry – mothballing two U.S. production facilities since the imposition of the AD and CVD orders on imports from China, India, and Turkey. This is the exact type of situation that compels the provision of safeguard relief.

### A. Background on Original AD/CVD Investigations on QSP

The chart below tells the story very clearly: America's quartz countertop industry has been hammered by wave after wave of cheap imports that have stolen market share, driven down prices, and seriously injured U.S. domestic producers over the last five years:

PUBLIC VERSION




The domestic industry first faced a surge of imports from China that peaked in 2018 and only subsided the following year after the domestic industry sought relief through the filing of AD/CVD petitions against imports of QSP from China. Before the ink was even dry on the AD/CVD orders against China, however, imports from other countries began hammering the U.S. market. As a result, in 2019, the domestic industry brought a second round of AD/CVD cases against imports of QSP from India and Turkey. This second round of cases helped briefly stem the tide of imports. But by 2021, imports of QSP had resumed surging into the U.S. market at some of the highest rates ever seen, with countries such as Malaysia, Thailand, and Vietnam entering the fray both with massive new production capacity and as hubs of rampant illegal

transshipment to evade the payment of AD/CVD duties. The details of this successive wave of surges are discussed in greater detail below. As will become clear from this discussion, the surge of imports over the last five years cries out for safeguard relief for the domestic industry.

### *1. Investigations on QSP from China*

On April 17, 2018, the domestic industry filed petitions for relief under Title VII of the Tariff Act of 1930, as amended (the "Tariff Act"), against imports of QSP from China that were being sold at less-than-fair value in the United States and against imports from China that were being unfairly subsidized by the Government of China.[2] In the ensuing AD/CVD investigations, the U.S. International Trade Commission (the "Commission") determined that "the volume of subject imports, and the increase in that volume, is significant in absolute terms and relative to production and consumption in the United States."[3] The Commission noted that the "volume of subject imports rose at a much faster rate than apparent U.S. consumption, and subject imports therefore experienced significant gains in market share."[4] With respect to price effects, the Commission found that "{s}ubject imports undersold the domestic product in all 180 quarterly price comparisons … at underselling margins that ranged from 4.3 percent to 85.3 percent and averaged 49.2 percent."[5] Moreover, the Commission explained that the underselling "enabled the

[2] Petitions for the Imposition of Antidumping and Countervailing Duties: Certain Quartz Surface Products from the People's Republic of China, EDIS Doc. No. 642263 (Apr. 17, 2018) ("QSP China Petitions").

[3] *See Quartz Surface Products from China*, Inv. Nos. 701-TA-606 and 731-TA-1416 (Final), USITC Pub. 4913 (June 2019) ("*QSP from China Inv Final*, USITC Pub. 4913") at 26.

[4] *Id.* at 25 (internal citation omitted).

[5] *Id.* at 27.

subject imports to capture a growing share of the U.S. market" and that subject imports "also suppressed domestic prices to a significant degree."[6]

The Commission concluded that the subject imports from China had a significant injurious impact on the domestic industry.[7] According to the Commission, the "increasing and significant volumes of low-priced subject imports that were substitutable with the domestic like product took market share from the domestic industry over the period of investigation" and the "reduced domestic industry market share in turn led to lower production, capacity utilization, shipments, and sales than would have otherwise would have occurred given the strong growth in apparent U.S. consumption."[8] The domestic industry's capacity utilization rate declined from 2015 to 2017 despite growing demand.[9] The Commission also noted that "as a result of the significant volume of low-priced subject imports, the domestic industry's output and revenues were lower than they would have been otherwise."[10] Additionally, the Commission determined that "nonsubject imports cannot explain the loss in market share, output, and revenues that we have attributed to the subject imports."[11]

---

[6] *Id.* at 28-29.

[7] *Id.* at 30-36.

[8] *Id.* at 33.

[9] *Id.* at 31.

[10] *Id.* at 33.

[11] *Id.*

**PUBLIC VERSION**

In July 2019, following investigations by the Commission and the U.S. Department of Commerce ("Commerce"), Commerce issued AD and CVD orders on imports of QSP from China.[12]

### 2. *Investigations on QSP from India and Turkey*

The imposition of the orders on *QSP from China* in 2019 caused a precipitous decline in imports of QSP from China. However, as imports of QSP from China receded, imports from other countries – led by India and Turkey – immediately surged into the U.S. market, quickly robbing the domestic industry's opportunity to compete on a level playing field.




*Source:* U.S. Imports of QSP, attached as **Exhibit 1**

[12] *See Certain Quartz Surface Products from the People's Republic of China: Antidumping and Countervailing Duty Orders*, 84 Fed. Reg. 33,053 (Dep't Commerce July 11, 2019) ("*AD/CVD Orders on QSP from China*").

On May 8, 2019, the domestic industry filed petitions for relief under Title VII of the Tariff Act against imports of QSP from India and Turkey that were being sold at less-than-fair value in the United States and against imports from India and Turkey that were being unfairly subsidized by the Indian and Turkish governments.[13] In its investigations, the Commission determined that "the volume of cumulated subject imports, and the increase in that volume, are significant in absolute terms and relative to production and consumption in the United States."[14] The Commission noted that "{b}ecause the volume of cumulated subject imports rose at a much faster rate than apparent U.S. consumption, cumulated subject imports gained market share rapidly."[15] With respect to price effects, the Commission found that "cumulated subject imports pervasively undersold the domestic like product throughout the" period of investigation ("POI") and that "cumulated subject imports undersold the domestic like product in all 129 quarterly price comparisons involving 18.2 million square feet ("SQF") of cumulated subject imports at underselling margins that ranged from 11.4 percent to 53.9 percent and averaged 28.9 percent."[16] Moreover, the Commission explained that the significant underselling by subject imports fueled their significant increase in market share over the POI, particularly in 2019 as QSP imports from China exited the market after the imposition of cash deposits and the AD/CVD orders on QSP

---

[13] Petitions for the Imposition of Antidumping and Countervailing Duties: Certain Quartz Surface Products from India and the Republic of Turkey, EDIS Doc. No. 675301 (May 8, 2019) ("QSP India & Turkey Petitions").

[14] *See Quartz Surface Products from India and Turkey*, Inv. Nos. 701-TA-624-625 and 731-TA-1450-1451 (Final), USITC Pub. 5061 (June 2020) ("*QSP from India & Turkey Inv Final*, USITC Pub. 5061") at 27.

[15] *Id.* at 26 (internal citation omitted).

[16] *Id*. at 28.

from China.[17] Consequently, the Commission determined that "cumulated subject imports had significant adverse price effects on the domestic industry."[18]

The Commission concluded that cumulated subject imports had a significant injurious impact on the domestic industry.[19] According to the Commission, measures of the domestic industry's output (*e.g.*, production, U.S. shipments, and total sales) generally increased between 2017 and 2019, but did so to a lesser degree than the growth in apparent U.S. consumption.[20] The Commission found that despite being profitable, the domestic industry's production, shipments, and revenues were significantly constrained from 2018 to 2019 by the surge of low-priced subject imports, which universally undersold domestic products in a price-sensitive market.[21] When imports from China withdrew in 2019, subject imports captured nearly half of the vacated market share, leaving domestic producers with less share than at the start of the POI despite expanded capacity and strong demand.[22] As a result, domestic producers were unable to achieve the higher shipments and revenues they otherwise would have obtained.[23] The Commission determined that "cumulated subject imports had a significant adverse impact on the domestic industry" and explained that "nonsubject imports from sources other than China cannot explain

[17] *Id.* at 28-29.

[18] *Id.* at 30.

[19] *Id.* at 30-36.

[20] *Id.* at 31.

[21] *Id.* at 33.

[22] *Id.*

[23] *Id.*

the magnitude of the domestic industry's inability to achieve materially greater output, market share, and revenues in 2019."[24]

### *3. Import Trends Following Issuance of the AD/CVD Orders*

In June 2020, following investigations by the Commission and Commerce, Commerce issued AD and CVD orders on imports of QSP from India and Turkey.[25] The relief granted by these orders was also short-lived. Imports from India showed some initial declines but then increased in subsequent years and have now surpassed pre-order levels for India and even the peak level of imports from China. Imports from Turkey have generally declined since the imposition of the orders but maintain a significant presence in the U.S. market. Furthermore, imports from several countries and foreign producers not subject to any AD/CVD orders have surged into the U.S. market.

[24] *Id.* at 34-35.

[25] *See Certain Quartz Surface Products from India and Turkey: Antidumping Duty Orders*, 85 Fed. Reg. 37,422 (Dep't Commerce June 22, 2020); *see also Certain Quartz Surface Products from India and Turkey: Countervailing Duty Orders*, 85 Fed. Reg. 37,431 (Dep't Commerce June 22, 2020) (collectively, "*AD/CVD Orders on QSP from India and Turkey*").

PUBLIC VERSION




*Source:* U.S. Imports of QSP, attached as **Exhibit 1**

### B. Evasion of Existing Relief

A substantial portion of the U.S. imports of QSP that have entered over the POI include imports that are evading existing measures imposed by the U.S. government to provide relief and level the playing field for the U.S. domestic industry. Indeed, through investigations under the Enforce and Protect Act ("EAPA"), U.S. Customs and Border Protection ("CBP") has determined on numerous occasions that transshipment and other schemes – such as the use of shell companies – are being used to evade payment of the applicable duties on QSP from China. The following are examples of final EAPA determinations issued by CBP regarding QSP from China:

- **EAPA 7552-7563**. In November 2021, CBP issued a final determination of evasion in a consolidated EAPA investigation covering 15 separate U.S. importers involved in

transshipment of Chinese QSP from Malaysia through Malaysian companies affiliated with Chinese QSP exporters.[26]

- **EAPA 7586-87**. In April 2022, CBP affirmed a final determination of evasion covering Texas-based importer Vivaldi, who had been importing QSP from China while falsely declaring that it was "crushed glass" that is not covered by AD/CVD orders.[27]

- **EAPA 7604.** In January 2022, CBP reached an affirmative determination of evasion covering the U.S. importer Simpli Home, which had been transshipping QSP through Vietnam in conjunction with the importation of bathroom vanities.[28]

- **EAPA 7567-7658**. In March 2023, CBP issued an affirmative determination of evasion covering 13 U.S. importers that had been transshipping QSP through Malaysia in conjunction with the Malaysian companies MSW Building Supply Sdn. Bhd. and Ever Stone World Sdn. Bhd.[29]

- **EAPA 7743.** In September 2023, CBP reached an affirmative determination that QSP imported by LTT International Trading Co. was Chinese QSP subject to the orders but was transshipped through Taiwan by Cheng Jug Enterprise Co., Ltd.[30]

- **EAPA 7720-22.** In October 2023, CBP affirmed a determination of evasion that imports of the Lucciare product made from fritted sand by Ameri Home Designs, Inc., Viotolo Inc., and Vanguard Trading Co. were evading the AD/CVD orders on QSP from China.[31]

- **EAPA 7783.** In January 2024, CBP determined that QSP imported by Superior Commercial Services was Chinese QSP subject to the AD/CVD orders but was

---

[26] *QSP from China First Review*, USITC Pub. 5578 at I-24 (Table I-8); CBP Notice of Determination of Evasion in EAPA Case 7522 (Nov. 24, 2021).

[27] *QSP from China First Review*, USITC Pub. 5578 at I-24 (Table I-8); CBP Review Determination of Evasion in EAPA Case 7586 (Apr. 15, 2022).

[28] *QSP from China First Review*, USITC Pub. 5578 at I-24 (Table I-8); CBP Notice of Determination of Evasion in EAPA Case 7604 (Jan. 28, 2022).

[29] *QSP from China First Review*, USITC Pub. 5578 at I-24 (Table I-8); CBP Review Determination of Evasion in EAPA Case 7657 (Mar. 21, 2023).

[30] *QSP from China First Review*, USITC Pub. 5578 at I-24 (Table I-8); CBP Notice of Determination of Evasion in EAPA Case 7743 (Sept. 12, 2023).

[31] *QSP from China First Review*, USITC Pub. 5578 at I-24 (Table I-8); Review Determination of Evasion in EAPA Case 7720 (Oct. 23, 2023).

transshipped through Vietnam by Kales Quartz and other companies that were affiliated with a Chinese QSP producer.[32]

- **EAPA 7809**. In June 2024, CBP affirmed a determination of evasion that imports of vanities by Legion Furniture and Vanity Art from Vietnam were incorporating Chinese QSP without the payment of AD/CVD duties.[33]

The evasion activity of Chinese QSP producers in Malaysia became so rampant at one point that, by February 2022, Commerce was forced to initiate a country-wide scope inquiry to investigate whether a seemingly endless array of Malaysian exporters had been shipping QSP to the United States that is covered by the AD/CVD orders.[34] In October 2022, Commerce issued a final determination implementing a certification requirement for all U.S. imports of QSP from Malaysia to ensure that such imports do not involve Chinese-origin merchandise evading the payment of the applicable duties.[35]

The level of evasion is simply staggering. Last month, the U.S. Department of Justice announced that Allied Stone Inc., a Dallas, Texas-based supplier of countertop and cabinetry products, and its President, Jia "Jerry" Lim, agreed to pay a total of $12.4 million to resolve allegations that they knowingly and improperly evaded AD/CVD duties owed on QSP from

---

[32] *QSP from China First Review*, USITC Pub. 5578 at I-24 (Table I-8); CBP Review Determination of Evasion in EAPA Case 7783 (Jan. 11, 2024).

[33] *QSP from China First Review*, USITC Pub. 5578 at I-24 (Table I-8); CBP Review Determination of Evasion in EAPA Case 7809 (June 20, 2024).

[34] *Certain Quartz Surface Products from the People's Republic of China: Final Scope Ruling on Malaysian Processed Quartz Slab and Recission of the Circumvention Inquiry*, 87 Fed. Reg. 64,011 (Dep't Commerce Oct. 21, 2022).

[35] *Id.*

China – with $2.2 million being paid to the whistleblower..[36] The evasion involved the company misclassifying QSP as marble or crystallized glass between 2018 and 2023.[37]

The evasion of existing remedies on unfairly traded imports of QSP involving misclassification or transshipment through countries such as Malaysia, Thailand, and Vietnam is a critical reason that the domestic industry has no choice other than to petition the Commission for global safeguard relief.

### C. Five-Year ("Sunset") Reviews

Earlier this year, in its first five-year ("sunset") review of the *AD/CVD Orders on QSP from China*, the Commission found that because of "the significant and increasing volume and market share of subject imports during the original investigations, the Chinese industry's large capacity and exports, the attractiveness of the U.S. market, and the continued presence of subject imports in the U.S. market by transshipment through nonsubject countries" the "volume of subject imports from China would likely be significant, both in absolute terms and relative to consumption in the United States" if the *AD/CVD Orders on QSP from China* were revoked.[38] With respect to price effects, the Commission stated that "there is a high degree of substitutability between the domestic like product and subject imports and that price remains important in purchasing decisions."[39] The Commission also found that absent the disciplining

---

[36] U.S. Department of Justice Press Release, Allied Stone Inc. and Company Official Agree to Pay $12.4M to Settle False Claims Act Allegations Relating to Evaded Customs Duties (Aug. 19, 2025), attached as **Exhibit 2**.

[37] *Id.*

[38] *Quartz Surface Products from China*, Inv. Nos. 701-TA-606 and 731-TA-1416 (Review), USITC Pub. 5578 (Jan. 2025) ("*QSP from China First Review*, USITC Pub. 5578") at 19.

[39] *Id.* at 21.

effect of the orders, the significant volume of low-priced subject imports would likely undersell the domestic like product to gain market share, forcing domestic producers to lower or restrain prices or lose sales, resulting in significant adverse price effects.[40] Furthermore, the Commission stated that the "likely significant volume of low-priced subject imports and their adverse price effects would likely have a significant adverse impact on the production, shipments, sales, market share, and revenues of the domestic industry, which, in turn, would have a direct adverse impact on the industry's profitability and employment, as well as its ability to raise capital and make and maintain necessary capital investments."[41] Moreover, the Commission noted that nonsubject imports "have substantially increased their presence in the U.S. market since the original investigations…."[42] The Commission concluded that if the *AD/CVD Orders on QSP from China* were revoked, "subject imports of QSP from China would likely have a significant adverse impact on the domestic industry within a reasonably foreseeable time."[43]

The first sunset reviews of the *AD/CVD Orders on QSP from India and Turkey* are currently ongoing.[44]

---

[40] *Id.*

[41] *Id.* at 23.

[42] *Id.*

[43] *Id.* at 24.

[44] The sunset review of the *AD/CVD Orders on QSP from China* covered five full years from 2019 through 2023 and the sunset reviews of *AD/CVD Orders on QSP from India and Turkey* covered five full years from 2020 through 2024. Given that in safeguard investigations, the Commission typically analyzes the five most recent full calendar years, the POI for this proceeding will be 2020 through 2024. Although the legal standard for the Commission's analysis in sunset reviews of AD/CVD orders is different from the legal standard applicable in a safeguard investigation, the record in the sunset reviews is highly probative given the overlapping periods and the detailed findings on market conditions, import trends, and injury factors.

* * *

As demonstrated throughout this petition, the surge of imports of QSP that has overwhelmed the U.S. market over the last five years is a substantial cause of the serious injury to the domestic QSP industry. Especially given that this remarkable import surge is significantly attributable to transshipped and misclassified QSP or merchandise that is in violation of intellectual property laws, these circumstances demand the immediate imposition of targeted import measures to stop the serious injury against the domestic QSP industry. Without decisive relief, as demonstrated by the mothballing of two U.S. production facilities over the POI, the domestic industry cannot fairly compete, recoup substantial past investments, or realize the recovery ordinarily seen after the trade orders. Especially where the U.S. market is so attractive to unfair imports, safeguard measures are appropriate to permit domestic producers to earn a fair return on investment and continue to reinvest in production, research and development, and innovation.

## II. PRODUCT DESCRIPTION AND DOMESTIC LIKE ARTICLE (19 C.F.R. § 206.14(A))

### A. Name and Definition of the Imported Article

The imported article covered by this petition is quartz surface products. The product is the same product that was the subject to the AD/CVD investigations of QSP from China, India, and Turkey that led to the imposition of AD and CVD orders against those countries.[45] The only exception is that Petitioner has removed the exclusion for "crushed glass surface products" that

[45] *See AD/CVD Orders on QSP from China*; *AD/CVD Orders on QSP from India and Turkey*.

was carved out of the scope of the AD and CVD orders.[46] QSP is defined as slabs and other surfaces created from a mixture of materials that includes predominately silica (*e.g.*, quartz, quartz powder, cristobalite) as well as a resin binder (*e.g.*, an unsaturated polyester). QSP may also generally be referred to as engineered stone or quartz, artificial stone or quartz, agglomerated stone or quartz, synthetic stone or quartz, processed stone or quartz, manufactured stone or quartz, and Bretonstone®.

QSP is primarily composed of crushed quartz stone or other silica-based materials and may also include materials such as pigments, cement, or other additives. Subject QSP only includes products where the silica content is greater than any other single material, by actual weight.[47] QSP is typically sold as rectangular slabs with a total surface area of approximately 45 to 60 SQF and a nominal thickness of one, two, or three centimeters. In addition to slabs, QSP is

[46] When the domestic industry filed the AD/CVD petitions against imports from China, the scope did not exclude crushed glass surface products. *See* Commerce Memo re: Scope Modification Determination in AD/CVD Investigations on QSP from China (Dep't Commerce May 14, 2019), attached as **Exhibit 3**. Crushed glass surface products were excluded from the scope of the China AD/CVD investigations only after Commerce specifically requested clarification regarding whether the scope should cover such products. In agreeing to the exclusion, the domestic industry intended to refer to products that had a distinctive appearance where large pieces of crushed glass were visible across the surface of the product and that served a niche segment in the overall countertop market. However, Chinese producers exploited the exclusion as a loophole that allowed them to avoid AD/CVD liability by exporting glass-based surface products that were virtually indistinguishable from other types of QSP. To combat this blatant evasion, Commerce modified the scope of the China AD/CVD investigations by including certain criteria that must be met to qualify for the exclusion for crushed glass surface products. Nevertheless, parties continue to attempt to exploit the crushed glass surface products exclusion to evade AD/CVD liability. *See QSP from China First Review*, USITC Pub. 5578 at I-24 (Table I-8) (noting that Texas-based importer Vivaldi imported QSP from China and avoided AD/CVD duties by falsely declaring that the merchandise was nonsubject crushed glass). Because crushed glass surface products are substantially identical to QSP, and because the exclusion for crushed glass surface products has incentivized foreign companies and U.S. importers to engage in evasive practices, Petitioner has not excluded glass surface products from the scope of this safeguard petition.

[47] So long as the silica content is greater than any other single material, it does not matter where the source of the silica is derived. A non-exhaustive list of silica sources would include quartz, quartz powder, cristobalite, glass powder, feldspar, mica, nepheline syenite, basalt, andesite, rhyolite, dacite, and other generic minerals..

also sold as countertops, backsplashes, vanity tops, bar tops, work tops, tabletops, flooring, wall facing, shower surrounds, fireplace surrounds, mantels, and tiles. Subject QSP may be polished or unpolished, cut or uncut, fabricated or not fabricated, cured or uncured, edged or not edged, finished or unfinished, thermoformed or not thermoformed, and packaged or unpackaged. In addition, subject QSP may be imported attached to, or in conjunction with, nonsubject merchandise such as sinks, sink bowls, vanities, cabinets, and furniture. Excluded from the definition of QSP is quarried stone surface products, such as granite, marble, soapstone, or quartzite.

Based on this definition, the imported article is defined as follows:

> QSP consists of slabs and other surfaces created from a mixture of materials that includes predominately silica (*e.g.*, quartz, quartz powder, cristobalite, glass powder) as well as a resin binder (*e.g.*, an unsaturated polyester). The incorporation of other materials, including, but not limited to, pigments, cement, or other additives does not remove the merchandise from the scope. However, the scope only includes products where the silica content is greater than any other single material, by actual weight. QSP is typically sold as rectangular slabs with a total surface area of approximately 45 to 60 square feet and a nominal thickness of one, two, or three centimeters. However, the scope includes surface products of all other sizes, thicknesses, and shapes. In addition to slabs, the scope includes, but is not limited to, other surfaces such as countertops, backsplashes, vanity tops, bar tops, work tops, tabletops, flooring, wall facing, shower surrounds, fireplace surrounds, mantels, and tiles. QSP may be polished or unpolished, cut or uncut, fabricated or not fabricated, cured or uncured, edged or not edged, finished or unfinished, thermoformed or not thermoformed, packaged or unpackaged, and may have any type of surface finish. In addition, QSP is covered by the scope whether or not it is imported attached to, or in conjunction with, nonsubject merchandise such as sinks, sink bowls, vanities, cabinets, and furniture. If QSP is imported attached to, or in conjunction with, such nonsubject merchandise, only the QSP is covered by the scope.
>
> Subject merchandise includes material matching the above description that has been finished, packaged, or otherwise fabricated in a third country, including by cutting, polishing, curing, edging, thermoforming, attaching to, or packaging with another product, or any other finishing, packaging, or fabrication that would not otherwise remove the merchandise from the scope if performed in the country of manufacture of the QSP. The scope does not cover quarried stone surface products, such as granite, marble, soapstone, or quartzite.

### B. Description of the Imported Article

QSP is a compacted stone composite building material used for countertop surfaces or aesthetic accents in residential, commercial, and industrial properties.[48] QSP competes with quarried stone products, such as granite, marble, or quartzite.[49] Demand for QSP has grown due to its improved aesthetic appeal, durability, stain and scratch resistance, heat tolerance, and anti-microbial properties compared to granite and marble surface products.[50] The visual appearance of QSP has improved from a monochromatic surface to a surface that imitates or is inspired by quarried stone patterns.[51]

The scope of this investigation covers both slabs and QSP that has been fabricated to its final shape and size so that it is ready for installation. Fully finished and fabricated products include countertop surfaces, cut-to-size slabs used particularly in the hospitality industry, and various other decorative products. QSP is utilized in commercial, residential, or industrial properties as countertops, tiles, bar surfaces, shower and tub surrounds, fireplace surrounds, walls, floors, bathroom vanities, and furniture surfaces.[52] QSP may be further worked to meet customer specifications.[53]

---

[48] *See QSP from China Inv Final*, USITC Pub. 4913 at I-11; *see also QSP from India & Turkey Inv Final*, USITC Pub. 5061 at I-13.

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

QSP without any pigments is generally white with fine particulates.[54] Producers of QSP invest in the development of new collections and designs to attract customers.[55] Manufacturing advances have improved the appearance of QSP and enabled producers to make QSP with designs inspired by various types of quarried stone, such as the veined movement of marble, or that otherwise has unique aesthetic patterns.[56] These patterns require specialized machinery and design by teams of engineers whose end products are protected and registered as intellectual property.[57] The domestic industry has been a pioneer in advancing new production techniques and innovative new designs for QSP that have led to growing demand for the product among consumers. And imports regularly infringe on the intellectual property rights of members of the alliance. For example, Cambria has filed several intellectual property lawsuits against imported products.[58]

### C. Current Tariff Treatment of the Imported Article

The imported article covered by this petition is classifiable under the Harmonized Tariff Schedule of the United States ("HTSUS") reporting numbers 6810.99.0020, 6810.99.0040, and 7020.00.6000. All imports under the first two HTSUS numbers (*i.e.*, 6810.99.0020 and 6810.99.0040) are covered articles as these two numbers are specific to QSP made from

---

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *See, e.g.*, *Cambria Company LLC v. Quartz Master, LLC and Raphael Stone Collection, Inc.*, C.A. No 2:2020-cv-01637 (D.N.J.); *Cambria Company LLC v. Hirsch Glass Corp. d/b/a Spectrum Quartz*, Case No. 1:21-cv-00143 (E.D. Va.); *Cambria Company v. Cosmos Granite & Marble, NC, LLC*, Case No. 5:18-cv-601 (E.D.N.C.).

agglomerated quartz of the type used for countertops.[59] If the imported article is made from materials that include crushed glass and the glass component provides the majority of the weight of the finished article, it is classifiable under HTSUS 7020.00.6000 ("Other articles of glass: Other").[60] Because this third HTSUS is a broader basket category, not all imports under HTSUS 7020.00.6000 are covered articles. However, Petitioner believes that the overwhelming majority of the imported articles covered by this petition were entered under HTSUS 6810.99.0020 and 6810.99.0040.

For customs purposes, the country of origin of QSP is the country in which the slab is manufactured. CBP has repeatedly ruled that off-shore fabrication of a QSP slab in a third country does not change the country of origin of the QSP.[61]

### D. Name and Description of the Like or Directly Competitive Domestic Article

The domestic article that is like the imported article covered by this petition is QSP because domestic QSP and imported QSP are substantially identical under the Commission's regulations. In a safeguard investigation, the Commission will define the domestic industry – and

---

[59] Prior to January 1, 2023, imports of QSP entered under HTSUS 6810.99.0010 (Agglomerated quartz slabs of the type used for countertops). Beginning on January 1, 2023, after an additional breakout for this statistical code was requested, imports of QSP have entered under HTSUS 6810.99.0020 (Agglomerated quartz slabs of the type used for countertops: In slabs of rectangular shape, with a length of 3 m or more and a width of 1.25 m or more) and HTSUS under 6810.99.0040 (Agglomerated quartz slabs of the type used for countertops: Other). *See* Letter from Committee for Statistical Annotation of Tariff Schedules (Jan. 3, 2023), attached as **Exhibit 4**.

[60] *See* Customs Classification Ruling N340084 Re: The tariff classification of agglomerated glass slabs from China (July 19, 2024), attached as **Exhibit 5**.

[61] *See* Customs Classification Ruling H303280 Re: Country of origin of quartz countertops; Section 301 trade remedy; 9903.88.03, HTSUS (Apr. 25, 2019), attached as **Exhibit 6**; Customs Classification Ruling N299117 Re: Country of origin determination of agglomerated quartz slabs (July 31, 2018), attached as **Exhibit 7**; Customs Classification Ruling N101559 Re: Country of origin marking of imported articles of agglomerated stone (May 10, 2010), attached as **Exhibit 8**.

evaluate the imports' impact on that industry – as the "the producers as a whole of the *like or directly competitive article* or those producers whose collective production of the like or directly competitive article constitutes a major proportion of the total domestic production of such article."[62] Although not addressed in the statute, the relevant legislative history distinguishes between "like" and "directly competitive" domestic articles.[63] The former term defines domestic products that are "substantially identical in inherent or intrinsic characteristics (*i.e.*, materials from which made, appearance, quality, texture, etc.)" to the imported article.[64] The latter term defines domestic products that are "are substantially equivalent for commercial purposes, that is, are adapted to the same uses and are essentially interchangeable" with the imported article.[65]

In its analysis of what constitutes the like or directly competitive domestic product, the Commission considers a number of factors in practice, including "the physical properties of the article, its customs treatment, its manufacturing process (where and how it is made, and whether in a separate facility), the product's uses, and the marketing channels through which the product is sold."[66] Notably, the Commission will look for "clear dividing lines between products, disregarding minor variations."[67]

---

[62] 19 U.S.C. § 2252(c)(6)(A)(i) (emphasis added).

[63] *Fresh, Chilled, or Frozen Blueberries*, Inv. No. TA-201-77, USITC Pub. 5164 (March 2021) ("*Blueberries*") at 7.

[64] *Id.* (citing H.R. Rep. No. 571, 93rd Cong., 1st Sess. 45 (1973); Senate Finance Committee, Report on Trade Reform Act of 1974 H.R. 10710, S. Rep. No. 1298, 93rd Cong., 2d Sess. at 121-22 (1974)).

[65] *Id.*

[66] *Id.* (citing *Large Residential Washers*, Inv. No. TA-201-076, USITC Pub. 4745 (Dec. 2017) ("*Washers*") at 7-12).

[67] *Id.* at 8.

Domestic QSP and imported QSP (including crushed glass surface products) are "substantially identical" under the Commission's regulations. Domestic QSP is, therefore, "like" the imported article covered by this petition, and the Commission should evaluate the impact of the imports on the domestic industry producing domestic QSP. In the AD/CVD investigations on *QSP from China* and *QSP from India and Turkey*, which cover the same imported article as this petition, the Commission defined domestic QSP as the domestic article "like" the imported merchandise covered by those investigations, and, accordingly, defined the domestic industry as all domestic producers of QSP.[68] Here, the factors the Commission typically considers in a safeguard investigation also support the conclusion that domestic and imported QSP are "substantially identical."

#### 1. *Domestic and Imported QSP Have Substantially Identical Physical Properties and End Uses Pursuant to the Commission's Regulations*

Domestic and imported QSP share substantially identical physical properties and uses, which are described above in Sections II.A. and II.B. In its domestic like product analysis in the AD/CVD investigations, the Commission rejected arguments from respondent parties attempting to differentiate QSP to define separate like products. In particular, the Commission concluded that upstream quartz slab and downstream fabricated QSP are part of a single domestic like product.[69] Furthermore, the Commission concluded that both domestic and imported QSP share the same essential physical characteristics. They are agglomerated stone surfaces produced from a mixture that is predominantly silica (quartz, quartz powder, or cristobalite) bound together with

[68] *QSP from China Inv Final*, USITC Pub. 4913 at 9, 13; *QSP from India & Turkey Inv Final*, USITC Pub. 5061 at 8, 14.

[69] *QSP from China Inv Final*, USITC Pub. 4913 at 5-9; *QSP from India & Turkey Inv Final*, USITC Pub. 5061 at 4-8.

resin, pigments, and other additives. QSP is typically manufactured into slabs of standard sizes and thicknesses but may also be cut into various shapes for end uses. Because of these uniform characteristics, QSP – regardless of origin – exhibits substantially identical durability, hardness, and aesthetic appeal. The Commission continued to define a single domestic like product in its first sunset review of the *AD/CVD Orders on QSP from China*.[70]

Domestic QSP also has the same essential physical characteristics as imported crushed glass surface products. In the AD/CVD investigations of QSP from China, Commerce rejected claims that QSP made of crushed glass are distinct from QSP made of crushed quartz. Commerce found that crushed glass, like crushed quartz, is made predominantly of silica.[71] Quartz is made from crystalline silica, whereas crushed glass is made from non-crystalline amorphous silica. Both are silica in a solid form. This difference in the type of silica is not commercially significant and does not demonstrate a clear dividing line between domestic QSP and imported crushed glass surface products. Like all QSP, crushed glass surface products are produced from a mixture that is predominantly silica bound together with resin, pigments, and other additives.

QSP from both domestic and foreign sources competes directly in the same end-use applications, including countertops, vanities, wall panels, flooring, and other decorative or functional surfaces in residential, commercial, and industrial properties. Importantly, the high degree of substitutability means purchasers view domestic and imported QSP as interchangeable, selecting between them based on price, color, design, or availability rather than any functional distinctions.

---

[70] *QSP from China First Review*, USITC Pub. 5578 at 4-9.

[71] *See* Commerce Memo re: Scope Modification Determination in AD/CVD Investigations on QSP from China (Dep't Commerce May 14, 2019) at 20-21, attached as **Exhibit 3**.

Consistent with the Commission's findings in the AD/CVD proceedings on *QSP from China* and *QSP from India and Turkey*, domestic and imported QSP are, therefore, "substantially identical" in terms of physical properties and uses.

***2. Domestic and Imported QSP Are Produced Using the Same Production Processes***

QSP producers worldwide employ essentially the same production processes, which typically involve seven separate stages: (1) mixing; (2) combining; (3) dispensing and molding; (4) pressing; (5) curing; (6) cooling; and (7) polishing. In the mixing stage, raw materials including silica (*e.g.*, quartz, quartz powder, cristobalite, glass powder, crushed glass), resin binder, pigments, and other additives are mixed together. In the combining stage, mixtures from the mixing stage may be blended. In the dispensing and molding stage, the combined material is dispensed into a rubber mold to be molded and pressed. In the pressing stage, the material in the mold may be put under vacuum inside the chamber of a press and the physical force of the press compacts the material into slabs of varying sizes and thicknesses. In the curing stage, the slabs are heated to harden the slabs. In the cooling stage, the slabs are cooled. In the polishing stage, the surface of the slabs is polished. The surface finish can vary, for example the polish could be smooth or matte. Finally, the slabs are inspected to ensure that they are free from any defects and damage. Production begins with crushing quartz, cristobalite, or another silica-based material into granules or powder, mixing the silica with resin and pigments, and subjecting the mixture to vibro-compression under vacuum. For crushed glass surface products, as with other QSP, silica-based glass is crushed to a glass powder before it is mixed with resin and pigments and subjected to vibro-compression under vacuum. Regardless of whether the QSP is made from crushed quartz or another silica-based material such as crushed glass, the slabs are then cured, polished, and cut into standard or customized sizes.

This standardized production process does not vary materially by country of origin. Wherever QSP is produced, the same inputs and processes are used, and the finished slabs have largely consistent performance characteristics. U.S. producers and importers confirmed in the investigations on *QSP from China* and *QSP from India and Turkey* that the production methods are "substantially identical," which supports the Commission's conclusion that there is no meaningful distinction between domestic and imported QSP on the basis of production processes.[72]

### *3. Domestic and Imported QSP Are Sold Through the Same Marketing Channels*

Domestic and imported QSP also move through the same channels of distribution in the U.S. market. Both are primarily sold as slabs to distributors, fabricators, and kitchen and bath retailers, which then cut and finish the slabs into the final consumer products. Some integrated producers both sell slabs and operate their own fabrication facilities, while most independent distributors and importers sell slabs directly to fabricators.

Domestic and imported QSP compete for the same downstream customers and ultimately serve identical end-user markets. Moreover, U.S. purchasers have reported that they source both domestic and imported QSP interchangeably through the same types of suppliers and distributors.[73]

[72] *QSP from China Inv Final*, USITC Pub. 4913 at 5-9; *QSP from India & Turkey Inv Final*, USITC Pub. 5061 at 4-8.

[73] *QSP from China Inv Final*, USITC Pub. 4913 at 5-9; *QSP from India & Turkey Inv Final*, USITC Pub. 5061 at 4-8.

#### 4. *Customs Treatment of the Imported Article Under Classification Rules Demonstrates That It Is Substantially Identical to Domestic QSP*

Customs treatment further confirms that imported QSP is substantially identical to domestic QSP. Imports of QSP enter under the same HTSUS subheading at the eight-digit level – 6810.99.00 – covering "Articles of cement, of concrete or of artificial stone, whether or not reinforced: Tiles, flagstones, bricks and similar articles: Other." This classification at the eight-digit level applies regardless of where the merchandise originates and regardless of whether the merchandise is a slab or a fabricated product. Imports of crushed glass surface products are imported under HTSUS subheading 7020.00.6000 ("Other articles of glass: Other").

#### 5. *Both Slabs and Fabricated Products Are Part of the Same Like Product*

In prior AD/CVD proceedings involving QSP, the Commission has consistently found that quartz slabs and fabricated QSP were not separate domestic like products and defined a single domestic like product coextensive with the scope.[74] In particular, the Commission has examined whether fabricated QSP and slabs should be defined to be separate domestic like products under its semi-finished product analysis.[75] The Commission found that all slabs are dedicated to production of fabricated products and that the products' essential physical characteristics remain the same, whether QSP is fabricated or not.[76] Consequently, the Commission found that quartz slab and fabricated QSP are a single domestic like product.[77]

[74] *QSP from India & Turkey Inv Final*, USITC Pub. 5061 at 7 n.24.

[75] *Id.*

[76] *Id.*

[77] *Id.*

PUBLIC VERSION

None of the relevant facts have changed, and the Commission should thus reach the same conclusion in this safeguard proceeding.

* * *

The factors the Commission typically analyzes in a safeguard investigation support defining the like domestic product as all QSP. The physical properties, end uses, production process, marketing channels, and customs treatment of the imported article demonstrate that domestically produced and imported QSP are substantially identical under the Commission's regulations. Moreover, with respect to crushed glass surfaces and other types of QSP that do not incorporate glass, the significant overlap in physical characteristics, uses, and manufacturing processes described above does not support finding clear dividing lines between these products. Accordingly, the Commission should define the domestic like product as inclusive of all QSP corresponding to the definition of the imported article.

**E. Domestic Industry**

Given the definition of the domestic like product as QSP, the domestic industry consists of integrated U.S. producers of QSP slabs.[78] These producers are listed and discussed further in Section III.[79]

[78] *See* 19 U.S.C. § 2252(c)(6)(A)(i).

[79] Petitioner does not include stand-alone fabricators as domestic producers in this petition. First, as per the Commission's practice, stand-alone fabricators do not engage in "sufficient production-related activities" to be included as domestic producers of QSP. Second, many stand-alone fabricators import QSP slabs and thus their interests are not aligned with QSP slab producers that have invested hundreds of millions of dollars in production facilities in the United States. Third, to the extent stand-alone fabricators are fabricating slabs that were produced in the United States, the production of those slabs has already been accounted for in the production figures reported by domestic slab producers. Fourth, there are many thousands of fabricators operating in the United States and there is no publicly available list of all the fabricators. Fifth, in the investigations of *QSP from China*, the Commission received responses to its U.S. producer questionnaires from U.S. producers of QSP slabs that accounted for the vast majority of slab production, but it only received 17 fabricator questionnaire responses that accounted for only one percent

## III. PETITIONER'S REPRESENTATIVENESS (19 C.F.R. § 206.14(A))

A safeguard petition must set forth the "percentage of domestic production of the like or directly competitive domestic article that such represented firms and/or workers account for and the basis for claiming that such firms and/or workers are representative of an industry."[80] Neither the law nor the Commission's regulations require a specific threshold to establish representativeness.

### A. Petitioner (19 C.F.R. § 206.14(b)(1))

Pursuant to 19 C.F.R. § 206.14(b)(1), the U.S. QSP producers and other companies participating as the QMAA are:

**Cambria Company LLC**
31496 Cambria Avenue
Le Sueur, MN 56058
Website: www.cambriausa.com
Tel: (507) 665-5003
E-mail: kari.barber@cambriausa.com

**Dal-Tile LLC**
7834 CF Hawn Freeway
Dallas, TX 75217
Website: www.daltile.com
Tel: (214) 309-4222
E-mail: renaud_dedecker@Mohawkind.com

**Guidoni USA**
263 E Oak St
McRae-Helena, GA 31055
Website: www.guidoni.com
Tel: (229) 315-8834
E-mail: rafael.guidoni@guidoni.com.br

**Architectural Surfaces, Inc.**[81]
401 Center Ridge Dr.
Suite 100, Austin, TX 78753
Website: https://arcsurfaces.com
Tel: (512) 264-7444
E-mail: rkaranam@arcsurfaces.com

of U.S fabrication of QSP. *QSP from China Inv Final*, USITC Pub. 4913 at III-1–III-2. Similarly, in the investigations of *QSP from India and Turkey*, while respondents contended that "there are at least 10,000 fabricators operating in the United States," only two stand-alone fabricators provided responses to the U.S. producer questionnaires. *QSP from India & Turkey Inv Final*, USITC Pub. 5061 at 1-17–1-18. Sixth, and finally, the U.S. Court of Appeals for the Federal Circuit has held that U.S. domestic QSP slab producers have standing to file an AD/CVD petition against imports of both slabs and fabricated product irrespective of the position of domestic fabricators. *Pokarna Engineered Stone Ltd. v. United States*, 56 F.4th 1345, 1347 (Fed. Cir. 2023).

[80] 19 C.F.R. § 206.14(b).

[81] Architectural Surfaces, Inc. is not a U.S. domestic producer but joins the QMAA in support of the safeguard petition as one of the largest distributors of QSP in the United States.

The QMAA is "representative" of the domestic industry because it accounted for a substantial portion of domestic production in 2024. There is no publicly available information regarding the total production of QSP in the United States by the domestic industry. Nor is there publicly available information regarding the production by any of the individual domestic producers of QSP. Thus, as the best information reasonably available to the Petitioner, the QMAA has estimated its share of total current U.S. production based on the number of production lines in its facilities and the number of production lines in the facilities of other known U.S. producers of QSP:

| **Company** | **Production Lines** | **Position** |
|---|---|---|
| Cambria Company LLC | 6 | Support |
| Dal-Tile LLC | 1 | Support |
| Guidoni USA | 1 | Support |
| Elite Quartz | 4 | None |
| E-Stone Corporation | 2 | None |
| LX Hausys | 3 | None |
| Total Lines | 17 | |

As can be seen in the table above, the QMAA accounts for 8 of the 17 QSP production lines in the United States. Petitioner emphasizes that estimating production based on production lines is conservative and likely understates the total production accounted for by the QMAA. Because the QMAA believes its production lines, which are supplied by Bretonstone, have larger capacity than the production lines that are employed by other domestic producers, the QMAA believes it accounts for a majority of domestic production of QSP in the United States. Petitioner also emphasizes that it accounts for 100% of domestic production that has to date expressed a position with respect to the safeguard petitions.

In prior safeguard proceedings, the Commission has initiated investigations for petitioners claiming to represent less than half of domestic production of the like product.[82] Moreover, in the context of Section 421 China safeguard proceedings, which used the same representativeness standard as petitions under Sections 201 and 202 of the Trade Act,[83] the Commission initiated at least one investigation for petitioners claiming less than half of domestic production.[84] This is consistent with the best reading of the statute, which is that when requiring that a petitioner be "representative of an industry," Congress did not intend for the term "representative" to mean a majority of the domestic industry.[85] If Congress had intended the term "representative" to mean "a majority," it would have defined it that way as it did in other contexts in safeguard proceedings.[86] Thus, on the basis that the QMAA represents 8 of 17

---

[82] *See, e.g., Crabmeat from Swimming Crabs; Institution of Safeguard Investigation*, 65 Fed. Reg. 15,008 (Mar. 20, 2000) (instituting safeguard investigation); Safeguard Petition on Certain Crabmeat (Mar. 2, 2000) at 8-9 (stating that petitioner represented 33% of domestic production and that additional companies that had agreed to support the safeguard petition represented "roughly another 13%" of production), excerpts attached as **Exhibit 35**.

[83] 19 U.S.C. § 2451(b)(1) (2009) (providing that a Section 421 petition may be filed "by an entity described in section 2252(a) of this title"); 19 C.F.R. § 206.44(c) (2009).

[84] *See, e.g.*, *Certain Passenger Vehicle and Light Truck Tires from China*, 74 Fed. Reg. 19,593 (Apr. 29, 2009) (instituting an investigation); Section 421 Petition on Consumer Tires from China (Apr. 20, 2009) at 5 (claiming that petitioners accounted for "46 percent of the consumer tire production capacity in the industry") excerpts attached as **Exhibit 36**.

[85] 19 U.S.C. § 2252(a)(1).

[86] It is a "cardinal principle of statutory construction that course must give effect, if possible, to every clause and word of a statute{.}" *Williams v. Taylor*, 529 U.S. 362, 404 (2000). The text of the statute requires a safeguard petition to be filed by those who are "representative of an industry." 19 U.S.C. § 2252(a)(1). However, in a separate context within safeguard proceedings, the statute requires a petition submitted by a majority of the domestic industry. Specifically, the statute authorizes the President to reduce, modify, or terminate safeguard relief only if "a majority of the representatives of the domestic industry" submit a petition requesting such change. 19 U.S.C. § 2254(b)(1)(B). If the drafters of the statute had meant for "representative" to mean a majority in the context of § 2252(a)(1), they would have used the term "majority" as they did in the context of § 2254(b)(1)(B). The use of different terms within related statutes makes clear that different meanings were intended. *See Loughrin v. United States*, 573

production lines of the domestic industry, the Commission should find that Petitioner is representative of the domestic industry.

In addition, the QMAA is representative of the domestic industry for the following reasons:

- The impact on the QMAA members' QSP business from increasing imports is representative of the experience of the entire domestic QSP industry. As discussed further below, the available evidence shows that other domestic producers of QSP experienced similar declines in operational and financial performance due to the surge of imports over the POI.

- The like product encompasses both QSP in slab form and QSP that has been fabricated. Cambria, one of the members of the QMAA, produces slabs and has its own fabrication operations.[87]

For all these reasons, the Commission should find that the QMAA is representative of the domestic industry and may file this safeguard petition.

### B. Other Known Domestic Producers of QSP (19 C.F.R. § 206.14(b)(3))

Pursuant to 19 C.F.R. § 206.14(b)(3), Petitioner provides the names and addresses of all other known domestic producers of QSP during the POI as follows:

**Elite Quartz**
4461 Highway 301 South
Latta, SC 29565
Website: https://www.elitequartz.com/
Tel: (843) 250-0983

**E-Stone Corporation**
1565 NW 36th Street
Miami, FL 33142

**LX Hausys**
3480 Preston Ridge Road, Suite 350
Alpharetta, GA, 30005
Website: www.lxhausysusa.com

**USA Quartz LLC**[89]
10 Van Dyck Rd
Jacksonville, FL 32218
Tel: +(561) 245-0866

---

U.S. 351, 358 (2014) ("{W}hen Congress includes particular language in one section of a statute but omits it in another – let alone in the very next provision – this Court presumes that Congress intended a difference in meaning." (internal citations and quotations omitted))

[87] *QSP from India & Turkey Inv Final*, USITC Pub. 5061 at 3 and I-13.

[89] As discussed throughout this petition, while USA Quartz was active during the POI, it has gone out of business and is no longer a producer of QSP.

Tel: (954) 266-6793 Email: krichardson@rdhllc.com

**Caesarstone USA, Inc.** [88]
1401 W. Morehead
Charlotte, NC 282208
Website: www.ceasarstoneus.com
Tel: (818 779-0999
Email: info@caeasarstoneus.com

## IV. QSP IS BEING IMPORTED IN INCREASED QUANTITIES

### A. Legal Standard

The statute first requires the Commission to determine whether QSP is being imported into the United States in such "increased quantities" as to be a substantial cause of serious injury, or the threat thereof.[90] Under Section 202 of the Trade Act, the increase in imports may be "either actual or relative to domestic production."[91] As detailed below, this statutory criterion is satisfied because imports of QSP increased significantly from 2020 to 2024, both in absolute terms and relative to domestic production, as well as relative to U.S. consumption.

### B. The Volume of U.S. Imports of QSP Increased Significantly Over the 2020 to 2024 Period in Both Absolute and Relative Terms

In absolute terms, the quantity and value of imports of QSP increased significantly over the past five years. In terms of quantity, total imports of QSP increased by 73.4% from 135 million SQF in 2020 to 234 million SQF in 2024.

[88] As discussed throughout this petition, while Caesarstone was active during the POI as a U.S. producer, it ceased its production operations in the United States in 2023.

[90] *See* 19 U.S.C. § 2252(b)(1)(A).

[91] *Id.* § 2252(c)(1)(C).




In terms of value as reported to CBP upon importation, total U.S. imports of QSP increased by 40.0% from $1.26 billion to $1.76 billion in 2024.[92] Of course, the value of sales displaced by low-priced imports that could have been made by the domestic industry is much higher.

As shown in the table below, imports also increased relative to domestic production. The ratio of U.S. imports to U.S. production rose from [ ] in 2020 to [ ] in 2024.

| **Ratio of U.S. Imports to U.S. Production (Quantity in Square Feet)** | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | **Calendar Year** | | | | | |
| | | **2020** | **2021** | **2022** | **2023** | **2024** | |
| U.S. Production | [ | | | | | | ] |
| U.S. Imports | | 135,252,123 | 201,135,281 | 215,082,118 | 188,344,542 | 234,476,551 | |
| Ratio of U.S. Imports to U.S. Production | [ | | | | | | ] |

[92] *See* U.S. Imports of QSP, attached as **Exhibit 1**.

**PUBLIC VERSION**

Finally, as shown in the table below, imports also rose significantly as a share of apparent domestic consumption:[93]

| Calculation of Market Share (in square feet and percent) | | | | | | | |
|---|---|---|---|---|---|---|---|
| ***Item*** | | **Calendar year** | | | | | |
| | | **2020** | **2021** | **2022** | **2023** | **2024** | |
| U.S. producers' U.S. shipments | [ | | | | | | ] |
| Total Imports | | 135,252,123 | 201,135,281 | 215,082,118 | 188,344,542 | 234,476,551 | |
| U.S. consumption value | [ | | | | | | ] |
| U.S. producers' U.S. shipments | [ | | | | | | ] |
| Total imports | [ | | | | | | ] |
| U.S. consumption value | | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | |

In particular, imports of QSP from all sources began the POI in 2020 with [ ] of the U.S. market, which stood at [ ] that year. Over the next five years, demand for QSP rapidly expanded, with total U.S. apparent consumption increasing by [ ] to reach [ ] by 2024. The U.S. domestic industry was eager to supply the expanding U.S. market and, as discussed in greater detail below, had invested in additional production capacity to be able to do so. However, while imports increased by 73.4% from 2020 to 2024, the domestic industry's U.S. shipments increased by [ ]. This resulted in imports taking [ ] percentage points of market share directly from the domestic industry to hold fully [ ] of the U.S. market by 2024. These trends show how rapidly imports are penetrating the U.S. market and displacing the domestic industry and establish serious injury under the legal standard.

---

93 *See* Calculation of Market Share, attached as **Exhibit 9**. To calculate total apparent consumption and market share, the QMAA has estimated the U.S. commercial shipments of the entire domestic industry by multiplying: (1) the QMAA's U.S. commercial shipments of QSP; by (2) the ratio of the QMAA's production capacity to the total production capacity of the entire domestic industry. *See id.*

# V. THE DOMESTIC INDUSTRY IS SUFFERING SERIOUS INJURY AND IS THREATENED WITH FURTHER SERIOUS INJURY

## A. Legal Framework

The second of the three statutory criteria concerns whether the domestic industry is seriously injured or threatened with serious injury. Section 202(c)(6)(C) of the Trade Act defines the term "serious injury" as "a significant overall impairment in the position of a domestic industry," and Section 202(c)(6)(D) defines the term "threat of serious injury" as "serious injury that is clearly imminent."[94] With respect to serious injury, the Commission considers:

(i) the inability of a significant number of firms to carry out domestic production operations at a reasonable level of profit,

(ii) the significant idling of productive facilities in the domestic industry, and

(iii) significant unemployment or underemployment within the domestic industry.[95]

With respect to threat of serious injury, the Commission considers:

(i) a decline in sales or market share, a higher and growing inventory (whether maintained by domestic producers, importers, wholesalers, or retailers), and a downward trend in production, profits, wages, productivity, employment (or increasing underemployment) in the domestic industry,

(ii) the extent to which firms in the domestic industry are unable to generate adequate capital to finance the modernization of their domestic plants and equipment, or are unable to maintain existing levels of expenditures for research and development, and

(iii) the extent to which the United States market is the focal point for the diversion of exports of the article concerned by reason of restraints on exports of such article to, or on imports of such article into, third country markets.[96]

---

[94] *See* 19 U.S.C. § 2252(c)(6)(C), 2252(c)(6)(D).

[95] *Id.* § 2252(c)(1)(A).

[96] *Id.* § 2252(c)(1)(B).

The presence or absence of any factor the Commission is required to evaluate is not "necessarily dispositive" of whether the increased imports are a substantial cause of serious injury, or the threat of serious injury, to the domestic industry.[97]

### B. The Domestic Industry Is Seriously Injured Under the Safeguard Standard

The evidence across all of the factors analyzed by the Commission – capacity and production trends, financial performance, and employment – demonstrates that the domestic QSP industry has sustained serious injury over the POI to the extent that safeguard relief is appropriate and necessary.

#### *1. Significant Idling of Production Facilities (19 C.F.R. § 206.14(e)(1)(i))*

The massive surge of imports of QSP into the U.S. market over the last five years has led to the idling of U.S. production facilities. Indeed, because of the negative impact of imports, two U.S. producers have stopped producing QSP in the United States entirely.

- Caesarstone announced in December 2023 that it was closing its Richmond Hill, Georgia slab plant, eliminating approximately 129 jobs.[98] The company stated the closure was needed to "optimiz{e} its global manufacturing footprint," saving $20 million annually – a clear sign that operating its U.S. facility had become unsustainable in the face of cheaper imports and that the company would turn to importing QSP rather than producing it in the United States.[99]

- In the wake of the relief granted against imports of QSP from China, USA Quartz opened a QSP manufacturing plant in Jacksonville, FL. However, USA Quartz was subsequently closed as it was unable to compete with the surge of low-priced imports.[100]

---

[97] *Id.* § 2252(c)(3).

[98] WTOC, Caesarstone Technologies announces closure of Richmond Hill Manufacturing Facility impacting over 100 employees (Dec. 18, 2023), attached as **Exhibit 10**; Caesarstone Provides Business Updates (Dec. 13, 2023), attached as **Exhibit 11**.

[99] *Id.*

[100] *QSP from China First Review*, USITC Pub. 5578 at I-16.

The domestic industry also has suffered from severely low levels of capacity utilization.

| Domestic Industry's Production Capacity Utilization (Quantity in SQF) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Item | | Calendar Year | | | | | |
| | | 2020 | 2021 | 2022 | 2023 | 2024 | |
| Production capacity | [ | | | | | | ] |
| Production | [ | | | | | | ] |
| Capacity Utilization | [ | | | | | | ] |

For example, as shown in the table above, the domestic industry's capacity utilization began the POI at [ ]% in 2020 before [ ] in 2024.[101] These trends are echoed by the evidence available for the broader industry. In the first sunset review of the *AD/CVD Orders on QSP from China*, the Commission gathered data from three domestic QSP producers (*i.e.*, Cambria, Dal-Tile, and Guidoni) regarding their U.S. operations. The Commission found that by 2023 the domestic industry's total production, capacity, and capacity utilization were all lower than in 2017, despite the new factories built by Dal-Tile and Guidoni – a strong indication of underutilized U.S. capacity.[102]

These low capacity utilization levels also show that the domestic industry had ample available capacity to produce additional QSP and supply it to the U.S. market over the POI. Indeed, domestic producers could have [ ] their production in 2023 and 2024 to supply the market. However, the surge of low-priced imports prevented the domestic industry from using their excess capacity as the imports took market share away.

[101] Petitioner's Confidential Operational and Financial Performance, attached as **Exhibit 12**.

[102] *QSP from China First Review*, USITC Pub. 5578 at 22-23.

### 2. *Inability of a Significant Number of Domestic Producers to Carry Out Domestic Production at a Reasonable Level of Profit (19 C.F.R. § 206.14(e)(1)(ii))*

The evidence in this petition also shows that the flood of imports of QSP has prevented a significant number of U.S. quartz producers to carry out domestic production of QSP at a reasonable profit.

| **Domestic Industry Profit Levels (Value in $1,000s)** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Item** | | **Calendar year** | | | | | |
| | | **2020** | **2021** | **2022** | **2023** | **2024** | |
| Net Sales Value | [ | | | | | | ] |
| Operating Income | [ | | | | | | ] |
| Operating Income / Net Sales Ratio | [ | | | | | | ] |
| Net Income | [ | | | | | | ] |
| Net Income / Net Sales Ratio | [ | | | | | | ] |

For example, while its net sales value [ ] from [ ], the domestic industry's operating income declined [ ] and saw declines in net income from [ ].

Further the profitability of the broader domestic industry over the last five years demonstrates that the legal standard has been met:

- In the first sunset review of the AD/CVD orders on *QSP from China*, the Commission found that the domestic industry's net sales and operating income were markedly lower in 2023 compared to 2017 and that the domestic industry's operating profit margins had also deteriorated over the same period.[103]

- Caesarstone saw a steep drop in its financial performance. In 2023, Caesarstone reported that its U.S. revenues fell 20.6% year-over-year.[104] By mid-2023, Caesarstone launched a major restructuring plan, implicitly acknowledging the unprofitability of its U.S.

[103] *Id.* at 23.

[104] Stone Update, Caesarstone: Positioning for 2024 (Feb. 22, 2024), attached as **Exhibit 13**.

manufacturing. When it decided to cease production at its Georgia plant, it incurred a one-time $45–55 million impairment charge.[105] By August 2024, Caesarstone CEO Yos Shiran explained that after closing two plants (one in the United States and one in Israel), "we are now sourcing over 60% of our production from our global network of manufacturing partners," a move that was aimed at "driving margin improvements."[106] In other words, Caesarstone shifted from producing QSP in the United States to importing QSP from overseas facilities because running its U.S. factory had become financially unsustainable for the company.

- As mentioned, the USA Quartz plant in Florida likely folded because it could not achieve a profitable scale due to the global flood of imports of QSP.

- While the Cosentino Group ("Cosentino") announced in 2023 that it planned to invest $270 million in a new manufacturing facility in Jacksonville, Florida, it has yet to break ground on this new facility.

The financial performance of the domestic industry over the POI is directly related to the increased volumes of low-priced imports. As overall apparent consumption for QSP showed large increases over the POI, the domestic industry should have been posting record profits.

### *3. Significant Unemployment or Underemployment in the Domestic Industry (19 C.F.R. § 206.14(e)(1)(iii))*

The loss of U.S. market share over the past five years has had a negative effect on the domestic industry's employment. A significant number of workers were terminated because of the recent closures of two major U.S. producers. When Caesarstone announced in late 2023 that it was closing its Richmond Hill, Georgia facility, it stated it was eliminating approximately 129 jobs.[107] The closure of the USA Quartz facility in Florida also resulted in the loss of jobs in the domestic industry. As for the QMAA, the alliance reported employing [ ] production-related

[105] Caesarstone Provides Business Updates (Dec. 13, 2023), attached as **Exhibit 11**.

[106] Earnings call: Caesarstone sees strategic gains amid market slowdown (Aug. 8, 2024), attached as **Exhibit 14**.

[107] WTOC, Caesarstone Technologies announces closure of Richmond Hill Manufacturing Facility impacting over 100 employees (Dec. 18, 2023), attached as **Exhibit 10**; Caesarstone Provides Business Updates (Dec. 13, 2023), attached as **Exhibit 11**.

workers ("PRWs") in 2020, and this figure had [ ] PRWs in 2024. Thus, the explosion of imports of QSP over the last five years has directly harmed American workers who have lost their jobs to low-priced imports.

* * *

In sum, all three factors analyzed by the Commission show that the domestic industry is seriously injured under the safeguard statute.

### C. The Domestic Industry Is Threatened with Further Serious Injury

As established above, the domestic industry suffered significant market share losses, deteriorating financial performance, low and declining capacity utilization, and a negative impact on its employment. Without the provision of immediate relief through this safeguard investigation, imports threaten continued serious injury to the domestic industry.

#### *1. Decline in Sales and/or Market Share (19 C.F.R. § 206.14(e)(2)(i))*

The huge increase in imports from 2020 to 2024 has led to a decline in U.S. sales and market share for the domestic industry. Over a period when overall demand in the U.S. market expanded by [ ], the domestic industry's U.S. commercial shipments [ ] from [ ] in 2020 to [ ] in 2024.[108] As mentioned above, Caesarstone also reported declines in its revenues over the POI.[109]

The market share of the domestic industry as a whole declined from [ ] in 2020 to [ ] percent in 2024, a decline of [ ] percentage points.[110] This loss of market share by the domestic industry shows how quickly imports have supplanted U.S. production. If left

[108] Calculation of Market Share, attached as **Exhibit 9**.

[109] Stone Update, Caesarstone: Positioning for 2024 (Feb. 22, 2024), attached as **Exhibit 13**.

[110] Calculation of Market Share, attached as **Exhibit 9**.

PUBLIC VERSION

unchecked, imports will continue to increase and take additional market share from the domestic industry, leading to continued declines in sales and market share.

### *2. Downward Trend in Production (19 C.F.R. § 206.14(e)(2)(i))*

Over the POI, the domestic industry's production [ ] in 2020 to [ ] in 2024 – a [ ].[111] In addition, two U.S. producers — Caesarstone and USA Quartz — closed their U.S. production facilities during the period. For a capital-intensive industry with high fixed costs, these persistent declines in production leave the domestic industry extremely vulnerable to the threat of further serious injury by reason of the surge in low-priced imports.

### *3. Declining Profits and Productivity (19 C.F.R. § 206.14(e)(2)(i))*

As detailed above, the domestic industry has experienced [ ] in profitability over the POI, including [

].[112] This demonstrates serious injury under the Commission's standards.

The loss of market share [

]:

| Domestic Industry Productivity Levels | | | | | | | |
|---|---|---|---|---|---|---|---|
| Item | | Calendar year | | | | | |
| | | 2020 | 2021 | 2022 | 2023 | 2024 | |
| Production (quantity) | [ | | | | | | ] |
| Hours Worked by PRWs (1,000 hours) | [ | | | | | | ] |
| Production per Hour | [ | | | | | | ] |

[111] Estimation of Total U.S. Shipments and Total U.S. Production, attached as **Exhibit 9**.

[112] Petitioner's Confidential Operational and Financial Performance, attached as **Exhibit 12**.

The domestic industry's productivity [ ].[113]

#### *4. Declines in Employment and Wages (19 C.F.R. § 206.14(e)(2)(i))*

As discussed above, the domestic industry has experienced a significant decline in employment from 2020 to 2024, with the number of its PRWs employed by the QMAA [ ] from [ ] in 2020 to [ ] PRWs in 2024 and over 100 other employees being laid off over the POI due to the closure of Caesarstone and USA Quartz.[114] Unless relief is provided from imports of QSP, they will continue to surge into the United States and threaten further layoffs and reduced hours.

#### *5. A higher and growing inventory (19 C.F.R. § 206.14(e)(2)(i))*

The QMAA does not have access to data regarding inventories of QSP held by U.S. importers or foreign producers. However, the surge of imports into this market has likely contributed to a significant increase in U.S. inventories of QSP. These high inventory volumes in the United States may cause prices to remain depressed or continue to fall in the near future. Thus, this factor indicates that the domestic industry is threatened with additional serious injury by reason of subject imports.

#### *6. Inability to Generate Capital for Investment and Research and Development (19 C.F.R. § 206.14(e)(2)(ii))*

The declining profitability experienced by the domestic industry has prevented it from making necessary investments to enable U.S. producers to compete against the surge in low-priced imports. With the low capacity utilization rates being experienced by the domestic

[113] *Id.*

[114] *Id.*

industry due to low-priced imports, it simply does not make sense for domestic producers to invest in additional production capacity.

### *7. Exports Are Driven to the U.S. Market (19 C.F.R. § 206.14(e)(2)(iii))*

The United States is the largest and most attractive market for foreign producers of QSP. Demand for QSP in the U.S. market has showed sustained growth for many years due to its improved aesthetic appeal, durability, stain and scratch resistance, heat tolerance, and anti-microbial properties compared to granite and marble surface products.[115] Indeed, multiple countries have exported QSP to the United States throughout the period, maintaining distribution networks and customer contacts and demonstrating their ability to penetrate the U.S. market. In addition to demand for QSP growing, the U.S. market is also attractive to foreign producers because U.S. homeowners spend significant amounts on home improvement projects, including kitchen renovations with new countertop surfaces, placing the United States among the top countries in the world in total dollars spent on home renovations. As confirmation of these basic facts, M S International, Inc. ("MSI"), a leading U.S. distributor of QSP, touts that the Journal of Commerce has ranked it as "One of the Top 20 Importers" based on the number of containers of imports it has made, including imports of "quartz countertops."[116]

### *8. Changes in Levels of Prices, Production, and Productivity (19 C.F.R. § 206.14(e)(3))*

U.S. imports of QSP have substantially undersold the domestic product throughout the period, with the levels of underselling increasing as imports surged from 2020 to 2024.[117] Price

---

[115] *See QSP from China Inv Final* at I-11; *see also QSP from India & Turkey Inv Final* at I-13.

[116] MS International Recognized as One of the Top 20 Importers In 2023, attached as **Exhibit 16**.

[117] *See* Underselling Analysis, attached as **Exhibit 18**.

comparisons based on Petitioner's average unit values ("AUVs") of U.S. shipments and importers' AUVs for the period 2019 to 2023 demonstrate that imports are priced lower than the domestic product. As shown in the table below, cumulated imports undersold Petitioner in every year for the last five years by margins of at least [ ] and steadily increasing up to [ ] in 2024.

| Underselling Analysis | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Item** | | **Calendar year** | | | | | |
| | | **2020** | **2021** | **2022** | **2023** | **2024** | |
| | | **Unit Price (*in $/SQF*)** | | | | | |
| Domestic Industry | [ | | | | | | ] |
| Total imports | | 9.29 | 9.37 | 9.27 | 8.16 | 7.50 | |
| Margin of Underselling | [ | | | | | | ] |

Notably, the degree of underselling by imports has intensified over the past five years, allowing imports to gain further market share at the domestic industry's expense. Moreover, the average price of imports has steadily fallen over the last five years from $9.29/SQF in 2020 to $7.50/SQF in 2024.

The Commission observed similar underselling when conducting the AD/CVD investigations of *QSP from China* and *QSP from India and Turkey*. In the first set of investigations on *QSP from China*, the Commission found that "{s}ubject imports undersold the domestic product in all 180 quarterly price comparisons … at underselling margins that ranged from 4.3 percent to 85.3 percent and averaged 49.2 percent."[118] Moreover, the Commission explained that the underselling "enabled the subject imports to capture a growing share of the U.S. market" and that subject imports "also suppressed domestic prices to a significant

[118] *QSP from China Inv Final* at 27.

degree."[119] In the later investigations on *QSP from India and Turkey*, the Commission found that "cumulated subject imports pervasively undersold the domestic like product throughout the POI" and that "cumulated subject imports undersold the domestic like product in all 129 quarterly price comparisons involving 18.2 million square feet of cumulated subject imports at underselling margins that ranged from 11.4 percent to 53.9 percent and averaged 28.9 percent."[120] Moreover, the Commission explained that the significant underselling by subject imports fueled their significant increase in market share over the POI, particularly in 2019 as QSP imports from China exited the market after the imposition of cash deposits and the AD and CVD orders on QSP from China.[121]

[

], the evidence also shows that the domestic industry could not increase prices sufficiently to cover rising costs, and, as a result, experienced price suppression due to low-priced import competition. The domestic industry's ratio of costs of goods sold ("COGS") to sales [ ] in 2024.[122] This price suppression, along with reduced sales volumes, caused the domestic industry's operating income as a share of net sales to worsen during the POI.

As described earlier, the increase in low-priced import competition forced U.S. producers to substantially reduce their production of QSP, and as a result, the U.S. producers' capacity utilization and productivity rates plummeted over the POI.

---

[119] *Id.* at 28-29.

[120] *Id.* at 28.

[121] *Id.* at 28-29.

[122] Petitioner's Confidential Operational and Financial Performance, attached as **Exhibit 12**.

### D. Conclusion on Injury

The surge of QSP imports has been remarkable—grabbing market share from U.S. producers, slashing domestic output, and closing factories. Safeguard relief is appropriate and needed in light of the aggressive surge of imports that have entered the United States including by misclassification and transshipping.

## VI. IMPORTS OF QSP ARE A SUBSTANTIAL CAUSE OF SERIOUS INJURY, OR THREAT THEREOF, TO THE DOMESTIC INDUSTRY

### A. Legal Framework

To reach a finding under the safeguard provision, the Commission must "determine whether an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article."[123] In this context, the term "substantial cause" is defined as "a cause which is important and not less than any other cause."[124] The statute instructs the Commission to "take into account all economic factors which it considers relevant," including, but not limited to, any increase in imports in either absolute or relative terms, and any decline in the market share held by the domestic industry.[125] The Commission must also "consider the condition of the domestic industry over the course of the relevant business cycle," and "examine factors other than imports which may be a cause of serious injury, or threat of serious injury, to the domestic industry."[126]

---

[123] 19 U.S.C. § 2252(b)(1)(A).

[124] *Id.* § 2252(b)(1)(B).

[125] *Id.* § 2252(c)(1), 2252(c)(1)(C).

[126] *Id.* § 2252(c)(2)(A), 2252(c)(2)(B).

In practice, the Commission has divided its substantial cause inquiry into two distinct stages.[127] First, the Commission assesses whether subject imports constitute an important cause of serious injury by examining economic indicators such as trends in import volume and pricing, along with the trade and financial performance of the domestic industry, in the context of the prevailing conditions of competition in the U.S. market.[128] Second, the Commission evaluates the role of other potential contributing factors in the domestic industry's injury.[129] In past investigations, the Commission has determined that factors including declining demand, the presence of existing trade remedies, and internal corporate mismanagement did not outweigh imports as the more important cause of serious injury.[130] As shown below, the Commission should reach the same conclusion here.

**B. Conditions of Competition**

The conditions of competition in the U.S. market for QSP establish that the domestic industry is susceptible to serious injury by reason of imports. The Commission described these conditions of competition — which include a high degree of substitutability between imports and the domestic product and the predominant importance of price in

[127] *See Washers*, USITC Pub. 4745 at 38-51; *Crystalline Silicon Photovoltaic Cells (Whether or not Partially or Fully Assembled into Other Products)*, Inv. No. TA-201-75, USITC Pub. 4739, (Nov. 2017) at 43-65.

[128] *Id.*

[129] *Id.*

[130] *See*, *e.g.*, *Steel,* Inv. No. TA-201-73, USITC Pub. 3479 (Dec. 2001) at 63-65, 114-115.

PUBLIC VERSION

purchasing decisions — in its original AD/CVD investigations concerning *QSP from China* and *QSP from India and Turkey*.[131] In the recently completed five-year review of *QSP from China*, which encompasses a period of review from 2019 through 2023, the Commission found that these conditions of competition continued to characterize the U.S. market for QSP.[132]

### *1. Demand Conditions*

Demand for QSP is driven by construction and remodeling of homes and commercial properties.[133] For context, the chart below shows that residential construction has been steadily increasing since the financial crisis in 2008.[134]




[131] *QSP from China Inv Final*, USITC Pub. 4913 at 22-26; *QSP from India & Turkey Inv Final*, USITC Pub. 5061 at 22-26.

[132] *QSP from China First Review*, USITC Pub. 5578 at 13-17.

[133] *Id.* at 22-23.

[134] U.S. Census Bureau, Monthly New Residential Construction, July 2025 (May 16, 2025), attached as **Exhibit 19**.

PUBLIC VERSION

During the POI, after dipping somewhat in 2022 and 2023, residential construction has remained relatively flat in 2024.

The situation is similar in the remodeling market. The graph below sets forth the National Association of Home Builders' ("NAHB") most recent release of its NAHB/Westlake Royal Remodeling Market Index ("RMI"): [135]




After peaking in 2021, the RMI showed declines in 2022 and 2023 before flattening out in 2024.

As noted above, however, while housing construction and renovation activity has been flat over the last five years, demand for QSP has showed sustained growth as consumers continue to switch to QSP over other alternatives due to its superior aesthetic and performance characteristics.[136] Indeed, a survey published by *Kitchen & Bath Design News* in March 2025 found that "engineered quartz is, far and away, the countertop surfacing material that is growing

[135] The National Association of Home Builders, "Remodeling Market Sentiment Down in the First Quarter" (Apr. 10, 2025), attached as **Exhibit 20**.

[136] *See QSP from China Inv Final*, USITC Pub. 4913 at I-11; *see also QSP from India & Turkey Inv Final*, USITC Pub. 5061 at I-13.

most in demand among kitchen consumers."[137] This explains why total apparent consumption for QSP increased by [ ] from [ ] in 2020 to reach [ ] by 2024.[138]

### 2. *Supply Conditions*

There has been a significant increase in investment and production capacity within the domestic QSP industry over the POI, including capital investments which was spurred both by growing demand for QSP and the imposition of AD/CVD orders on *QSP from China* and *QSP from India and Turkey*:

- Cambria completed a $130 million factory expansion in November 2022, adding a sixth production line and at least 50 jobs, bringing the footprint of its operations in Le Sueur, Minnesota to one million SQF.[139]

- Dal-Tile began production of QSP in its new facility in Dickson, Tennessee, with total investment in the new facility reaching $140 million and creating 142 new jobs when the facility became fully operational in 2023.[140] This allowed Dal-Tile to launch new products that include the largest QSP slabs in the world.[141]

- Guidoni Group completed a new QSP facility in McRae-Helena, GA, in December 2020, investing $96 million and creating 455 new jobs.[142]

- LX Hausys announced in 2020 that it added a third production line at its existing

---

[137] Kitchen Countertop Trends: Bold Choices (Mar. 5, 2025), attached as **Exhibit 21**.

[138] Calculation of Market Share, attached as **Exhibit 9**.

[139] Dee DePass, "It's Hard But We Just Hustle," *Star Tribune* (Nov. 20, 2022), attached as **Exhibit 22**.

[140] Chris Gadd, "100 jobs at new Dickson Dal-Tile facility, company reps at Dickson Co. fair," *The Tennessean* (Sept. 4, 2018), attached as **Exhibit 23**.

[141] Floor Covering Weekly, "Daltile debuts new domestically made quartz lines" (Feb. 21, 2020), attached as **Exhibit 24**.

[142] "Exporter Guidoni Group to locate facility in Telfair County," *The Albany Herald* (Nov. 27, 2019), attached as **Exhibit 25**; "Penetron Adds Durability to Georgia (USA) Stone Manufacturing Plant," PRWeb.com (May 20, 2021), attached as **Exhibit 26**.

manufacturing location in Adairsville, GA. The new facility spans more than 111,000 SQF, increases the company's production capacity by 50 percent, and is staffed with 40 new employees.[143]

- The U.S. importer M S International and the Chinese producer Spectrum Quartz created a joint venture, Elite Quartz, which built a 360,000 square foot manufacturing plant in Latta, South Carolina, which began operations in 2020. As of 2022, the facility has created 150 jobs in Dillon County, South Carolina.[144]

- Cosentino announced in 2023 that it planned to invest $270 million in a new manufacturing facility in Jacksonville, Florida. Cosentino purchased land for this facility in January 2025 and plans to begin operations with 180 employees in 2028.[145] Planned future investments in this plant could total more than $440 million.[146]

- OK Stone Engineering has announced a "next-generation US factory for engineered stone in Fort Worth, Texas" projected to start full operations by 2026.[147]

While the domestic industry expanded its production capacity and maintained ample idle capacity with which it could have increased its sales to the U.S. market throughout the POI, it was unable to do so due to competition from low-priced imports.

Importantly, the domestic industry can produce all types of QSP sold in the United States and competes with imports in all areas of the U.S. market. In the prior investigations of *QSP from China* and *QSP from India and Turkey*, the Commission rejected arguments that

---

[143] "LG Hausys Expands Viatera Operations," CountertopResource.com (Mar. 19, 2020), attached as **Exhibit 27**.

[144] MSI Surfaces, "MSI's Luxalume Technology and Elite Quartz Manufacturing Collaboration" (Sept. 9, 2022), attached as **Exhibit 28**; MSI Surfaces, "MSI Announces Joint Venture with Spectrum Quartz to Build a Domestic State-of-the-Aert Quartz Manufacturing Facility" (Dec. 11, 2019), attached as **Exhibit 29**; Elite Quartz Manufacturing, "Who We Are", attached as **Exhibit 30**.

[145] Dan Macdonald, "Cosentino buys land at the Cecil Commerce Center megasite for $20.39 million," *Jacksonville Daily Record* (Jan. 27, 2025), attached as **Exhibit 31**.

[146] Mike Mendenhall, "Plan to sell 330 acres of Cecil megasite to Spanish manufacturer Cosentino headed to City Counsel," *Jacksonville Daily Record* (Apr. 24, 2023), attached as **Exhibit 32**.

[147] OK Stone, Inc., attached as **Exhibit 33**.

competition between the domestic product and imports was attenuated because they served different markets. The Commission explained:

> We are not persuaded by Respondents' argument that competition between the cumulated subject imports and the domestic product is attenuated because they serve different parts of the QSP market and that the domestic like product is a luxury product not sold to the broader market. As noted above, the domestic like product and cumulated subject imports are sold in the same patterns and product types and the record shows that domestic products were competing with cumulated subject imports for sales to a variety of end users. With respect to Cambria, which was the focus of respondents' arguments, the record shows that it competes for sales to various types of end users and does not simply serve the high end of the residential U.S. market for QSP. It reports making sales to commercial projects, as well as to mass retailers such as Home Depot and Costco. Contrary to Respondents' contentions, the record indicates that Cambria sells to builders' residential projects. There is also information in the current record indicating that other U.S. slab producers (including USA Quartz, Estone, LG Hausys, Caesarstone, and Dal-Tile) … compete in the mass market sector of the U.S. market for QSP and that subject producers from India and Turkey also market their QSP as luxury products.[148]

The bottom line is that the domestic industry had growing and ample excess capacity over the POI to serve the U.S. market but was robbed of the opportunity to do so by a flood of low-priced imports.

***3. Substitutability***

The ability of imports to rapidly capture sales and market share from the domestic industry is aided by the high degree of substitutability between imported QSP and domestically produced QSP. In the investigations on *QSP from China*, the Commission found that "there is a high degree of substitutability between domestically produced QSP and QSP imported from China, and that price is an important factor in purchasing decisions."[149] Similarly, in the

[148] *QSP from India & Turkey Inv Final*, USITC Pub. 5061 at 35-36.

[149] *QSP from China Inv Final*, USITC Pub. 4913 at 26.

investigations on *QSP from India and Turkey*, the Commission found a "moderate-to-high degree of substitutability between subject imports from India and Turkey and the domestic like product."[150] A large majority of purchasers reported that price was "very important" in their purchasing decisions, and most purchasers reported that differences other than price "were sometimes or never important."[151] These conditions of competition have not changed since these prior two investigations. Thus, the U.S. market remains characterized by a moderate-to-high degree of substitutability between imports and domestically produced QSP, and price remains a primary consideration when choosing between the two sources.

### C. Imports Are a Substantial Cause of Serious Injury and Threat of Serious Injury to Domestic Producers

As demonstrated above, the evidence related to all relevant economic factors examined by the Commission in a safeguard investigation shows that the domestic industry is seriously injured and threatened with further serious injury. As demonstrated below, there can be no doubt that imports were a substantial cause of this serious injury and that they threaten to cause additional serious injury if left unaddressed. The declining performance of the domestic industry between 2020 and 2024 corresponded with a surge in low-priced imports, which undersold the domestic product at margins that exceeded roughly [ ] over the entire period and captured significant market share from the domestic industry.

---

[150] *QSP from India & Turkey Inv Final*, USITC Pub. 5061 at 25.

[151] *Id.* at 25–26.

### 1. *Imports Have Captured Sales and Market Share at the Direct Expense of the Domestic Industry*

The fact that low-priced imports are a substantial cause of serious injury to the domestic industry is evidenced by the decline in U.S. producers' market share as imports of QSP surged over the POI and captured market share from the domestic industry. As the volume of imports surged from 135 million SQF in 2020 to 234 million SQF in 2024, the market share held by imports rose from [ ] to [ ].[152] The market share held by the domestic industry, in turn, dropped from [ ] to [ ].[153] As imports captured sales and revenues from U.S. producers — precipitating facility closures, production curtailments, and layoffs — the volume of imports also increased substantially as a share of domestic production. Indeed, as discussed above, the ratio of imports to U.S. production grew from [ ] in 2020 to [ ] in 2024. In other words, by the end of the POI, the volume of imports in a single year represented exactly [ ] times the entire production of the domestic industry.

### 2. *Imports Have Undersold Domestically Produced QSP by Substantial Margins*

The fact that subject imports are a substantial cause of the serious injury experienced by the domestic industry is also evidenced by the pervasive underselling that took place during the POI. As discussed above, annual price comparisons based on AUVs demonstrate that imports were priced lower than U.S. producers' U.S. shipments in each year between 2020 and 2024. Indeed, imports overwhelmingly undersold the domestic product during the POI, with margins of

[152] Calculation of Market Share, attached as **Exhibit 9**.

[153] *Id.*

underselling ranging from [ ] to [ ].[154] In addition, in the investigations of both *QSP from China* and *QSP from India and Turkey*, the Commission has found universal underselling in every quarterly comparison of every product for which it collected pricing information.

A comparison of the domestic industry's COGS to the AUVs of all imports underscores the dilemma being faced by domestic producers:

| Comparison of Domestic Industry COGS to Import AUVs | | | | | | | |
|---|---|---|---|---|---|---|---|
| Item | | Calendar year | | | | | |
| | | 2020 | 2021 | 2022 | 2023 | 2024 | |
| | | Unit Price (*in $/SQF*) | | | | | |
| Domestic Industry COGS | [ | | | | | | ] |
| Total Imports AUV | | 9.29 | 9.37 | 9.27 | 8.16 | 7.50 | |

As shown in the table above, import AUVS are [ ] the domestic industry's COGS throughout the entire POI, with the gap widening from [ ].

Because QSP from all sources is highly fungible and sold primarily on the basis of price, this underselling allowed imports to capture sales and market share from the domestic industry. As imports surged, the domestic industry was also forced to compete for sales at lower prices and accept lower prices in contracts. Consequently, the domestic industry experienced a cost-price squeeze, leading to price depression and suppression, and poor and worsening financial results.

[154] Underselling Analysis, attached as **Exhibit 18**.

### 3. *Imports Are the Most Important Factor Causing Serious Injury to the Domestic Industry*

No other factor besides low-priced imports can adequately explain the serious injury experienced by the domestic industry. As documented above, the substantial loss in market share the domestic industry suffered to imports over the 2020 to 2024 period, the closures and idling of productive facilities and lost jobs as a result of competition from low-priced imports, and the financial performance of the U.S. industry due to surging volumes of low-priced imports, all provide compelling evidence that imports are the most important factor causing serious injury to the domestic industry.

Declining demand due to tepid activity in the construction and home renovation sectors of the economy cannot explain the deteriorating operations and financial performance of the domestic industry. Because consumers have been steadily switching to QSP as the material of choice for their countertops and other surface applications, the market and demand for QSP have continued their trajectory of high growth over the last five years. Indeed, apparent consumption increased by an incredible [ ] between 2020 and 2024.

Nor is there any evidence that the serious injury to the domestic industry was caused by a lack of investment or an inability to supply customers. The domestic industry engaged in substantial capital expenditures immediately prior to and during the POI, as three new U.S. producers — Dal-Tile, Guidoni, and Elite Quartz — opened facilities and entered the market. In addition, the established producers Cambria and LX Hausys invested in new production lines during the POI to increase their capabilities to supply QSP to the U.S. market. That these companies were unable to earn adequate returns on their investments is a direct result of increasing volumes of imports, which undercut U.S. prices and captured sales from the domestic industry. Further, these imports were not drawn into the U.S. market to fill a supply gap. The domestic industry maintained ample idle

capacity with which it could have increased its sales to the U.S. market throughout the POI and contended with increasing volumes of imports that far exceeded the growth in demand. Just as the Commission recognized in the AD/CVD investigations on *QSP from China* and *QSP from India and Turkey* that no other factors could reasonably explain the domestic industry's losses in market share, output and revenue that resulted from the subject imports, so too here no factor other than imports can explain the domestic industry's losses in market share, output and revenue from 2020 to 2024.

For all the above reasons, the Commission should find that imports are the most important cause, and thereby a substantial cause, of the serious injury experienced by the domestic industry.

## VII. RELIEF SOUGHT AND PURPOSE THEREOF (19 C.F.R. § 206.14(G))

The QMAA urgently seeks relief to prevent the ongoing serious injury to the domestic QSP industry as well as the imminent threat of additional serious injury in the future. Only a strong and effective remedy can stem the flood of surging import volumes and depressed import prices. The QMAA therefore calls on the Commission to consider the following forms of relief, among others, to safeguard the domestic industry:

- A quota system that would limit the volume of imports on a country-specific basis; and
  - A 50% *ad valorem* tariff on all imports of QSP to address the injurious behavior of imports; or
  - if an *ad valorem* tariff is not imposed, a specific tariff applied to the weight of the QSP at an appropriate rate to address the injurious behavior of imports.

The remedy should encompass both QSP slabs and prefabricated QSP that has been cut to size offshore before importation. The surge in imports of low-priced prefabricated QSP are also injuring U.S. fabricators by undercutting their business model, displacing demand for domestic cutting and finishing services, eroding the fabricators' profit margins and customer base, and

stealing the opportunity to use domestically produced QSP slabs. Based on current trends, unless the safeguard remedy encompasses prefabricated product, U.S. fabricators will be wiped out.

The QMAA believes that some or all of these potential forms of relief are necessary to remedy the serious injury, and threat thereof, caused by imports. In addition, the QMAA welcomes participation in any other program designed to strengthen U.S. manufacturing of QSP and the products made by the industry's customers. To effectively address the harm suffered by the domestic industry, the QMAA anticipates that any remedy will need to last, at a minimum, for the initial statutory period of up to four years, with the option to extend such relief for as long as eight years as required to ensure that imports do not continue causing serious injury to the domestic industry.

The QMAA also reserves the right to amend or adjust any of the requested remedies during this investigation as the record develops and expects to provide further details as the proceeding advances.

## VIII. THE INCREASE IN IMPORTS RESULTED FROM UNFORESEEN DEVELOPMENTS AND FROM OBLIGATIONS INCURRED UNDER THE WTO AGREEMENT

Consistent with U.S. obligations under Article XIX of the General Agreement on Tariffs and Trade ("GATT") and the World Trade Organization's ("WTO") Agreement on Safeguards ("Safeguards Agreement"), the recent surge in imports of QSP, which is a substantial cause of serious injury to the domestic QSP industry, is the result of unforeseen developments and the effects of earlier U.S. trade concessions. In previous safeguard investigations, the Commission has analyzed whether the increased imports at issue resulted from unforeseen developments and

from the effect of obligations incurred under the GATT.[155] The following unforeseen developments and obligations incurred under the GATT have resulted in this surge in imports.

First, despite the United States' attempts to alleviate the injury done to its domestic industry through the legitimate imposition of targeted AD/CVD orders, imports have nonetheless continued to skyrocket. Indeed, there has been a surge of QSP imports from several third countries such as Cambodia, Indonesia, Thailand, and Vietnam since the imposition of the AD/CVD orders on *QSP from China* and *QSP from India and Turkey*:

- ***Cambodia.*** U.S. imports of QSP from Cambodia increased by 20,800% from 13,875 SQF in 2020 to over 2.9 million SQF in 2024.[156]

- ***Indonesia.*** U.S. imports of QSP from Indonesia increased by 12,400% from 245,719 SQF in 2020 to over 3.3 million SQF in 2024.[157]

- ***Thailand.*** U.S. imports of QSP from Thailand increased by 1,900% from 1.4 million SQF in 2020 to almost 28 million SQF in 2024.[158]

- ***Vietnam.*** And U.S. imports of QSP from Vietnam increased by 121% from 19 million SQF in 2020 to over 42 million SQF in 2024.[159]

Had it not been for the increase in imports from Thailand and Vietnam alone over the last five years, the domestic industry could have built an additional 12 production lines with an investment of roughly $1 billion that would have supported the employment of 3,000 American workers.

---

[155] *See, e.g.*, USITC, Supplemental Report of the U.S. International Trade Commission Regarding Unforeseen Developments, Investigation No. 201-TA-75, 70 (Dec. 27, 2017); USITC, Supplemental Report of the U.S. International Trade Commission, Investigation No. 201-TA-78 (Oct. 10, 2024).

[156] *See* U.S. Imports of Quartz Surface Products, attached as **Exhibit 1**.

[157] *Id.*

[158] *Id.*

[159] *Id.*

As the Commission has previously found, situations where AD/CVD orders have seen such limited success were not foreseen when the United States made concessions in the global trade economy by acceding to the WTO.[160] The ineffectiveness of the AD/CVD orders has uniquely contributed to the idling of domestic capacity and injury to domestic producers. As discussed previously, domestic producers have invested in enhancing capacity in reliance on the effectiveness of AD/CVD orders, only to be met with an ongoing onslaught of underpriced imports.

Second, the initial CVD investigations unveiled substantial evidence of elaborate subsidy programs implemented by China, India, and Turkey. The subsidy programs implemented by China included the provision of various inputs for QSP production at less than fair value; preferential taxation policies; enactment of an export buyer's credit; concessionary loans; and various types of technical assistance.[161] During the course of the recent sunset review of the CVD order on imports of QSP from China, Commerce found that certain Chinese subsidy programs are still in operation.[162] The programs implemented by the Government of India that were determined to be countervailable included a duty drawback program; tax benefits tied to the cost of importing inputs for exports; concessionary loans for exporters; and various Special

---

[160] USITC, Supplemental Report Regarding Unforeseen Developments at 10.

[161] Quartz Surface Products from China, Inv. Nos. 701-TA-606 and 731-TA-1416, USITC Pub. 4913 (June 2019) (Final), I-6.

[162] *Certain Quartz Surface Products From the People's Republic of China: Final Results of the Expedited First Sunset Review of the Countervailing Duty Order*, 89 Fed. Reg. 81,887 (Dep't Commerce Oct. 3, 2024) and accompanying Issues and Decision Memorandum at 8

Economic Zone programs.[163] Countervailable programs implemented by Turkey included government support for industry participation in international trade fairs; tax benefits for domestic producers incentivizing regional diversification of investments; and tax incentives supporting domestic producers' research and development.[164] U.S. negotiators could not have foreseen that the governments of China, India and Turkey would implement programs directly contradicting their WTO obligations.[165] As was established during the initial CVD investigations, these subsidy programs played a key role in establishing an environment that has fostered the rapid growth of a global industry able to under-sell the U.S. industry.

Third, foreign producers have developed uniquely creative and elaborate schemes to evade these legitimately imposed AD/CVD orders. Since the imposition of the AD/CVD orders on QSP from China, fully 45 EAPA investigations have been initiated, constituting more than 10% of all EAPA investigations for all products that have made it to advanced stages of investigation.[166] The prevalence of EAPA investigations provides clear evidence of how the AD/CVD orders that have been implemented have had "limited effectiveness and instead lead to rapid changes in the global supply chains and manufacturing processes" that have facilitated

---

[163] *Certain Quartz Surface Products From India: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, In Part*, 85 Fed. Reg. 25,398 (Dep't Commerce May 1, 2020) and accompanying Issues and Decision Memorandum.

[164] *Certain Quartz Surface Products From Turkey: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, In Part*, 85 Fed. Reg. 25,400 (Dep't Commerce May 1, 2020) and accompanying Issues and Decision Memorandum.

[165] *See, e.g.,* USITC, Supplemental Report of the U.S. International Trade Commission Regarding Unforeseen Developments at 5 (stating that "a series of industrial policies, five-year plans, and other government support programs" implemented by the Chinese government was "unforeseen by the U.S. negotiators at the time that the United States acceded to GATT 1947, at the time that the United States acceded to the WTO, or at the time that the United States agreed to China's accession to the WTO.").

[166] EAPA Statistics, attached as **Exhibit 34**.

ongoing evasion of the orders, yet another circumstance that was not foreseen by negotiators at the time that relevant trade concessions were made.[167]

Finally, in addition to being the result of unforeseen developments, the surge in imports of QSP is attributable to obligations the United States incurred as part of its accession to the WTO. As part of its obligations under GATT 1994 Article II and its Schedule of Concessions to the GATT 1994, the United States bound its ordinary customs duties on heading 6810.99.00.[168] As a result, the United States did not have the option of increasing its ordinary customs duties on QSP to reduce the injurious effects of the surge in imports seen in recent years.

Given these circumstances, the surge in imports has resulted from both unforeseen developments and obligations incurred by the United States as part of its accession to the WTO.

## IX. EFFORTS TO COMPETE (19 C.F.R. § 206.14(H))

The domestic industry, including members of the QMAA, has devoted significant resources to staying competitive in the U.S. market. In 2018, the domestic industry successfully petitioned the U.S. government for AD/CVD relief from imports from China. The following year, in 2019, the domestic industry successfully petitioned the U.S. government for AD/CVD relief from imports from India and Turkey. In all these proceedings, members of the domestic industry expended significant time and resources to bring and participate in those investigations. Moreover, as discussed above, there has been a significant increase in investment and production capacity within the domestic QSP industry since 2020, including capital investments which the imposition of AD/CVD orders on QSP from China, India, and Turkey helped spur and new

[167] USITC, Supplemental Report Regarding Unforeseen Developments at 10.

[168] Schedule XX – United States of America at USA1-204 (GATT 1994).

producers entering the U.S. market, expanding the U.S. investment in and production capacity for QSP.

Unfortunately, the beneficial impact of the AD/CVD orders was short-lived and was never fully realized because surging imports from both subject and other import sources not subject to the orders rapidly increased. Two U.S. producers – Caesarstone and USA Quartz – were forced to close their factories and cease producing QSP in the United States. Other domestic producers were forced to curtail operations due to poor market conditions caused by import competition.

The domestic industry has spent considerable resources and energy to remain competitive, expand domestic capacity, reinvest in their businesses, and retain and attract customers. Despite these extensive and best efforts, the domestic industry now finds itself in a situation where safeguard relief is necessary.

## X. IMPORTS FROM USMCA COUNTRIES (19 C.F.R. § 206.14(I))

Upon issuing an affirmative determination, the Commission must make an additional finding regarding United States-Mexico-Canada Agreement ("USMCA") (formerly, North American Free Trade Agreement ("NAFTA")) countries.[169] Specifically, the Commission shall consider whether: (1) the imported article from a USMCA country, considered individually,

[169] *See* United States-Mexico-Canada Agreement Implementation Act § 301, 19 U.S.C. § 4551(a). The Statement of Administrative Action accompanying the United States-Mexico-Canada Agreement Implementation Act ("USMCA SAA") notes that Article 10.2 of the USMCA replicates Article 802 of the NAFTA, the provision providing for exclusion of a member country's goods from global safeguard actions. *See* USMCA SAA at 23-24, available at https://www.finance.senate.gov/imo/media/doc/FINAL%20SAA%20USMCA.pdf. In addition, the USMCA SAA explains that Sections 301 and 302 of the USMCA Implementation Act maintain the treatment provided in Sections 311 and 312 of the NAFTA Implementation Act, formerly codified at 19 U.S.C. §§ 3371, 3372. *Id.*

account for a substantial share of total imports; and (2) the imported article from a USMCA country, considered individually, or in exceptional circumstances USMCA imports considered collectively, contributes importantly to the serious injury, or threat thereof, caused by imports.[170] With respect to the first prong, the statute states that imports from a USMCA country "normally shall not be considered to account for a substantial share of total imports if that country is not among the top five suppliers of the article subject to the investigation, measured in terms of import share during the most recent three-year period."[171] With respect to the second prong, the statute defines "contribute importantly" as an important cause, but not necessarily the most important cause.[172] In determining whether imports have contributed importantly to the serious injury or threat thereof caused by imports, the Commission is directed to

> consider such factors as the change in the import share of the USMCA country or countries, and the level and change in the level of imports from such country or countries. {I}mports from a USMCA country or countries normally shall not be considered to contribute importantly to serious injury, or the threat thereof, if the growth rate of imports from such country or countries during the period in which an injurious increase in imports occurred is appreciably lower than the growth rate of total imports from all sources over the same period.[173]

---

[170] 19 U.S.C. § 4551(a)(1)-(2). Under the first prong of the statute, imports from a USMCA country normally will not be considered to account for a substantial share of total imports if that country is not among the top five suppliers of the article subject to investigation, based on the import share during the most recent three-year period. *Id.* § 4551(b)(1). Under the second prong, in determining whether imports from a USMCA country individually contribute importantly to the serious injury or threat thereof, the Commission shall consider factors such as the change in the import share of the USMCA country, the level of imports from such country, and the change in the level of imports from such country. *Id.* § 4551(b)(2). If imports from a USMCA country increased, the Commission will consider whether the rate of increase is appreciably lower than the growth rate of total imports from all sources over the same period. *Id.* § 4551(b)(2).

[171] 19 U.S.C. § 4551(b)(1).

[172] 19 U.S.C. § 4551(c).

[173] 19 U.S.C. § 4551(b)(2).

Imports from Canada and Mexico do not account for a substantial share of total imports as these countries were not among the top five suppliers of QSP during the most recent three-year period.[174] Additionally, the QMAA does not believe that imports from Canada or Mexico are contributing importantly to the serious injury, or threat of such injury, caused by imports of QSP. U.S. imports of QSP from Canada have steadily declined during the POI both in absolute terms and as a share of total U.S. imports.[175] Despite slight upticks in the last two years, U.S. imports of QSP from Mexico have similarly declined during the POI both in absolute terms and as a share of total U.S. imports.[176] In accordance with 19 C.F.R. § 206.14(i), the QMAA submits the following quantitative data on imports from Canada and Mexico.

**U.S. Imports of QSP**
**Import Quantity (sqf), Share of Total Imports (%), Average Unit Value ($/sqf)**

| Country | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| Canada | 8,143,946 | 7,762,021 | 5,899,960 | 4,948,064 | 4,714,433 |
| Share of Total | 6.0% | 3.9% | 2.7% | 2.6% | 2.0% |
| AUV | 11.43 | 11.98 | 13.73 | 13.24 | 12.45 |
| Mexico | 188,950 | 34,703 | 17,459 | 35,962 | 54,056 |
| Share of Total | 0.14% | 0.02% | 0.01% | 0.02% | 0.02% |
| AUV | 8.11 | 14.47 | 6.28 | 12.65 | 13.20 |
| All Other | 126,919,228 | 193,338,557 | 209,164,699 | 183,360,516 | 229,708,061 |
| % of Total | 93.8% | 96.1% | 97.2% | 97.4% | 98.0% |
| AUV | 9.16 | 9.26 | 9.15 | 8.02 | 7.40 |
| **Total** | **135,252,123** | **201,135,281** | **215,082,118** | **188,344,542** | **234,476,551** |

Source: ITC Dataweb (U.S. imports for consumption for HTSUS subheadings 6810990010, 6810990020, and 6810990040).

The QMAA emphasizes that, while imports from Canada and Mexico did not account for a substantial share of total imports over the last five years, there is a serious risk that these two

[174] *See* U.S. Imports of QSP, attached as **Exhibit 1**.

[175] *Id.*

[176] *Id.*

countries may act as a locus of transshipment for QSP produced in other countries if they are exempted from any remedy imposed against imports of QSP. Thus, as a prophylactic measure to prevent this type of evasion from taking place and undermining the effectiveness of any remedy that is provided, imports of QSP from Canada and Mexico should be included in the scope of the remedy. As an alternative, a voluntary restraint agreement may be negotiated with Canada and Mexico that limits the volume of their exports of QSP to ensure they do not become transshipment waypoints.

## XI. CRITICAL CIRCUMSTANCES (19 C.F.R. § 206.14(I))

The QMAA does not allege the existence of critical circumstances at this time and, therefore, does not request provisional relief. Nevertheless, the QMAA urges the Commission to conduct this investigation expeditiously and to recommend that the President grant the requested relief to the domestic industry as soon as possible.

## XII. CONCLUSION

As set forth in this petition, the surge of QSP imports into the United States, which includes a significant volume of imports that are illegally evading AD/CVD duties or violating intellectual property protections, has been a substantial cause of serious injury, and poses an ongoing threat of further injury, to the domestic QSP industry. The QMAA therefore urges the Commission to initiate an investigation under Sections 201 and 202 of the Trade Act of 1974 and to grant prompt and effective relief to the U.S. QSP industry.

*   *   *

**PUBLIC VERSION**

Respectfully Submitted,

/s/ Luke A. Meisner

Roger B. Schagrin
Luke A. Meisner
Saad Y. Chalchal*
Maliha Khan
Amanda G. Swenson
Rui Fan, *Consultant*

SCHAGRIN ASSOCIATES

*Counsel to the Quartz Manufacturing Alliance of America*

* Admitted only in New York and New Jersey. Practice limited to matters before federal courts and agencies.

PUBLIC VERSION

# TABLE OF EXHIBITS

| Exhibit | Description | Confidential Treatment Requested |
|---|---|---|
| 1 | U.S. Imports of Quartz Surface Products | No |
| 2 | U.S. Department of Justice Press Release, Allied Stone Inc. and Company Official Agree to Pay $12.4M to Settle False Claims Act Allegations Relating to Evaded Customs Duties (Aug. 19, 2025) | No |
| 3 | Commerce Memo re: Scope Modification Determination in AD/CVD Investigations on QSP from China (Dep't Commerce May 14, 2019) | No |
| 4 | Letter from Committee for Statistical Annotation of Tariff Schedules (Jan. 3, 2023) | No |
| 5 | Customs Classification Ruling N340084 Re: The tariff classification of agglomerated glass slabs from China (July 19, 2024) | No |
| 6 | Customs Classification Ruling H303280 Re: Country of origin of quartz countertops; Section 301 trade remedy; 9903.88.03, HTSUS (Apr. 25, 2019) | No |
| 7 | Customs Classification Ruling N299117 Re: Country of origin determination of agglomerated quartz slabs (July 31, 2018) | No |
| 8 | Customs Classification Ruling N101559 Re: Country of origin marking of imported articles of agglomerated stone (May 10, 2010) | No |
| 9 | Calculation of Market Share | Yes |
| 10 | WTOC, Caesarstone Technologies announces closure of Richmond Hill Manufacturing Facility impacting over 100 employees (Dec. 18, 2023) | No |
| 11 | Caesarstone Provides Business Updates (Dec. 13, 2023) | No |
| 12 | Petitioner's Confidential Operational and Financial Performance | Yes |
| 13 | Stone Update, Caesarstone: Positioning for 2024 (Feb. 22, 2024) | No |
| 14 | Earnings call: Caesarstone sees strategic gains amid market slowdown (Aug. 8, 2024) | No |
| 15 | RESERVED | No |

PUBLIC VERSION

| | | |
|---|---|---|
| 16 | MS International Recognized as One of the Top 20 Importers In 2023 | No |
| 17 | RESERVED | No |
| 18 | Underselling Analysis | Yes |
| 19 | U.S. Census Bureau, Monthly New Residential Construction, July 2025 (May 16, 2025) | No |
| 20 | The National Association of Home Builders, "Remodeling Market Sentiment Down in the First Quarter" (Apr. 10, 2025) | No |
| 21 | Kitchen Countertop Trends: Bold Choices (Mar. 5, 2025) | No |
| 22 | Dee DePass, "It's Hard But We Just Hustle," *Star Tribune* (Nov. 20, 2022) | No |
| 23 | Chris Gadd, "100 jobs at new Dickson Dal-Tile facility, company reps at Dickson Co. fair," *The Tennessean* (Sept. 4, 2018) | No |
| 24 | Floor Covering Weekly, "Daltile debuts new domestically made quartz lines" (Feb. 21, 2020) | No |
| 25 | "Exporter Guidoni Group to locate facility in Telfair County," *The Albany Herald* (Nov. 27, 2019) | No |
| 26 | "Penetron Adds Durability to Georgia (USA) Stone Manufacturing Plant," PRWeb.com (May 20, 2021) | No |
| 27 | "LG Hausys Expands Viatera Operations," CountertopResource.com | No |
| 28 | MSI Surfaces, "MSI's Luxalume Technology and Elite Quartz Manufacturing Collaboration" (Sept. 9, 2022) | No |
| 29 | MSI Surfaces, "MSI Announces Joint Venture with Spectrum Quartz to Build a Domestic State-of-the-Aert Quartz Manufacturing Facility" (Dec. 11, 2019) | No |
| 30 | Elite Quartz Manufacturing, "Who We Are" | No |
| 31 | Dan Macdonald, "Cosentino buys land at the Cecil Commerce Center megasite for $20.39 million," *Jacksonville Daily Record* (Jan. 27, 2025) | No |
| 32 | Mike Mendenhall, "Plan to sell 330 acres of Cecil megasite to Spanish manufacturer Cosentino headed to City Counsel," | No |

| | | |
|---|---|---|
| | *Jacksonville Daily Record* (Apr. 24, 2023) | |
| 33 | OK Stone, Inc. | No |
| 34 | EAPA Statistics | No |
| 35 | Safeguard Petition on Certain Crabmeat (Mar. 2, 2000) | No |
| 36 | Section 421 Petition on Consumer Tires from China (Apr. 20, 2009) | No |

# Exhibit 2

Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Opposition to Institution of Sections 201-202 Petition on Quartz Surface Products*, Inv. No. TA-201-79 (Injury) (Sep. 17, 2025)

Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T +1 202 637 5600
F +1 202 637 5910
www.hoganlovells.com

September 17, 2025

Inv. No. TA-201-79 (Injury)
Total Pages: 7

**PUBLIC VERSION**

Business Proprietary Information removed from page 2.

***VIA ELECTRONIC FILING (EDIS)***

Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC 20436

**Re: Opposition to Institution of Sections 201-202 Petition on Quartz Surface Products**

Dear Secretary Barton:

On behalf of Elite Quartz Manufacturing ("Elite Quartz"), a leading U.S. producer of quartz surface products ("QSP"), we write to the U.S. International Trade Commission (the "ITC" or the "Commission") to voice our strong opposition to the Petition filed by the Quartz Manufacturing Alliance of America ("QMAA" or "Petitioner") on September 15, 2025 under Sections 201-202 of the Trade Act of 1974 (the "Act") on QSP. 1/ Elite Quartz respectfully submits, for the reasons set forth below, that the Commission should not institute proceedings under Sections 201-202, because QMAA lacks standing under Section 202(a)(1) of the Act as the (purported) ***production is not representative of the domestic industry***.

Petitioner has put forward to use as a purported proxy for U.S. QSP production the number of manufacturing lines of each known domestic QSP ***slab*** producer. Elite Quartz, which began producing QSP in early 2020 at a state-of-the-art, 360,000 square foot manufacturing facility in Latta, South Carolina, is of the view that this methodology is far from sufficient to establish representativeness under the statutory test. Moreover, the Petition ignores the many U.S.

---

1/ 19 C.F.R. § 201.12.

fabricators of QSP that also constitute members of the domestic industry, 2/ as well the thousands of American jobs that they represent. These important American manufacturers and their workers must be accounted for in the Commission's assessment of representativeness.

As such, the Petition must be dismissed. Alternatively, at minimum, the Commission should delay institution to allow for the Commission to investigate thoroughly whether the Petition is supported by sufficient domestic production so as to be representative of the ***entire*** domestic industry producing QSP.

**Background on Elite Quartz**

Elite Quartz is a state-of-the-art 360,000 square foot manufacturing facility in Latta, South Carolina. Elite Quartz began producing QSP in early 2020 and has created more than 150 new jobs for the Dillon County area of South Carolina.

In 2024, Elite Quartz produced **[ ]** slabs of quartz countertop totaling approximately **[ ]** square feet, primarily for sale in the U.S. market. Elite Quartz continues today to increase its domestic QSP production, with the aim of becoming the largest manufacturer of engineered quartz countertops in North America.

Neither Elite Quartz nor its numerous fabricator partners were made aware of this Petition until the public filing. The very filing of the Petition represents an abuse of the Commission's processes.

**Elite Quartz, the Second Largest QSP Producer in the United States, Opposes the Petition**

QMAA states in the Petition that the three domestic QSP producers account for 100% of domestic production that has to date expressed a position with respect to the Petition. 3/ Based on information and belief, Elite Quartz is the second largest producer of QSP in the United States. 4/ Elite Quartz opposes the safeguard Petition—as such, by Petitioner's own estimates, at least 24 percent of the domestic industry already publicly opposes the Petition. 5/

---

2/ The Commission has found in every QSP investigation that U.S. fabricators should be included in its tabulation and analysis of the domestic industry. *Quartz Surface Products from China*, Inv. Nos. 701-TA-606 and 731-TA-1416 (Final), USITC Pub. 4913 (June 2019)("*QSP from China*") at 12-13; *Quartz Surface Products from India & Turkey*, Inv. Nos. 701-TA-624-625 and 731-TA-1450-1451 (Final), USITC Pub. 5061 (June 2020) ("*QSP from India & Turkey*") at 11-12.

3/ *Quartz Surface Products – Petition for Safeguard Relief Pursuant to Sections 201 & 202 of the Trade Act of 1974*, Inv. No. TA-201-79 (USITC Comm'n Sep. 15, 2025) ("Petition") at 29.

4/ That Elite Quartz is likely the second largest producer of QSP in the United States is also supported by the Petition. *See id*.

5/ *See id*.

**The Institution of a Sections 201-202 Case with this Limited Level of Domestic Support Would be Unprecedented**

The legal standard for "institution" of a Sections 201-202 investigation under Section 202(a)(1) of the Act requires that the entities filing the Petition are "representative of an industry." 6/ Every petition brought under Sections 201-202 to date has garnered greater than 50% of the domestic industry's support. 7/ Therefore, it would be unprecedented for the Commission to initiate an investigation in reliance on a Petition filed with the ostensible support of only a minority of the domestic industry's production. 8/

The U.S. QSP producers participating as the QMAA are Cambria Company LLC, Guidoni USA, and Dal-Tile LLC. 9/ Petitioner explains that the QMAA is representative of the domestic industry because it accounted for a "substantial portion" of domestic production in 2024. 10/ This representation is inaccurate.

To estimate its share of production, the QMAA purports to rely on the number of production lines in its facilities and the number of production lines in the facilities of other known U.S. producers of QSP. 11/ Petitioner proffers that, at most, the QMAA accounts for only 8 of 17 of the QSP production lines in the United States. 12/ In other words, by Petitioner's own estimates, QMAA accounts for just 47 percent of the domestic industry's production capacity when measured by production line.

---

6/ *See* 19 U.S.C. § 2252(a)(1).

7/ Petitioner cites two inapposite cases in its Petition supporting that the Commission has initiated investigations for petitioners claiming to represent less than half of domestic production of the like product: USITC Report, *Crabmeat from Swimming Crabs*, Inv. No. TA-201-71 (Aug. 2000) at II-13-14 (where roughly 75% of the industry ultimately supported the petition) and *Certain Passenger Vehicle and Light Truck Tires from China*, 74 Fed. Reg. 19,593 (Apr. 29, 2009) (which was a Section 421 China safeguard proceeding, not a Sections 201-202 proceeding). Accordingly, to our knowledge, every petition brought under Sections 201-202 to date has garnered greater than 50% of the domestic industry's support.

8/ Indeed, for a petitioner to have standing before the Department of Commerce in an injury investigation, it must establish support of domestic producers or workers accounting for more than 50% of the total production of the domestic like product, or the Department must poll the industry to determine support for the petition. 19 U.S.C. § 1673a(c)(4)(D).

9/ Petitioner also includes Architectural Surfaces, Inc. in the QMAA; however, they are a distributor, not a domestic producer of QSP, and therefore are not properly a petitioner in this case. *See* Petition at 28, n. 81.

10/ *Id*. at 29.

11/ *Id*.

12/ *Id*.

This purported "back of the envelope" calculation of production is fundamentally flawed, as the Petition does not measure "production" whatsoever, in contravention of the statutory requirement. Merely comparing the number of production lines of the three petitioning QSP producers with the total number of QSP production lines is insufficient to establish standing. For example, the different production lines could have different capacities or utilization rates (as Petitioner itself admits). 13/ Petitioner's attempt to demonstrate representativeness of the domestic industry is thus plainly deficient and should be rejected. This case simply cannot proceed to institution on the basis of the limited production information provided in the Petition—these data do not *prima facie* establish representativeness of the supporting domestic industry as required by statute.

Finally, Petitioner asserts that the level of support identified in the Petition – ostensibly 47 percent of domestic production – is sufficient per Commission practice. This is a half truth at best. QMAA points to only one safeguard investigation in which the petitioners represented less than half of domestic production—*Crabmeat from Swimming Crabs*. QMAA ignores that, in that investigation, the petition ultimately received the support of roughly 75% of the domestic industry. 14/ We are not aware of a prior Sections 201-202 investigation in which the petition ultimately garnered the support of less than 50% of domestic production. Accordingly, even by its own estimates, QMAA's percentage of supporting domestic production – accounting for a minority of domestic producers – falls below any reasonable standard for representativeness.

**Petitioner Lacks Standing Due to its Failure to Include Fabricators in the Domestic Industry for Purposes of Determining Industry Representation**

Petitioner's estimate of domestic industry production also underrepresents domestic industry production because its estimate does not account for U.S. fabricators of QSP. This is critical because the Petition includes fabricated QSP in the scope. 15/ Notwithstanding, the Petition also states that stand-alone fabricators are not included as domestic producers in this Petition. 16/

The Commission must reconcile this fundamental inconsistency prior to institution. In both *Quartz Surface Products from China* and *Quartz Surface Products from India and Turkey*, the Commission found that fabricators are domestic producers, must be included in the domestic industry producing QSP, and must be accounted for and analyzed in the Commission's injury

13/ *Id*. ("Because the QMAA believes its production lines, which are supplied by Bretonstone, have larger capacity than the production lines that are employed by other domestic producers…").

14/ *See id*. at 30, n. 82 (citing *Crabmeat from Swimming Crabs*, Inv. No. TA-201-71, filed Mar. 20, 2000). In that case, approximately 75% of the domestic industry that responded to questionnaires ultimately supported the petition. USITC Report, *Crabmeat from Swimming Crabs*, Inv. No. TA-201-71 (Aug. 2000) at II-13-14.

15/ Petition at 17 ("Subject QSP may be…fabricated or not fabricated…"); *see also* Petition at 26-27 ("both slabs and fabricated products are part of the same like product").

16/ Petition at 27, n.79.

analysis. 17/ The Commission explained in each of those cases that QSP fabricators have substantial capital investment, employ a significant total number of personnel in their U.S. operations, and add substantial value to the finished product. 18/ This is so irrespective of whether the fabricators rely on imported QSP slabs, domestic QSP slabs, or both to fabricate the end QSP product. 19/

Accordingly, Petitioner's failure to include the fabricators of QSP as part of the domestic industry in the Petition means that Petitioner is not "representative of an industry" in accordance with 19 C.F.R. § 206.14(b). 20/ Quite simply, ignoring a massive part of the domestic industry makes the Petition unrepresentative of the domestic QSP industry—the Commission should not countenance such gerrymandering of its rules and practice.

Finally, at the very least, and in order to compile the data necessary to institute this investigation, the Commission should issue questionnaires to all QSP fabricators and producers. These questionnaires should request basic information regarding the quantity of these firms' QSP production in the United States and their position on the Petition. This industry polling should enable the Commission to assess whether the safeguard Petition is representative of the industry in accordance with 19 C.F.R. § 206.14(b).

---

17/ *QSP from China* at 12-13 ("we find that the more complete record in the final phase of these investigations…indicates that fabricators should be considered domestic producers" and we conclude that fabricators are engaged in sufficient production-related operations to be included in the domestic industry definition"); *QSP from India & Turkey* at 11-12 ("The record in the final phase of these investigations indicates that fabricators should be included in the domestic industry" and "fabricators are engaged in sufficient production-related operations to be included in the domestic industry").

18/ *Id*.

19/ *Id*. In any event, there is no statutory basis to find that a domestic producer should not be included in the Commission's assessment of the "representative" standard in a Sections 201-202 safeguard petition on the basis of whether they import upstream products.

20/ Furthermore, 19 C.F.R. § 206.14(b)(2) requires that petitioners provide "the ***percentage of domestic production of the like or directly competitive domestic article*** that such represented firms and/or workers account for and the basis for claiming that such firms and/or workers are representative of an industry." 19 C.F.R. § 206.14(b)(2) (emphasis added). The regulation therefore suggests that the relevant industry for purposes of "representativeness" is the industry that produces the like or directly competitive domestic article. Petitioner asserts that "the like product encompasses both QSP in slab form and QSP that has been fabricated." Petition at 31. Therefore, pursuant to the regulation and to Petitioner's statements, for the purposes of assessing standing, the relevant "percentage of domestic production" that the Commission should be considering ***must include fabricated QSP***. The Commission must consider fabricators as part of the domestic industry when assessing whether QMAA has standing on its own to bring this case.

* * *

We respectfully submit that the Commission should not institute proceedings under Sections 201-202, because QMAA lacks standing under Section 202(a)(1) of the Act. Quite simply, QMAA has not demonstrated that the domestic industry supports the Petition, as it relies on production estimates that are not representative of the domestic industry. We urge that QMAA's request to initiate an investigation be rejected and this matter be terminated.

At minimum, the Commission should issue questionnaires to all fabricators and producers of QSP requesting their position on the case and their quantity of U.S. production. This information is vital so that the Commission can test and evaluate Petitioner's representativeness.

We ask that this letter be placed on the public record prior to any decision by the Commission on institution. Please let us know if we can be of further assistance to the Commission.

Respectfully submitted,

**HOGAN LOVELLS US LLP**

/s/ Jonathan T. Stoel
Jonathan T. Stoel
Michael G. Jacobson
Jared R. Wessel
Lyric E. Galvin

*Counsel to Elite Quartz Manufacturing*

**PUBLIC**
**CERTIFICATE OF SERVICE**

**<u>Quartz Surface Products</u>**

**Inv. No. TA-201-79 (Injury)**

I, Natalia Lopez, hereby certify that as of 3:00 p.m. on September 17, 2025, no service list was available in this proceeding.

/s/ Natalia Lopez
Natalia Lopez

**HOGAN LOVELLS US LLP**

**Exhibit 3**

Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Fabricator Opposition to Institution of Sections 201-202 Petition on Quartz Surface Products*, Inv. No. 201-3847 (Injury) (Sep. 19, 2025)

Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T +1 202 637 5600
F +1 202 637 5910
www.hoganlovells.com

September 19, 2025

Inv. No. TA-201-3847 (Injury)
Total Pages: 7

**PUBLIC VERSION**

Business Proprietary Information removed from Exhibit 1.

***VIA ELECTRONIC FILING (EDIS)***

Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC 20436

**Re: Fabricator Opposition to Institution of Sections 201-202 Petition on Quartz Surface Products**

Dear Secretary Barton:

On behalf of our client Elite Quartz Manufacturing ("Elite Quartz"), we respectfully submit the enclosed declarations from U.S. quartz fabricators who are members of the domestic industry of quartz surface products ("QSP") in the above-captioned proceeding.

**Exhibit 1** contains declarations from 493 companies, all of which oppose the Petition and the imposition of safeguard duties on QSP. As summarized in the chart at the beginning of the exhibit, the 493 companies identified in **Exhibit 1** to this letter accounted for over 50,007,011 sq ft of QSP manufacturing in the United States in 2024.

We are filing this submission as a follow-up to our September 17, 2025 letter to the Commission regarding the Petitioner's lack of standing to bring this case. 1/ Quartz fabricators are vital members of the domestic industry who make significant contributions to the value of the product to the customer—as the Commission has repeatedly found in each prior quartz surface product investigation. 2/ We understand that the overwhelming majority of U.S. fabricators oppose the Petition and the imposition of safeguard remedies on imported QSP – as demonstrated by this filing.

* * *

In accordance with 19 C.F.R. §§ 201.6 and 207.3, we request business proprietary treatment for the information contained in brackets in this letter which includes proprietary domestic industry information. Disclosure of this information would cause substantial commercial and competitive harm to the listed companies and other parties subject to the APO.

This submission is being filed electronically in accordance with 19 C.F.R. § 201.8(f). We ask that this letter be placed on the public record prior to any decision by the Commission on institution. Thank you for your attention to this matter.

---

1/ Letter from Hogan Lovells US LLP to the Commission, *Opposition to Institution of Sections 201-202 Petition on Quartz Surface Products*, Inv. No. TA-201-79 (Injury) (Sept. 17, 2025).

2/ *Quartz Surface Products from China*, Inv. Nos. 701-TA-606 and 731-TA-1416 (Final), USITC Pub. 4913 (June 2019)("QSP from China") at 12-13; *Quartz Surface Products from India & Turkey*, Inv. Nos. 701-TA-624-625 and 731-TA-1450-1451 (Final), USITC Pub. 5061 (June 2020) ("QSP from India & Turkey") at 11-12.

Please contact the undersigned if you have questions regarding this submission.

Respectfully submitted,

**HOGAN LOVELLS US LLP**

By: /s/ Jonathan T. Stoel
Jonathan T. Stoel
Michael G. Jacobson
Jared R. Wessel
Lyric E. Galvin

*Counsel to Elite Quartz Manufacturing*

**PUBLIC**
**CERTIFICATE OF SERVICE**

**Quartz Surface Products**

**Inv. No. TA-201-3847 (Injury)**

I, Katherine Huckaby, hereby certify that as of 2:00 p.m. on September 19, 2025, no service list was available in this proceeding.

/s/ Katherine Huckaby
Katherine Huckaby

**HOGAN LOVELLS US LLP**

## CERTIFICATION

CITY OF WASHINGTON )
) SS:
DISTRICT OF COLUMBIA )

I, Jonathan T. Stoel, on this 19th day of September, 2025, do hereby swear in accordance with section 201.6(b)(3)(iii) of the International Trade Commission's regulations, 19 C.F.R. § 201.6(b)(3)(iii), that information substantially identical to the information for which we have requested proprietary treatment and removed from this submission is not available to the public.

In accordance with section 207.3(a) of the International Trade Commission's regulations, 19 C.F.R. § 207.3(a), I further certify that the information contained in the attached submission is accurate and complete to the best of my knowledge.

Jonathan T. Stoel

Hogan Lovells US LLP
555 13th Street, N.W.
Washington, DC 20004
Tel: (202) 637-5600

# Exhibit 1

Not Capable of
Public Summary

# Exhibit 4

Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Further Evidence Demonstrating that the Commission should not Institute a Safeguard Investigation on Quartz Surface Products*, Inv. No. 201-3847 (Injury) (Sep. 22, 2025)

Hogan Lovells

Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T +1 202 637 5600
F +1 202 637 5910
www.hoganlovells.com

September 22, 2025

Inv. No. TA-201-3847 (Injury)
Total Pages: 10

**PUBLIC VERSION**

Business Proprietary Information removed from Exhibit 1 and 2.

***VIA ELECTRONIC FILING (EDIS)***

Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC 20436

**Re: Further Evidence Demonstrating that the Commission should not Institute a Safeguard Investigation on Quartz Surface Products**

Dear Secretary Barton:

On behalf of our client Elite Quartz Manufacturing ("Elite Quartz"), we respectfully submit additional and updated evidence from U.S. quartz fabricators, which are members of the domestic industry producing quartz surface products ("QSP"), demonstrating that the U.S. International Trade Commission (the "Commission") should not institute the above-captioned safeguard investigation. This is because, as set forth in Elite Quartz's September 17, 2025 letter, the Quartz Manufacturing Alliance of America ("QMAA") is not representative of the domestic industry

producing QSP. 1/ As such, the QMAA lacks standing to prosecute this safeguard action, and its September 15, 2025 petition (the "Petition") should be rejected.

The Commission has repeatedly found in previous QSP trade remedy investigations that quartz fabricators are vital members of the domestic industry, producing QSP for U.S. home builders and remodelers, contributing substantial value to the QSP industry and the U.S. economy more broadly, and providing employment to 1000s of American workers. 2/ We demonstrated in our September 19, 2025 letter to the Commission and the accompanying evidence, including declarations from nearly 500 fabricators, that the domestic industry fabricating QSP resoundingly opposes the Petition and the relief requested by the QMAA. 3/

Further evidencing that the Commission should not institute the investigation requested by the QMAA, **Exhibit 1** provides an updated list of approximately 670 fabricators opposing to date the Petition and the imposition of safeguard duties on QSP. 4/ In 2024, these 670 fabricators accounted for approximately 65 million square feet of QSP manufacturing in the United States.

---

1/ Letter from Hogan Lovells US LLP to the Commission, *Opposition to Institution of Sections 201-202 Petition on Quartz Surface Products*, Inv. No. TA-201-79 (Injury) (Sept. 17, 2025).

2/ *Quartz Surface Products from China*, Inv. Nos. 701-TA-606 and 731-TA-1416 (Final), USITC Pub. 4913 (June 2019)mat 12-13; *Quartz Surface Products from India & Turkey*, Inv. Nos. 701-TA-624-625 and 731-TA-1450-1451 (Final), USITC Pub. 5061 (June 2020) at 11-12.

3/ Letter from Hogan Lovells US LLP to the Commission, *Fabricator Opposition to Institution of Sections 201-202 Petition on Quartz Surface Products*, Inv. No. TA-201-3846 (Injury) (Sept. 19, 2025).

4/ The list of approximately 670 fabricators contained in **Exhibit 1** incorporates and supersedes the list of fabricators accompanying our September 19 submission.

**Exhibit 2** provides declarations from these approximately 670 fabricators voicing their opposition to the Petition and the institution of a safeguard investigation on imports of QSP. 5/

* * *

In accordance with 19 C.F.R. §§ 201.6 and 207.3, we request business proprietary treatment for the information contained in brackets in this letter which includes proprietary domestic industry information. Disclosure of this information would cause substantial commercial and competitive harm to the listed companies and other parties subject to the APO.

This submission is being filed electronically in accordance with 19 C.F.R. § 201.8(f). We ask that this letter be placed on the public record prior to any decision by the Commission on institution.

Thank you for your attention to this matter. Please contact the undersigned if you have questions regarding this submission.

Respectfully submitted,

**HOGAN LOVELLS US LLP**

By: /s/ Jonathan T. Stoel
Jonathan T. Stoel
Michael G. Jacobson
Jared R. Wessel
Lyric E. Galvin

*Counsel to Elite Quartz Manufacturing*

5/ **Exhibit 2** includes the fabricator declarations submitted to the Commission on September 19, as well as many additional declarations.

**PUBLIC**
**CERTIFICATE OF SERVICE**

**Quartz Surface Products**

**Inv. No. TA-201-3847 (Injury)**

I, Natalia Lopez, hereby certify that as of 1:00 p.m. on September 22, 2025, no service list was available in this proceeding.

/s/ Natalia Lopez
Natalia Lopez

**HOGAN LOVELLS US LLP**

**CERTIFICATION**

CITY OF WASHINGTON )
) SS:
DISTRICT OF COLUMBIA )

I, Jonathan T. Stoel, on this 22nd day of September, 2025, do hereby swear in accordance with section 201.6(b)(3)(iii) of the International Trade Commission's regulations, 19 C.F.R. § 201.6(b)(3)(iii), that information substantially identical to the information for which we have requested proprietary treatment and removed from this submission is not available to the public.

In accordance with section 207.3(a) of the International Trade Commission's regulations, 19 C.F.R. § 207.3(a), I further certify that the information contained in the attached submission is accurate and complete to the best of my knowledge.

Jonathan T. Stoel

Hogan Lovells US LLP
555 13th Street, N.W.
Washington, DC 20004
Tel: (202) 637-5600

**QUARTZ SURFACE PRODUCTS**
**Inv. No. TA-201-3847 (Injury)**

**Exhibit List**

| Exhibit No. | Description | Status |
|---|---|---|
| **Exhibit 1** | List of Fabricators Opposing the Petition | **BPI** |
| **Exhibit 2** | Declarations of Fabricators Opposing the Petition | **BPI** |

# Exhibit 1:

## List of Candidates Opposing the Petition

Not Capable of
Public Summary

# Exhibit 2:
## Declarations of Fabricators Opposing the Petition

Not Capable of
Public Summary

**Exhibit 5**

Letter from Sidley Austin LLP to the U.S. International Trade Commission, *Opposition to Institution of Investigation on Quartz Surface Products Submitted on behalf of Stone Suppliers, Inc.*, Inv. No. TA-201-3847 (Injury) (Sep. 22, 2025)

SIDLEY

SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, D.C. 20005
+1 202 736 8000
+1 202 736 8711 FAX

AMERICA • ASIA PACIFIC • EUROPE

TED.MURPHY@SIDLEY.COM
+1 202 736 8016

JOSEPH.OSCHRIN@SIDLEY.COM
+1 202 736 8745

September 22, 2025

Inv. No. TA-201-3847 (Injury)
Pages: 3

**PUBLIC DOCUMENT**

**Via Electronic Filing (EDIS)**

The Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, DC 20436

**Re: Opposition to Institution of Investigation on Quartz Surface Products Submitted on behalf of Stone Suppliers, Inc.**

Dear Secretary Barton:

On behalf of our client, Stone Suppliers, Inc. and its subsidiaries[1] (collectively, "Stone Suppliers"), a leading U.S. fabricator of quartz surface products ("QSP"), we respectfully submit that the U.S. International Trade Commission should not institute proceedings in response to the petition filed on September 15, 2025 for safeguard relief on behalf of the Quartz Manufacturing Alliance of America. Stone Suppliers was not consulted before the petition was filed, despite being a domestic fabricator of QSP and, therefore, part of the domestic industry. For the avoidance of doubt, Stone Suppliers opposes the petition.

[1] The subsidiaries include the following QSP fabrication entities: Carrara Stone Systems of Chicago, LLC; Stone Made Products, Inc; Stone Systems and Services, Inc.; Stone Systems of Atlanta, LLC; Stone Systems of Central Texas, LLC; Stone Systems of Houston, LLC; Stone Systems of New Jersey, LLC; Stone Systems of New Mexico, LLC; Stone Systems of Raleigh, LLC; and Stone Systems of South Florida, LLC.

Sidley Austin (DC) LLP is a Delaware limited liability partnership doing business as Sidley Austin LLP and practicing in affiliation with other Sidley Austin partnerships.

SIDLEY



Stone Suppliers endorses the submissions made by Elite Quartz Manufacturing on September 17, 2025 and on September 19, 2025, and incorporates those submissions here by reference.

Thank you for your attention to this matter. If you have any questions concerning this submission, please contact the undersigned at (202) 736-8016.

Respectfully submitted,

SIDLEY AUSTIN LLP

/s/ Michael E. Murphy
Michael E. Murphy
Joseph C. Oschrin
Attorneys for
Stone Suppliers, Inc.

**CERTIFICATE OF SERVICE**

I, Joseph C. Oschrin, hereby certify that the attached public submission was served on September 22, 2025, via electronic mail, to the following parties:

**On behalf of Petitioner Quartz Manufacturing Alliance of America:**
Luke Meisner
Schagrin Associates
900 Seventh Street, N.W.
Suite 500
Washington, D.C., 20001
Email: lmeisner@schagrinassociates.com

**On behalf of Arizona Tile, et al.:**
Jonathan Stoel
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Columbia Square
Washington, D.C., 20046
Email: jonathan.stoel@hoganlovells.com

/s/ Joseph C. Oschrin
Joseph C. Oschrin

**Exhibit 6**

Letter from Caesarstone Ltd. to the U.S. International Trade Commission, *Objection to Petition for Safeguard Measures on Quartz Surface Products*, Inv. No. TA-201-79 (Sep. 22, 2025)

caesarstone

September 22, 2025

Chair Amy A. Karpel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436

Re: Objection to Petition for Safeguard Measures on Quartz Surface Products

**Introduction**

On behalf of Caesarstone Ltd., we respectfully object to the safeguard petition filed under Sections 201 and 202 of the Trade Act of 1974 on quartz surface products. Caesarstone was a longstanding producer of quartz surface products (QSP) in the United States. The petition misrepresents Caesarstone's business decisions and misuses our name, while pursuing unjustified protectionist measures that would harm downstream U.S. businesses, fabricators, and consumers. We request that the Commission reject the petition as not representative of the interests of the domestic industry producing QSP.

**Misuse of Caesarstone's Name**

The petition cites Caesarstone's decision to close our Georgia QSP plant in December 2023 as evidence of alleged serious injury that was substantially caused by imports. **This is incorrect.** We were not "forced" to close our Georgia facility as the result of import competition. Rather, our decision followed a careful assessment of QSP industry innovations, U.S. challenges accessing unique raw materials we use, and an inability to achieve increased efficiencies. To suggest otherwise is misleading.

**A Pattern of Protectionism**

This safeguard petition follows a now-familiar pattern: first, Cambria targeted imports from China, leading to sweeping antidumping duty and countervailing duties (AD/CVD) in 2019 [1][2]. These high duties knocked imports of Chinese QSP out of the U.S. market. Next, it turned to India and Turkey, securing further AD/CVD restrictions in 2020—albeit with far lower margins than in the China case [4]. Now, through the veil of the Quartz Manufacturing Alliance of America (QMAA), Cambria again seeks to broaden trade barriers. This sequence reflects not unforeseen developments or serious injury, but a strategy of repeatedly invoking unneeded government protection.

**Lack of Representativeness and Downstream Harm**

QMAA is not representative of the broader U.S. industry that produces QSP. The sector is diverse, including thousands of American fabricators, which are also U.S. manufacturers just like slab producers. It also includes many distributors and small-scale operators—many of them "mom and pop" businesses, which depend on imported quartz slabs to serve local customers due to the insufficient supply of domestic-made slabs to meet the needs of the U.S. market. By seeking broad restrictions on imports, the petition risks cutting off the raw material—slabs—critical to these American businesses. A global safeguard would consolidate market power in the hands of a few, large and deep-pocketed petitioners at the expense of thousands of American businesses and their workers.

caesarstone

**The Domestic Industry is already Supported by Powerful, Targeted Trade Remedies**

In addition to the AD/CVD measures already in place on China, India, and Turkey, the broader tariff environment has reinforced trade protection for domestic producers. Section 301 actions maintain elevated tariffs on a wide range of Chinese products following the May 2024 four-year review [6], Section 232 national security measures impose duties on steel and aluminum inputs that affect manufacturing cost structures [7][8], and International Emergency Economic Powers Act (IEEPA) tariffs [9] further expand protection for the domestic industry. Together, these measures operate alongside the country-specific AD/CVD orders to provide multiple layers of protection without resorting to blunt, economy-wide safeguards.

Nevertheless, despite these substantial protections, the QMAA continues to pursue further safeguard relief. Such unnecessary measures will shift higher costs onto U.S. fabricators and, ultimately, consumers by restricting access to essential raw materials needed for competitive, efficient downstream manufacturing.

**No “Unforeseen Developments” Justify a Global Safeguard**

Safeguard relief requires that increased imports be a substantial cause of serious injury due to unforeseen developments and obligations undertaken. Here, the narrative in the petition effectively implies that governments everywhere are engaged in unfair practices against the QMAA’s interests. In reality, there are no “unforeseen developments” in this market that would justify a global safeguard.

**Public Interest and Innovation**

Blanket safeguard duties would raise costs for American homeowners, builders, and fabricators, while reducing incentives to innovate (*e.g.*, safer formulations, process improvements, ESG compliance). A robust, rules-based trading system—with targeted enforcement where necessary—best supports U.S. consumers and healthy competition. As President Reagan emphasized, responsible free and fair trade brings growth and opportunity, whereas protectionism destroys jobs [5].

**Conclusion**

The petition does not demonstrate serious injury caused by unforeseen developments. Rather, it is a protectionist maneuver designed to block competition and shift the cost of inefficiency onto American consumers. By invoking Caesarstone’s name, the QMAA mischaracterizes our strategy of innovation and responsible sourcing. For these reasons, Caesarstone urges the Commission to reject the petition.

Respectfully submitted,

Kobi Brenner, CFO

caesarstone

**Notes**

[1] U.S. Department of Commerce, Final Determinations (May 16, 2019): Quartz Surface Products from China—AD 265.84%–336.69%; CVD 45.32%–190.99%.

[2] Federal Register (Jan. 30, 2025), Continuation of AD/CVD Orders on Quartz Surface Products from China (90 FR 8521); see also USITC press release (Jan. 10, 2025) confirming affirmative sunset determinations.

[3] Scope/circumvention tools and CBP enforcement have been used over time in the China orders framework, as reflected in subsequent administrative reviews and continuation notices.

[4] U.S. Department of Commerce, Final Determinations (Apr. 28, 2020): Quartz Surface Products from India—AD 2.67%–5.15%; CVD 1.57%–2.34%. Türkiye—AD 0%–5.17%; CVD 2.43%.

[5] President Ronald Reagan, “Radio Address to the Nation on Free and Fair Trade,” Aug. 2, 1986: “Free and fair trade brings growth and opportunity and creates jobs… protectionism… destroys jobs.”

[6] Office of the U.S. Trade Representative, May 14, 2024, notice proposing tariff modifications in the Section 301 four-year review of China tariffs.

[7] Section 232 measures on steel: Proclamation 9705 (Mar. 8, 2018) and subsequent adjustments (e.g., May 31, 2024 proclamation).

[8] Section 232 measures on aluminum: Proclamation 9704 (Mar. 8, 2018) and subsequent adjustments.

[9] Executive Order 14257 of April 2, 2025 (Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits).

**Exhibit 7**

Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Additional Evidence Demonstrating that the Commission should not Institute a Safeguard Investigation on Quartz Surface Products*, Inv. No. TA-201-3847 (Injury) (Sep. 25, 2025)

Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T +1 202 637 5600
F +1 202 637 5910
www.hoganlovells.com

September 25, 2025

Inv. No. TA-201-3847 (Injury)
Total Pages: 10

**PUBLIC VERSION**

Business Proprietary Information removed from Exhibits 1 and 2.

***VIA ELECTRONIC FILING (EDIS)***

Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC 20436

**Re: Additional Evidence Demonstrating that the Commission should not Institute a Safeguard Investigation on Quartz Surface Products**

Dear Secretary Barton:

On behalf of our client Elite Quartz Manufacturing ("Elite Quartz"), we respectfully submit additional evidence from U.S. quartz fabricators, which are members of the domestic industry producing quartz surface products ("QSP"), demonstrating that the U.S. International Trade Commission (the "Commission") should not institute the above-captioned safeguard investigation. This is because, as set forth in Elite Quartz's September 17, 2025 letter, the Quartz Manufacturing Alliance of America ("QMAA") is not representative of the domestic industry producing QSP. 1/

1/ Letter from Hogan Lovells US LLP to the Commission, *Opposition to Institution of Sections 201-202 Petition on Quartz Surface Products*, Inv. No. TA-201-79 (Injury) (Sept. 17, 2025).

As such, the QMAA lacks standing to prosecute this safeguard action, and its September 15, 2025 petition (the "Petition") should be rejected.

The Commission has found in previous QSP trade remedy investigations that quartz fabricators are members of the domestic industry. 2/ Our September 22, 2025 letter to the Commission and the accompanying evidence, including declarations from approximately 670 fabricators, demonstrated that the domestic industry fabricating QSP resoundingly opposes QMMA's Petition and the institution of a QSP safeguard investigation. 3/ These fabricators produce QSP for U.S. home builders and remodelers, contribute substantial value to the QSP industry and the U.S. economy more broadly, and provide employment to 1000s of American workers.

Reaffirming that the Commission should not institute a safeguard investigation here, **Exhibit 1** identifies 47 additional fabricators opposing the Petition, and **Exhibit 2** provides their declarations voicing this position for the Commission's consideration. Moreover, in 2024, these additional 47 fabricators accounted for more than 5.5 million square feet of QSP manufacturing in the United States.

In total, the Commission record now contains declarations from **more than 700 fabricators opposing the Petition** and the institution of a QSP safeguard investigation. Moreover,

---

2/ *Quartz Surface Products from China*, Inv. Nos. 701-TA-606 and 731-TA-1416 (Final), USITC Pub. 4913 (June 2019)mat 12-13; *Quartz Surface Products from India & Turkey*, Inv. Nos. 701-TA-624-625 and 731-TA-1450-1451 (Final), USITC Pub. 5061 (June 2020) at 11-12.

3/ Letter from Hogan Lovells US LLP to the Commission, *Further Evidence Demonstrating that the Commission should not Institute a Safeguard Investigation on Quartz Surface Products*, Inv. No. TA-201-3847 (Injury) (Sept. 22, 2025).

these fabricators opposing the Petition **accounted for approximately 70 million square feet of QSP manufacturing in the United States in 2024**.

* * *

In accordance with 19 C.F.R. §§ 201.6 and 207.3, we request business proprietary treatment for the information contained in brackets in this letter which includes proprietary domestic industry information. Disclosure of this information would cause substantial commercial and competitive harm to the listed companies and other parties subject to the APO.

This submission is being filed electronically in accordance with 19 C.F.R. § 201.8(f). We ask that this letter be placed on the public record prior to any decision by the Commission on institution.

Thank you for your attention to this matter. Please contact the undersigned if you have questions regarding this submission.

Respectfully submitted,

**HOGAN LOVELLS US LLP**

By: /s/ Jonathan T. Stoel
Jonathan T. Stoel
Jared R. Wessel
Michael G. Jacobson
Lyric E. Galvin

*Counsel to Elite Quartz Manufacturing*

**PUBLIC**
**CERTIFICATE OF SERVICE**

**Quartz Surface Products**

**Inv. No. TA-201-3847 (Injury)**

I, Natalia Lopez, hereby certify that as of 2:00 p.m. on September 25, 2025, no service list was available in this proceeding.

/s/ Natalia Lopez
Natalia Lopez

**HOGAN LOVELLS US LLP**

**CERTIFICATION**

CITY OF WASHINGTON )<br>
) SS:<br>
DISTRICT OF COLUMBIA )

I, Jonathan T. Stoel, on this 25th day of September, 2025, do hereby swear in accordance with section 201.6(b)(3)(iii) of the International Trade Commission's regulations, 19 C.F.R. § 201.6(b)(3)(iii), that information substantially identical to the information for which we have requested proprietary treatment and removed from this submission is not available to the public.

In accordance with section 207.3(a) of the International Trade Commission's regulations, 19 C.F.R. § 207.3(a), I further certify that the information contained in the attached submission is accurate and complete to the best of my knowledge.

Jonathan T. Stoel

Hogan Lovells US LLP<br>
555 13th Street, N.W.<br>
Washington, DC 20004<br>
Tel: (202) 637-5600

**QUARTZ SURFACE PRODUCTS**
**Inv. No. TA-201-3847 (Injury)**

**Exhibit List**

| Exhibit No. | Description | Status |
|---|---|---|
| **Exhibit 1** | List of Fabricators Opposing the Petition | **BPI** |
| **Exhibit 2** | Declarations of Fabricators Opposing the Petition | **BPI** |

# Exhibit 1:

List of Candidators Opposing the Petition

Not Capable of
Public Summary

# Exhibit 2:

## Declarations of Fabricators Opposing the Petition

Not Capable of
Public Summary

# Exhibit 8

Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *More Evidence Demonstrating that the Commission Should Not Institute a Safeguard Investigation on Quartz Surface Products*, Inv. No. TA-201-3847 (Injury) (Nov. 17, 2025)

Hogan Lovells

Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T +1 202 637 5600
F +1 202 637 5910
www.hoganlovells.com

November 17, 2025

Inv. No. TA-201-3847 (Injury)
Total Pages: 10

**PUBLIC VERSION**

Business Proprietary Information removed from Exhibits 1 and 2.

***VIA ELECTRONIC FILING (EDIS)***

Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC 20436

**Re: More Evidence Demonstrating that the Commission Should Not Institute a Safeguard Investigation on Quartz Surface Products**

Dear Secretary Barton:

On behalf of our client Elite Quartz Manufacturing ("Elite Quartz"), we respectfully submit more evidence from U.S. quartz fabricators demonstrating (yet again) that the U.S. International Trade Commission (the "Commission") should not institute the above-captioned safeguard investigation. This is because, as set forth in Elite Quartz's September 17, 2025 letter, the Quartz Manufacturing Alliance of America ("QMAA") is not representative of the domestic industry

producing quartz surface products ("QSP") and lacks standing to prosecute this safeguard action. 1/ The QMAA's September 15, 2025 petition (the "Petition") thus should be rejected.

The Commission has repeatedly found that quartz fabricators are vital members of the domestic industry—producing QSP for U.S. home builders and remodelers, contributing substantial value to the QSP industry and the U.S. economy more broadly, and providing employment to 1000s of American workers. 2/ We demonstrated in our prior letters to the Commission and the accompanying evidence that the domestic industry fabricating QSP resoundingly opposes the Petition and the relief requested by the QMAA. 3/

Further evidencing that the Commission should not institute an investigation, this submission provides a list of an additional 23 fabricators opposing the Petition (**Exhibit 1**) and declarations from these fabricators (**Exhibit 2**). In 2024, these additional 23 fabricators accounted for more than 600,000 square feet of QSP manufacturing in the United States. All told, the Commission's record now contains declarations from almost 750 fabricators, which produced roughly 71,000,000 square feet of QSP, that oppose the Petition.

---

1/ Letter from Hogan Lovells US LLP to the Commission, *Opposition to Institution of Sections 201-202 Petition on Quartz Surface Products*, Inv. No. TA-201-79 (Injury) (Sept. 17, 2025).

2/ *Quartz Surface Products from China*, Inv. Nos. 701-TA-606 and 731-TA-1416 (Final), USITC Pub. 4913 (June 2019)mat 12-13; *Quartz Surface Products from India & Turkey*, Inv. Nos. 701-TA-624-625 and 731-TA-1450-1451 (Final), USITC Pub. 5061 (June 2020) at 11-12.

3/ Letter from Hogan Lovells US LLP to the Commission, *Further Evidence Demonstrating that the Commission should not Institute a Safeguard Investigation on Quartz Surface Products*, Inv. No. TA-201-3847 (Injury) (Sept. 22, 2025); Letter from Hogan Lovells US LLP to the Commission, *Additional Evidence Demonstrating that the Commission should not Institute a Safeguard Investigation on Quartz Surface Products*, Inv. No. TA-201-3847 (Injury) (Sept. 25, 2025).

* * *

In accordance with 19 C.F.R. §§ 201.6 and 207.3, we request business proprietary treatment for the information contained in brackets in this letter which includes proprietary domestic industry information. Disclosure of this information would cause substantial commercial and competitive harm to the listed companies and other parties subject to the APO.

This submission is being filed electronically in accordance with 19 C.F.R. § 201.8(f). We ask that this letter be placed on the public record prior to any decision by the Commission on institution.

Thank you for your attention to this matter. Please contact the undersigned if you have questions regarding this submission.

Respectfully submitted,

**HOGAN LOVELLS US LLP**

By: /s/ Jonathan T. Stoel
Jonathan T. Stoel
Jared R. Wessel
Michael G. Jacobson
Lyric E. Galvin

*Counsel to Elite Quartz Manufacturing*

**PUBLIC**
**CERTIFICATE OF SERVICE**

**Quartz Surface Products**

**Inv. No. TA-201-3847 (Injury)**

I, Natalia Lopez, hereby certify that as of 10 a.m. on November 17, 2025, no service list was available in this proceeding.

/s/ Natalia Lopez
Natalia Lopez

**HOGAN LOVELLS US LLP**

**CERTIFICATION**

CITY OF WASHINGTON )
) SS:
DISTRICT OF COLUMBIA )

I, Jonathan T. Stoel, on this 17th day of November, 2025, do hereby swear in accordance with section 201.6(b)(3)(iii) of the International Trade Commission's regulations, 19 C.F.R. § 201.6(b)(3)(iii), that information substantially identical to the information for which we have requested proprietary treatment and removed from this submission is not available to the public.

In accordance with section 207.3(a) of the International Trade Commission's regulations, 19 C.F.R. § 207.3(a), I further certify that the information contained in the attached submission is accurate and complete to the best of my knowledge.

Jonathan T. Stoel

Hogan Lovells US LLP
555 13th Street, N.W.
Washington, DC 20004
Tel: (202) 637-5600

**QUARTZ SURFACE PRODUCTS**
**Inv. No. TA-201-3847 (Injury)**

**Exhibit List**

| Exhibit No. | Description | Status |
|---|---|---|
| **Exhibit 1** | List of Fabricators Opposing the Petition | **BPI** |
| **Exhibit 2** | Declarations of Fabricators Opposing the Petition | **BPI** |

# Exhibit 1:

List of Fabricators Opposing the Petition

[

Not Capable of
Public Summary

]

# Exhibit 2:

## Declarations of Fabricators Opposing the Petition

# Not Capable of Public Summary

**Exhibit 9**

Letter from The Rockheads Group USA to the U.S. International Trade Commission, *Opposition to Institution of Safeguard Case on Quartz Surface Products*, Inv. No. TA-201-3847 (Injury) (Nov. 17, 2025)

ROCKHEADS
GROUP • USA

1401 Lavaca St #1146
Austin, Texas 78701
www.rockheadsusa.com

***VIA ELECTRONIC FILING (EDIS)***

November 17, 2025

Inv. No. TA-201-3847 (Injury)
Total Pages: 4

**PUBLIC DOCUMENT**

Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC 20436

**Re: Opposition to Institution of Safeguard Case on Quartz Surface Products**

Dear Secretary Barton:

On behalf of The Rockheads Group USA ("Rockheads"), the leading quartz and natural stone fabricators association in the United States, we write to voice our deep concerns over the possible imposition of quotas or duties on U.S. imports of quartz surface products ("QSP"). Specifically, the Rockheads vigorously disagree with and strongly object to the September 15, 2025 safeguard Petition on QSP imports filed with the U.S. International Trade

Honorable Lisa R. Barton
November 17, 2025

Commission (the "Commission") by the Quartz Manufacturing Alliance of America ("QMAA" or "Petitioner").[1]

We ask the Commission not to institute a safeguard investigation here. This is because the Petition does not represent the interests of the thousands of U.S. fabricators of QSP in the United States and their approximately 100,000 workers. On the contrary, the relief sought by the Petitioner would be enormously harmful to domestic fabricator producers of QSP.

The Rockheads is the leading group of surface product fabricators in the United States, representing roughly 120 fabricator members across the United States. Rockhead Member shops service all 50 states, covering roughly 92% of the population within 150 miles.

ROCKHEADS
GROUP • USA




Rockheads Member Map — Updated November 2025

[1] Letter from Schagrin Associates to the Commission, *Quartz Surface Products – Petition for Safeguard Relief Pursuant to Sections 201 & 202 of the Trade Act of 1974*, Inv. No. TA-201-3847 (U.S. Int'l Tr. Comm'n Sep. 15, 2025) ("the Petition"). The Petition was filed pursuant to Sections 201-202 of the Trade Act of 1974.

Our membership employs approximately 10,000 American workers, and its production accounted for 14M square feet of QSP fabrication/manufacturing in 2024. Moreover, the Rockheads members total approximately $1.8 billion in sales.

The Petitioners did not consult with the Rockheads or, to our knowledge, any of our members prior to the filing of the QSP Petition. This is especially disappointing because we are major customers of the individual producer petitioners, and our domestic QSP production substantially exceeds that of the Petitioners.

On behalf of our roughly 120 members, we are deeply concerned about the potential adverse commercial impacts on domestic QSP producers/fabricators stemming from the relief sought in the Petition. QSP slab is the most important input to our members' domestic manufacturing operations. Imported QSP slabs are necessary as domestic supply can provide only a fraction of the slabs required to meet the demands of our members' customers. The Petition requests a quota and/or high tariffs on imported QSP slab, thereby threatening to create a scarcity of U.S. supply. This outcome would cause serious financial and operational harm to our members' production/fabrication businesses and their 10,000 domestic manufacturing workers.

For the foregoing reasons, the Petition is not in the best interests of the U.S. industry producing/fabricating QSP. As such, we ask the Commission not to institute this investigation.

* * *

We ask that this letter be placed on the public record prior to any decision by the Commission on institution. Please let us know if we can be of further assistance.

Respectfully submitted,

Rich Katzmann
Executive Director
**The Rockheads Group USA**

# **Exhibit 10**

Letter from Schagrin Associates to the U.S. International Trade Commission, *Quartz Surface Products – Additional Support for Petition for Safeguard Relief Pursuant to Sections 201 and 202 of the Trade Act of 1974*, Inv. No. TA-201-3847 (Nov. 17, 2025)

SCHAGRIN ASSOCIATES
900 SEVENTH STREET, N.W. - SUITE 500 - WASHINGTON, D.C. 20001
P: (202) 223-1700 LMEISNER@SCHAGRINASSOCIATES.COM F: (202) 429-2522

November 17, 2025

USITC Inv. No. TA-201-3847
Total Pages: 18
Investigation

**PUBLIC VERSION**

Confidential treatment requested for bracketed information contained in Exhibits 1-2.

**BY ELECTRONIC FILING**
The Honorable Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street S.W., Room 112
Washington, D.C. 20436

**Re: Quartz Surface Products –Additional Support for Petition for Safeguard Relief Pursuant to Sections 201 and 202 of the Trade Act of 1974**

Dear Secretary Barton:

On behalf of the Quartz Manufacturing Alliance of America (the "QMAA" or "Petitioner"), we hereby submit to the U.S. International Trade Commission (the "Commission") information regarding additional support for the QMAA's petition for safeguard relief from the serious injury that has been caused to the entire U.S. domestic industry by imports of quartz surface products ("QSP").

First, the known U.S. producer LX Hausys America, Inc. ("LX Hausys") has decided to support the petition for safeguard relief from imports of QSP. QMAA provides a declaration of support for safeguard relief from LX Hausys as **Exhibit 1**. LX Hausys is a U.S. producer of QSP that operates three production lines at its facility in Adairsville, Georgia.

Second, after the filing of the safeguard petition, the QMAA was contacted by an additional U.S. producer, Hendrix Industries, Inc. ("Hendrix"), that has expressed its support for

the petition for safeguard relief from imports of QSP. QMAA provides a declaration of support from Hendrix as **Exhibit 2**. Hendrix operates two production lines dedicated to the production of QSP at its facility in Sealy, Texas.

Based on the additional support from these companies, the QMAA's safeguard petition is now supported by fully 15 of the 19 operating QSP production lines in the United States.[1]

| Company | Production Lines | Position |
|---|---|---|
| Cambria Company LLC | 6 | Support |
| Dal-Tile LLC | 1 | Support |
| Guidoni USA | 1 | Support |
| Elite Quartz | 4 | Oppose |
| E-Stone Corporation | 2 | Support |
| Hendrix Industries | 2 | Support |
| LX Hausys | 3 | Support |
| Total Lines | 19 | |

In other words, those who support the petition now account for 78.9 percent of domestic production of QSP based on production lines.[2]

Major importers and distributors are also joining forces with the QMAA to support the safeguard petition. For over two decades, the Cosentino Group has served the U.S. market from its production facilities in Spain and more recently announced a $270 million investment in Jacksonville, Florida. A letter from the Cosentino Group attached as **Exhibit 3** explains that the

[1] The QMAA has also learned of the existence of another potential U.S. producer of QSP, American Quartz Group, Inc., that has a production facility in Barstow, CA. However, to the best of the QMAA's knowledge, the facility in Barstow has for various reasons not been operational for some time. *See, e.g.*, *Months after illegal pot-farm bust in China firm's Barstow warehouse, questions remain*, Victorville Daily Press (Feb. 8, 2023), attached as **Exhibit 4**.

[2] The Architectural Surfaces Group ("ASG") was part of the QMAA at the time of the filing of the original safeguards petition. After a change in leadership, ASG is withdrawing its participation in the QMAA. However, because ASG is not a domestic producer of QSP, its withdrawal does not impact the overall percentage of total U.S. production of QSP that is supporting of the safeguards petition.

**PUBLIC VERSION**

company is "severely troubled by the huge surge of low-priced imports into the U.S. market of quartz surface products from China, India, Thailand, and the entire Pacific Rim" and that "{t}his surge of imports seriously jeopardizes our ability to earn a reasonable return on the investments we are making in Jacksonville, Florida." The Consentino Group states in the attached letter that, provided no remedy is imposed on imports from Spain, it supports the QMAA's safeguard petition.

Similarly, Hyundai L&C USA is a sister company of Hyundai L&C Canada, which makes the HanStone QSP product in London, Ontario, Canada. Hyundai L&C USA has become a member of the QMAA and supports the safeguard petition.

Based on the overwhelming support for the safeguard petition that has been expressed by domestic producers of QSP and other industry participants, the Commission should find that the QMAA and the other supporters of the petition are together representative of the domestic industry and should promptly institute a safeguard proceeding to investigate whether QSP is being imported into the United States in such increased quantities as to be a substantial cause of serious injury to the domestic industry or the threat thereof.

Pursuant to 19 U.S.C. § 2252(i) and 19 C.F.R. § 206.7, Petitioner requests confidential treatment for information designated as confidential and enclosed in single brackets ("[ ]") in **Exhibits 1-2**. This bracketed information is highly sensitive confidential business information warranting confidential treatment. The information for which confidential treatment is requested constitutes the type of information normally treated as confidential business information pursuant to 19 C.F.R. § 201.6(a), is not publicly available, and would cause substantial harm to the competitive position of the submitter if it were released to the public. A nonconfidential

version has been prepared and is being filed simultaneously with this submission in accordance with 19 C.F.R. § 201.8(f).

Attached to this cover letter is a counsel certification regarding the completeness and accuracy of the information contained in this submission, as required by 19 C.F.R. § 206.8(a).

* * *

Please do not hesitate to contact the undersigned should you have any questions regarding this Petition.

Respectfully Submitted,

/s/ Luke A. Meisner
Roger B. Schagrin
Luke A. Meisner
Saad Y. Chalchal*
Maliha Khan
Amanda G. Swenson

SCHAGRIN ASSOCIATES

*Counsel to the Quartz Manufacturing Alliance of America*

* Admitted only in New York and New Jersey. Practice limited to matters before federal courts and agencies.

## CERTIFICATION OF COUNSEL

In accordance with Section 206.8 of the Commission's rules of practice and procedure (19 C.F.R. § 206.8), I, Luke A. Meisner of Schagrin Associates, hereby certify that (1) I have read the enclosed submission dated November 17, 2025, and (2) based on the information made available to me, I have no reason to believe that this submission contains any material misrepresentation or omission of fact, and (3) the information contained in this submission is accurate and complete to the best of my knowledge.

In accordance with Section 201.6(b)(3)(iii) of the Commission's rules of practice and procedure (19 C.F.R. § 201.6(b)(3)(iii)), I further certify that information substantially identical to the information for which confidential treatment has been requested in this submission is not available to the general public.

This certification is made in accordance with 28 U.S.C. § 1746. I declare under penalty of perjury of the laws of the United States of America that the foregoing statements are true and correct to the best of my information and belief.

Date: 11/17/25

Luke A. Meisner [signature]

Luke A. Meisner

# CERTIFICATE OF SERVICE

**Quartz Surface Products**
**Safeguard Relief Pursuant to Sections 201 and 202 of the Trade Act of 1974**
**TA-201-3847**

I, Zahra DeShaw, hereby certify that as of today, November 17, 2025, no service list was available in this proceeding.

/s/ *Zahra DeShaw*
Zahra DeShaw, *Paralegal*
SCHAGRIN ASSOCIATES

# EXHIBIT 1

**PUBLIC VERSION**

LX Hausys

**LX Hausys America, Inc.**
3480 Preston Ridge Rd, Suite 350
Alpharetta, GA 30005
www.lxhausys.com/us

## Declaration of Support for Safeguard Petition

I, Gerald Choi, President of LX Hausys America, Inc. ("LX Hausys"), make this declaration in my official capacity on behalf of the company. I declare, under penalty of perjury under the laws of the United States, that the following statements are true and correct to the best of my knowledge and belief:

1. LX Hausys is a producer of quartz surface products, with manufacturing facility located in Adairsville, Georgia. The facility has three production lines dedicated to the production of quartz surface products.

2. In 2024, LX Hausys produced [ ] square feet of quartz surface products at its facilities in Adairsville, Georgia.

3. LX Hausys supports the safeguard petition on imports of quartz surface products. LX Hausys believes that the recent surge of imports from multiple countries has been a substantial cause of serious injury to the U.S. domestic industry, including LX Hausys, which has sustained direct injury attributable to the increased imports of these products.

4. Pursuant to 19 U.S.C. § 2252(i) and 19 C.F.R. § 206.7, LX Hausys respectfully requests proprietary treatment for the information enclosed in single brackets in this submission. Disclosure of LX Hausys' non-public production data would cause serious and substantial harm to LX Hausys.

Dated: October 8, 2025

Gerald Choi
President
LX Hausys America, Inc.

# EXHIBIT 2

PUBLIC VERSION

**Declaration of Hank Vu**

I, Hank Vu, the undersigned, declare, under penalty of perjury under the laws of the United States, that to the best of my knowledge the following statements are true and correct.

1. I am the President of Hendrix Industries, Inc. ("Hendrix"), a Texas corporation. Hendrix is a producer of quartz surface products from a manufacturing facility located in Sealy, Texas. This is our first and only manufacturing facility which has two production lines dedicated to the production of quartz surface products.

2. The State of Texas, Austin County, and the City of Sealy, Texas embraced our new production facility with anticipated new jobs related to the production and development of manufactured quartz products.

3. We broke ground in December 2021, but in the face of Covid related delays we did not receive our Occupancy permit until late February, 2024, followed by equipment calibration and testing.

4. By late 2024 Hendrix commenced manufacturing operations and [ ] square feet of quartz surface products at its facilities in Sealy, Texas.

5. Hendrix supports the safeguard petition on imports of quartz surface products because import pricing in many instances is below direct material cost. Such price undercutting has created a recent surge of imports of quartz surface products from around the world which is a substantial cause of serious injury to the U.S. domestic engineered quartz manufacturing industry.

6. I declare, under penalty of perjury under the laws of the United States, that to the best of my knowledge the foregoing is true and correct.

7. Pursuant to 19 U.S.C. § 2252(i) and 19 C.F.R. § 206.7, Hendrix requests proprietary treatment for the information enclosed in single brackets in this submission. Disclosure of Hendrix's data regarding the production of quartz surface products, which is not publicly available, would cause serious and substantial harm to the competitive position of Hendrix.

Hank Vu, President

10/8/2025

Date

EXHIBIT 3

October 3, 2025

To whom it may concern,

The Cosentino Group has long demonstrated a unique and exceptional commitment to the U.S. market for quartz surface products through substantial investments, innovation, and job creation. For over two decades, we have been a responsible player in the U.S. market, serving the market from our production facilities in Spain. More recently, we have announced a $270 million investment in Jacksonville, Florida, a clear and tangible example of our commitment to deepening our footprint in the U.S. economy.

We are severely troubled by the huge surge of low-priced imports into the U.S. market of quartz surface products from China, India, Thailand, and the entire Pacific Rim. This surge of imports seriously jeopardizes our ability to earn a reasonable return on the investments we are making in Jacksonville, Florida. For this reason, we support the safeguard petition that the Quartz Manufacturing Alliance of America (QMAA) has filed against imports of quartz surface products, provided that no remedy is imposed on imports from Spain.

Given how we have always been a responsible player in the U.S. market, and because of the substantial investments we are making in this country, we believe that imports from Spain should be exempted from any safeguard relief that is provided. Every dollar of safeguard tariffs that we would have to pay may be a dollar less that we can invest in our nascent U.S. manufacturing facility.

Sincerely,

Brandon Calvo
Chief Operating Officer
Cosentino North America

EXHIBIT 4

DAILY PRESS

NEWS

# Months after illegal pot-farm bust in China firm's Barstow warehouse, questions remain

*An unplanned raid at a Barstow warehouse owned by a Chinese quartz-countertop company revealed a more than 80,000 square-foot weed-growing complex.*

**Charlie McGee** Victorville Daily Press
Feb. 8, 2023, 7:00 a.m. PT

An impromptu July 2022 raid at a Barstow warehouse owned by a Chinese countertop-making company — purportedly vacant at the time — uncovered an illegal weed-cultivation complex spanning more than 80,000 square feet and storing millions of dollars worth of product.

But seven months later, while a criminal investigation of the illegal pot grow is still underway, the City of Barstow maintains permits for other marijuana-focused entrepreneurs who lack state licenses on the 75-acre Mojave Desert property owned by China-based American Quartz Group Inc.

Even after the multi-million dollar bust, the Barstow City Council greenlit an application from Quality Life Inc. — a Carlsbad-based firm incorporated in November 2021 by attorney Alvin Gomez and run by sole director Michael Wilhoit — to cultivate, manufacture and distribute weed in the American Quartz warehouse that police had swarmed five weeks prior.

Quality Life had already gotten Barstow's first cannabis-biz approval in February 2022 for a dispensary in a building that now jointly operates as a pot shop and IHOP restaurant at 2841 Lenwood Road, less than a mile southeast of American Quartz.

In March 2022, Quality Life leased a 5,000-square-foot unit of the warehouse from American Quartz and applied to grow pot there. The pitch got unanimous post-raid approval from Barstow's elected council after city staff argued a then-ongoing investigation had cleared Quality Life of involvement in the illegal grows at the same building, which they said were instead run by separate entities using the rest of the warehouse that totals 86,000 square feet.

Six months after that local approval, though, Quality Life still hasn't secured the state-level permits it needs to produce or transport weed. A California Department of Cannabis Control database listed only five state-issued licenses in Barstow as of Feb. 7, all of which permit only retail-bud sales.

"The City of Barstow has had no official communication with Quality Life since its development agreement was approved by council on (Aug.) 15, 2022," Barstow City Manager Willie Hopkins Jr. said in a statement via public-relations firm The Ferraro Group, responding to a Daily Press email inquiry.

City officials didn't address separate inquiries in the email as to whether Barstow has reprimanded or enhanced oversight of American Quartz for its housing of the illegal grow, and whether the investigation cited by city staff in August has since concluded or progressed in any way.

In response to a Daily Press inquiry about the American Quartz raid, Jacquelyn Rodriguez, a spokeswoman for San Bernardino County District Attorney Jason Anderson, said the office is awaiting a final report from Barstow Police Department "for issuing and review."

"In following up with Barstow PD, they let us know that they are concluding their investigations and submitting the case to us likely within the coming week," Rodriguez wrote in an emailed statement.

Representatives of Quality Life and American Quartz didn't respond to requests for comment.

## How the raid went down

The American Quartz bust only occurred because a building inspector stumbled upon the illegal pot-farming warehouse by coincidence.

American Quartz has owned a block of land parcels totaling 74.7 acres since 2019 along Lenwood Road, in the north corner of Barstow's Interstate 15 hub midway between Las Vegas and Los Angeles, according to county property records.

This land includes three industrial-size structures: one that houses American Quartz's countertop-making operations, the largest building; a second that operates as a semi-truck terminal; and a third classified in county records as a commercial storage warehouse, closest to the property's Lenwood Road entry.

A City of Barstow inspector went to the American Quartz property on July 7 to inspect a different building than the storage warehouse closest to the entry, according to a July 12 Facebook post by BPD and as later explained by Chris Heldreth, Barstow's Building and Safety Department director and fire marshal.

"The inspector was doing an inspection on another building," Heldreth said at the City Council's Aug. 15 meeting, when he "noticed that somebody was inside the (warehouse) and decided to go over there."

Then, the "inspector requested assistance from the Barstow Police Department regarding a possible marijuana cultivation operation," according to BPD's post.

Detectives Andrew Hollister and Jose Sanchez dispatched with BPD officers around 3:10 p.m. to the American Quartz warehouse, which has a specific address of 2989 Lenwood Road.

There, "Hollister and the officers on the scene could smell a strong odor of marijuana emitting from the building from as much as 100 feet away," BPD stated, "indicating a strong, reasonable suspicion that a large quantity of marijuana or marijuana plants were at the location."

"People could be heard inside the building as the officers knocked and announced their presence multiple times with no one from inside the building responding."

Hollister wrote a search warrant and got it approved as officers continued announcing their presence via a PA system to no response from the warehouse occupants, according to BPD's post.

When the detectives and officers entered the warehouse with an approved warrant, they found "(10) individual cultivation rooms with marijuana plants in various stages of developmental growth."

"Based on the extent of the grow," BPD stated, "the operation had been in existence for months."

The department counted a facility-wide total of 15,047 cannabis plants and arrested 14 people inside the warehouse for illegal-marijuana cultivation, all of whom it says "were working inside the building."

City officers photographed the warehouse, loaded every cannabis plant onto city-owned trucks, and hauled it all "to the Barstow landfill," where they dumped "a total weight of 8,980 pounds of Marijuana," as described by BPD.

The Barstow Sanitary Landfill is a solid-waste dump run by San Bernardino County a few miles south of Barstow's city limits. If the 8,980 pounds cited by BPD was ready-to-smoke marijuana, it could've netted roughly $8.8 million on the legal-wholesale market as of Jan. 27, according to the U.S. Cannabis Spot Index — and potentially double that if it were high-quality.

## A murky aftermath

BPD detectives identified the business behind the operation as Woolsey Farms LLC, according to the department's post.

The firm "had applied for a cultivation permit with the City of Barstow, but the application had failed to meet all the requirements of the city ordinance and was ultimately rejected," BPD stated.

Woolsey Farms was registered as a business based in the gated city of Canyon Lake in September 2020. It recently filed its required statement of information on Jan. 19, according to California Secretary of State records.

The recent filing lists the LLC's managers as Jacob W. Woolsey and Jordan M. Woolsey, the same first and last name as two of the people BPD named in its July arrest logs among the 14 illegal-cultivation arrestees at the American Quartz warehouse.

The 14 people cited for illegal-marijuana cultivation in the American Quartz warehouse as a result of the July 7 raid, according to the arrest logs, included:

- Cui Zhang
- Hong Wei
- Yong Huang
- Lin Juan
- Carmelino Lopez
- Woshun Yang

- David Fabian-Orantes
- Ming Wu
- Jordan Woolsey
- Jacob Woolsey
- Han Chen
- Natasha Stratton
- Zachary Woolsey
- En Lee

Despite each of these individuals being arrested and booked that day, according to BPD, all were cited and released without criminal charges.

That's because California made illegal-grow citations a misdemeanor comparable to speeding tickets in 2018, no matter how big a pot farm is. The San Bernardino County Sheriff's and DA's offices have criticized this area of the state's legal-weed policy, arguing it has fueled a surge of cartel-tied grows in rural High Desert pockets.

## Quality Life

Barstow's City Council gave Quality Life — the dispensary operator connected to an IHOP — its final approval at an Aug. 15 meeting to become the first business with local permits to cultivate, manufacture, and transport weed in one unit on the north end of the warehouse that BPD had busted five weeks prior.

City staff exonerated Quality Life that night as a potential subject of investigation, though. Councilwoman Barbara Rose focused a line of pre-vote questioning on the idea that a legitimate cannabis business shouldn't be hindered by a probe of the illegal-pot growers who'd been busted in its building.

Quality Life entered a lease as "tenant" with American Quartz as "landlord" on March 21 to enable its planned grow operation, according to its cannabis-biz application. It had gotten unanimous approvals in a Barstow Planning Commission review and an initial City Council vote before the raid happened.

Heldreth said at the Aug. 15 meeting that the roughly 86,000-square-foot American Quartz warehouse contains 16 units.

Separate from Quality Life's 5,000-square-foot unit, he said, two other businesses had applied for permits to grow cannabis across the rest of the warehouse. Aside from Woolsey Farms being named in BPD's statement five days after the raid, city officials haven't identified a second business responsible for illegal growing at the site.

"When the police department did their search warrant," Heldreth said, "the entire two suites, or the two — the majority of the building, approximately 80,000 square feet, was used for the illegal operation."

In Quality Life's unit, "we actually went in and took pictures and did all that just to have for ourselves and the investigation the police department was doing," the building official continued. "There was nothing inside that unit."

The illegal growers had "applied for their permit. They were going through the entire process. They just decided to start," Heldreth said. He added that they built a wall dividing Quality Life's unit from the rest of the American Quartz warehouse that they were using to grow.

"So they not only did, obviously, illegal cultivation," he said, "but they did illegal construction inside the facility as well."

No building inspectors had entered or checked in on the American Quartz warehouse since at least February 2022 "because there was no reason to" as "nobody had a permit to do anything" there, Heldreth said.

Rose asked, referencing Quality Life, "is it going to be OK for them to be in there and not be affected by this investigation in any way, shape, or form?"

"Yes," BPD Chief Andrew Espinoza responded.

"That's what we anticipate at this time," City Attorney Matthew Summers added.

"We cleared (Quality Life) that day," the chief continued. "We talked with the owner, and we — just like Chris said, there's a wall right there. There's no way you can access their area."

"And I should note," Summers said, "the investigation regarding the other side of that wall does continue. That matter is not resolved yet, that investigation."

"That's correct," Espinoza confirmed.

***Charlie McGee covers California's High Desert for the Daily Press, focusing on the city of Barstow and its surrounding communities. He is also a Report for America corps member with The GroundTruth Project, an independent, nonpartisan, nonprofit news organization dedicated to supporting the next generation of journalists in the U.S. and worldwide. McGee may be reached at 760-955-5341 or cmcgee@gannett.com. Follow him on Twitter @bycharliemcgee.***

**Exhibit 11**

*Quartz Surface Products; Institution of Investigations, Scheduling of Public Hearings, and Determination That the Investigation is Extraordinarily Complicated*, 90 Fed. Reg. 55165 (Int'l Trade Comm'n Dec 1, 2025)

definitions of the *Domestic Like Product* and *Domestic Industry;* if you disagree with either or both of these definitions, please explain why and provide alternative definitions.

*Authority:* This proceeding is being conducted under authority of Title VII of the Tariff Act of 1930; this notice is published pursuant to § 207.61 of the Commission's rules.

By order of the Commission.

Issued: November 25, 2025.

**Susan Orndoff,**

*Supervisory Attorney.*

[FR Doc. 2025–21685 Filed 11–28–25; 8:45 am]

**BILLING CODE 7020–02–P**

## INTERNATIONAL TRADE COMMISSION

**[Investigation No. TA–201–79]**

## Quartz Surface Products; Institution of Investigation, Scheduling of Public Hearings, and Determination That the Investigation Is Extraordinarily Complicated

**AGENCY:** United States International Trade Commission.

**ACTION:** Notice of Institution of Investigation and Scheduling of Public Hearings.

**SUMMARY:** Following receipt of a petition for import relief on September 15, 2025, as supplemented on September 23, 2025, and November 17, 2025, the Commission has instituted investigation No. TA–201–79 pursuant to section 202 of the Trade Act of 1974 (''the Act'') to determine whether quartz surface products (''QSP'') are being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article. The Commission has deemed the petition, as supplemented, to have been properly filed on November 17, 2025. The Commission has determined that this investigation is ''extraordinarily complicated,'' and will make its serious injury determination by April 1, 2026. The Commission will submit to the President the report required under section 202(f) of the Act within 180 days after the date on which the petition was filed, or by May 18, 2026.

**DATES:** November 17, 2025.

**FOR FURTHER INFORMATION CONTACT:** Alejandro Orozco (202–205–3177), Office of Investigations, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436. Hearing-impaired persons can obtain information on this matter by contacting the Commission's TDD terminal on 202–205–1810. Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at 202–205–2000. General information concerning the Commission may also be obtained by accessing its internet server (*https://www.usitc.gov*). The public record for this investigation may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov.*

**SUPPLEMENTARY INFORMATION:**

*Background.*—This investigation is being instituted, pursuant to section 202 of the Act (19 U.S.C. 2252), in response to a petition initially submitted on September 15, 2025, and supplemented on September 23, 2025, and November 17, 2025, by the Quartz Manufacturing Alliance of America (''QMAA''), which we have deemed to be properly filed on November 17, 2025.[1] QMAA alleges that QSP is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article. The Commission must submit its report on this investigation to the President no later than 180 days after the date on which the petition was filed, or by May 18, 2026. (19 U.S.C. 2252(f)).

The imported article covered by this investigation is QSP, which consists of slabs and other surfaces created from a mixture of materials that includes predominately silica (*e.g.,* quartz, quartz powder, cristobalite, glass powder) as well as a resin binder (*e.g.,* an unsaturated polyester). The incorporation of other materials, including, but not limited to, pigments, cement, or other additives does not remove the merchandise from the scope. However, the scope only includes products where the silica content is greater than any other single material, by actual weight. QSP is typically sold as rectangular slabs with a total surface area of approximately 45 to 60 square feet and a nominal thickness of one, two, or three centimeters. However, the scope includes surface products of all other sizes, thicknesses, and shapes. In addition to slabs, the scope includes, but is not limited to, other surfaces such as countertops, backsplashes, vanity tops, bar tops, work tops, tabletops, flooring, wall facing, shower surrounds, fireplace surrounds, mantels, and tiles. QSP may be polished or unpolished, cut or uncut, fabricated or not fabricated, cured or uncured, edged or not edged, finished or unfinished, thermoformed or not thermoformed, packaged or unpackaged, and may have any type of surface finish. In addition, QSP is covered by the scope whether or not it is imported attached to, or in conjunction with, nonsubject merchandise such as sinks, sink bowls, vanities, cabinets, and furniture. If QSP is imported attached to, or in conjunction with, such nonsubject merchandise, only the QSP is covered by the scope.

Subject merchandise includes material matching the above description that has been finished, packaged, or otherwise fabricated in a third country, including by cutting, polishing, curing, edging, thermoforming, attaching to, or packaging with another product, or any other finishing, packaging, or fabrication that would not otherwise remove the merchandise from the scope if performed in the country of manufacture of the QSP. The scope does not cover quarried stone surface products, such as granite, marble, soapstone, or quartzite.

For Customs purposes, QSP covered by the investigation is provided for under Harmonized Tariff Schedule of the United States (''HTSUS'') statistical reporting numbers 6810.99.0020, 6810.99.0040, and 7020.00.6000. These HTSUS numbers are provided for convenience and the written description of the scope is dispositive.

*Determination to institute this investigation.*—QMAA initially submitted a petition on September 15, 2025. Shortly thereafter, the Commission received a series of submissions containing statements from a current producer of QSP slab and more than 700 entities stating that they were independent fabricators of QSP that oppose the petition. On September 23, 2025, and November 17, 2025, QMAA supplemented the petition with signed statements on behalf of E-Stone USA Corporation, LX Hausys America, Inc., and Hendrix Industries, Inc. supporting the petition. The Commission determined that the petition, as supplemented, was supported by entities representative of a domestic industry producing QSP, including an industry producing QSP slabs, and an industry producing both QSP slabs and fabricated QSP. Therefore, the Commission determined

[1] At the time the petition was filed, the QMAA was composed of Cambria Company, LLC, Le Sueur, Minnesota; Dal-Tile LLC, Dallas, Texas; Guidoni USA, McRae-Helena, Georgia; and Architectural Surfaces, Inc., Austin, Texas; but Architectural Surfaces subsequently withdrew its participation in the QMAA, while Hyundai L&C USA, Norcross, Georgia became a member of the QMAA.

that the petition, as supplemented, was properly filed as of November 17, 2025.

*Determination that investigation is extraordinarily complicated.*—The Commission has determined that this investigation is ''extraordinarily complicated'' within the meaning of section 202(b)(2)(B) of the Act (19 U.S.C. 2252(b)(2)(B)). The Commission's decision to designate this investigation ''extraordinarily complicated'' is based on the complexity of the issues, including the existence of antidumping and countervailing duty orders on certain imports covered by this investigation. Ordinarily, the Commission would have been required to make its serious injury determination within 120 days after November 17, 2025, the date on which the petition was properly filed, or by March 17, 2026. (19 U.S.C. 2252 (b)(2)(A)). The statute permits the Commission to take up to 30 additional days to make its serious injury determination in an investigation where it determines that the investigation is extraordinarily complicated. In this instance, the Commission intends to take 15 additional days and make its serious injury determination by April 1, 2026.

*Participation in the investigation and public service list.*—Persons (other than petitioner) wishing to participate in the investigation as parties must file an entry of appearance with the Secretary to the Commission, as provided in section 201.11 of the Commission's rules, not later than 21 days after publication of this notice in the **Federal Register**. The Secretary will prepare a service list containing the names and addresses of all persons, or their representatives, who are parties to this investigation upon the expiration of the period for filing entries of appearance.

Please note the Secretary's Office will accept only electronic filings during this time. Filings must be made through the Commission's Electronic Document Information System (EDIS, *https://edis.usitc.gov.*) No in-person paper-based filings or paper copies of any electronic filings will be accepted until further notice.

*Limited disclosure of confidential business information (CBI) under an administrative protective order (APO) and CBI service list.*—Pursuant to section 206.17 of the Commission's rules, the Secretary will make CBI gathered in this investigation available to authorized applicants representing interested parties (as defined in 19 CFR 206.17(a)(3)(iii)) under the APO issued in the investigation, provided that the application is made not later than 21 days after the publication of this notice in the **Federal Register**. A separate service list will be maintained by the Secretary for those parties authorized to receive CBI under the APO.

The Commission may transmit CBI to the Office of the United States Trade Representative (USTR) and may include CBI in the report it sends to the President and USTR for use in decision-making related to this proceeding. Additionally, all information, including CBI, submitted in this investigation may be disclosed to and used by (i) the Commission, its employees and Offices, and contract personnel (a) for developing or maintaining the records of this or a related proceeding, or (b) in internal investigations, audits, reviews, and evaluations relating to the programs, personnel, and operations of the Commission including under 5 U.S.C. Appendix 3; or (ii) by U.S. government employees and contract personnel for cybersecurity purposes. The Commission will not otherwise disclose any CBI in a manner that would reveal the operations of the firm supplying the information.

*Hearings on injury and remedy.*—The Commission has scheduled separate hearings in connection with the injury and remedy phases of this investigation. The hearing on injury will be held beginning at 9:30 a.m. on February 24, 2026, at the U.S. International Trade Commission Building, 500 E Street SW, Washington, DC. In the event that the Commission makes an affirmative serious injury determination or is equally divided on the question of serious injury in this investigation, a hearing on the question of remedy will be held beginning at 9:30 a.m. on April 14, 2026. Requests to appear at the hearings should be filed in writing with the Secretary to the Commission on or before February 13, 2026, for the injury hearing, and April 6, 2026, for the remedy hearing. A nonparty who has testimony that may aid the Commission's deliberations may request permission to present a short statement at the hearings.

All parties and nonparties desiring to appear at the hearings and make oral presentations should participate in prehearing conferences to be held on February 20, 2026, for the injury hearing and April 10, 2026, for the remedy hearing, if deemed necessary. Parties shall file and serve written testimony and presentation slides in connection with their presentation at the hearing by no later than noon. on the business day prior to the hearing. Oral testimony and written materials to be submitted at the public hearings are governed by sections 201.6(b)(2) 201.13(f), and 206.5 of the Commission's rules. Parties must submit any request to present a portion of their hearing testimony *in camera* no later than 7 business days prior to the date of the respective hearings.

Any requests to appear as a witness via videoconference must be included with your request to appear. Requests to appear via videoconference must include a statement explaining why the witness cannot appear in person; the Chairman, or other person designated to conduct the investigations, may in their discretion for good cause shown, grant such a request. Requests to appear as remote witness due to illness or a positive COVID–19 test result may be submitted by 3:00 p.m. the business day prior to the hearing. Further information about participation in the hearing will be posted on the Commission's website at *https://www.usitc.gov/calendarpad/calendar.html.*

*Written submissions.*—Each party who is an interested party may submit a prehearing brief to the Commission. Prehearing briefs must conform with the provisions of sections 201.8, 206.7, and 206.8 of the Commission's rules. The deadline for filing prehearing briefs on injury is February 17, 2026; that for filing prehearing briefs on remedy, including any commitments pursuant to 19 U.S.C. 2252(a)(6)(B), is April 7, 2026. Parties may also file written testimony in connection with their presentation at the hearing, as provided in sections 201.13, 206.5, and 206.8 of the Commission's rules, and posthearing briefs, which must conform with the provisions of sections 201.8, 201.13, 206.7, and 206.8 of Commission's rules. The deadline for filing posthearing briefs for the injury phase of the investigation is March 3, 2026; the deadline for filing posthearing briefs for the remedy phase of the investigation, if any, is April 21, 2026.

No posthearing brief, either in the injury phase or any remedy phase, shall exceed fifteen (15) pages of textual material, double-spaced and single-sided, when printed out on pages measuring 8.5 x 11 inches. In addition, the presiding official may permit persons to file answers to questions or requests made by the Commission at the hearing for the injury phase, and at any hearing for the remedy phase, within a specified time. In addition, any person who has not entered an appearance as a party to the investigation may submit a written statement of information pertinent to the consideration of injury on or before March 3, 2026, and pertinent to the consideration of remedy on or before April 21, 2026. All written submissions must conform with the provisions of section 201.8 of the Commission's rules; any submissions that contain CBI must also conform with

the requirements of sections 201.6 and 206.17 of the Commission's rules. The Commission's *Handbook on E-Filing,* available on the Commission's website at *https://edis.usitc.gov,* elaborates upon the Commission's rules with respect to electronic filing.

Any additional written submissions to the Commission, including requests pursuant to section 201.12 of the Commission's rules, will not be accepted unless good cause is shown for accepting such a submission, or unless the submission is pursuant to a specific request by a Commissioner or Commission staff.

In accordance with section 201.16(c) of the Commission's rules, each document filed by a party to the investigation must be served on all other parties to the investigation (as identified by the service list), and a certificate of service must be timely filed. The Secretary will not accept a document for filing without a certificate of service.

For further information concerning the conduct of this investigation and rules of general application, consult the Commission's Rules of Practice and Procedure, part 201, subparts A and B (19 CFR part 201), and part 206, subparts A and B (19 CFR part 206).

*Authority:* This investigation is being conducted under authority of section 202 of the Act; this notice is published pursuant to section 202(b)(3) of the Act.

By order of the Commission.

Issued: November 26, 2025.

**Susan Orndoff,**

*Supervisory Attorney.*

[FR Doc. 2025–21715 Filed 11–28–25; 8:45 am]

**BILLING CODE 7020–02–P**

---

## INTERNATIONAL TRADE COMMISSION

**[Investigation Nos. 701–TA–463 and 731–TA–1159 (Third Review)]**

## Oil Country Tubular Goods From China; Institution of Five-Year Reviews

**AGENCY:** United States International Trade Commission.

**ACTION:** Notice.

**SUMMARY:** The Commission hereby gives notice that it has instituted reviews pursuant to the Tariff Act of 1930, as amended, to determine whether revocation of the antidumping and countervailing duty orders on oil country tubular goods ("OCTG") from China would be likely to lead to continuation or recurrence of material injury. Pursuant to the Act, interested parties are requested to respond to this notice by submitting the information specified below to the Commission.

**DATES:** Instituted November 3, 2025.[1] To be assured of consideration, the deadline for responses is December 31, 2025. Comments on the adequacy of responses may be filed with the Commission by February 6, 2026.

**FOR FURTHER INFORMATION CONTACT:** Rachel Devenney (202–205–3172), Office of Investigations, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436. Hearing-impaired persons can obtain information on this matter by contacting the Commission's TDD terminal on 202–205–1810. Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at 202–205–2000. General information concerning the Commission may also be obtained by accessing its internet server (*https://www.usitc.gov*). The public record for this proceeding may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov.*

**SUPPLEMENTARY INFORMATION:**

*Background.*—On January 20, 2010, the Department of Commerce ("Commerce") issued a countervailing duty order on imports of OCTG from China (75 FR 3203). On May 21, 2010, Commerce issued an antidumping duty order on imports of OCTG from China (75 FR 28551). Commerce issued a continuation of the antidumping and countervailing duty orders on imports of OCTG from China following Commerce's and the Commission's first five-year reviews, effective May 18, 2015 (80 FR 28224) and second five-year reviews, effective December 3, 2020 (85 FR 78117). The Commission is now conducting third five-year reviews pursuant to section 751(c) of the Act, as amended (19 U.S.C. 1675(c)), to determine whether revocation of the orders would be likely to lead to continuation or recurrence of material injury to the domestic industry within a reasonably foreseeable time. Provisions concerning the conduct of this proceeding may be found in the Commission's Rules of Practice and Procedure at 19 CFR part 201, subparts A and B, and 19 CFR part 207, subparts A and F. The Commission will assess the adequacy of interested party responses to this notice of institution to determine whether to conduct full or expedited reviews. The Commission's determinations in any expedited reviews will be based on the facts available, which may include information provided in response to this notice.

*Definitions.*—The following definitions apply to these reviews:

(1) *Subject Merchandise* is the class or kind of merchandise that is within the scope of the five-year reviews, as defined by Commerce.

(2) The *Subject Country* in these reviews is China.

(3) The *Domestic Like Product* is the domestically produced product or products which are like, or in the absence of like, most similar in characteristics and uses with, the *Subject Merchandise.* In its original determinations and its expedited first and second five-year review determinations, the Commission defined a single *Domestic Like Product* consisting of all OCTG, coextensive with Commerce's scope.

(4) The *Domestic Industry* is the U.S. producers as a whole of the *Domestic Like Product,* or those producers whose collective output of the *Domestic Like Product* constitutes a major proportion of the total domestic production of the product. In its original determinations and its expedited first and second five-year review determinations, the Commission defined a single *Domestic Industry* consisting of all domestic producers of OCTG.

(5) An *Importer* is any person or firm engaged, either directly or through a parent company or subsidiary, in importing the *Subject Merchandise* into the United States from a foreign manufacturer or through its selling agent.

*Participation in the proceeding and public service list.*—Persons, including industrial users of the *Subject Merchandise* and, if the merchandise is sold at the retail level, representative consumer organizations, wishing to participate in the proceeding as parties must file an entry of appearance with the Secretary to the Commission, as provided in § 201.11(b)(4) of the Commission's rules, no later than 21 days after publication of this notice in the **Federal Register**. The Secretary will maintain a public service list containing the names and addresses of all persons, or their representatives, who are parties to the proceeding.

Former Commission employees who are seeking to appear in Commission five-year reviews are advised that they may appear in a review even if they participated personally and substantially in the corresponding underlying original investigation or an earlier review of the same underlying investigation. The Commission's designated agency ethics official has advised that a five-year review is not the

[1] Due to the lapse in appropriations and ensuing cessation of Commission operations, the deadlines in this proceeding have been tolled.

# Exhibit 12

Excerpt of Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Quartz Surface Products Global Safeguard Investigation: Prehearing Brief of Arizona Tile LLC, Elite Quartz Manufacturing, and M S International, Inc.*, Inv. No. TA-201-79

Hogan Lovells

Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T +1 202 637 5600
F +1 202 637 5910
www.hoganlovells.com

February 18, 2026

Inv. Nos. TA-201-79 (Safeguard)
Pages: 1,220

**PUBLIC VERSION**

Business Proprietary Information removed from brief pages 16, 25, 50–51, 54, 56–58, 60–71, 77–78, 82–83, 87–94, 97–98, 101–102, Exhibits 1-A, 1-B, 1-C, and 2.

***VIA ELECTRONIC FILING (EDIS)***

The Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, DC 20436

**Re: Quartz Surface Products Global Safeguard Investigation: Prehearing Brief of Arizona Tile LLC, Elite Quartz Manufacturing, and M S International, Inc.**

Dear Secretary Barton:

On behalf of our clients, Arizona Tile LLC ("Arizona Tile"), Elite Quartz Manufacturing ("Elite Quartz"), and M S International, Inc. ("MSI"), American producers and distributors of the subject merchandise, and in accordance with the U.S. International Trade Commission's Schedule for the Final Phase Investigations in the above-captioned proceeding, 1/ we respectfully submit this Prehearing Brief.

---

1/ *Quartz Surface Products; Institution of Investigation, Scheduling of Public Hearings, and Determination That the Investigation Is Extraordinarily Complicated*, 90 Fed. Reg. 55166 (Int'l Trade Comm'n Dec. 1, 2025).

In accordance with 19 C.F.R. §§ 201.6 and 207.3, we request business proprietary treatment for the information contained in brackets in this submission, which includes proprietary domestic industry, importer, and foreign producer data; and other information released to this firm under administrative protective order ("APO"). Disclosure of this information would cause substantial commercial and competitive harm to the above companies and other parties subject to the APO.

Included in this submission are certifications required by 19 C.F.R. §§ 201.6(b)(3)(iii) and 207.3(a). Service has been effectuated as required by 19 C.F.R. §§ 201.16 and 207.3(b). In accordance with 19 C.F.R. § 207.23 and the Handbook on Filing Procedures, we hereby file this submission electronically on the final public version of this submission.

Please contact the undersigned if you have any questions.

Respectfully submitted,

**HOGAN LOVELLS US LLP**

By: /s/ Jonathan T. Stoel
Jonathan T. Stoel
Jared R. Wessel
Michael G. Jacobson
Maria A. Arboleda
Kelly Heesch Sharbo
Emma K. Peterson, Director of Int'l Trade Analytics

*Counsel to Arizona Tile LLC, Elite Quartz Manufacturing, and M S International, Inc.*

**BEFORE THE**
**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

| | | |
|---|---|---|
| **In the Matter of:** | ) | |
| **QUARTZ SURFACE PRODUCTS** | ) | **Inv. No. TA-201-79 (Injury)** |

**PUBLIC VERSION**

Business Proprietary Information removed from pages 16, 25, 50–51, 54, 56–58, 60–71, 77–78, 82–83, 87–94, 97–98, 101–102.

**PREHEARING BRIEF OF**
**ARIZONA TILE LLC, ELITE QUARTZ MANUFACTURING, AND M S INTERNATIONAL, INC.**

Jonathan T. Stoel
Jared R. Wessel
Michael G. Jacobson
Maria A. Arboleda
Kelly Heesch Sharbo
Emma K. Peterson, Director of Int'l Trade Analytics

**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, DC 20004-1109

*Counsel to Arizona Tile LLC, Elite Quartz Manufacturing, and M S International, Inc.*

February 17, 2026

prior safeguard investigations, the Commission has evaluated economic conditions through the familiar rubric of "conditions of competition" in the U.S. market. 41/

The economic realities and competitive characteristics of the QSP market and industry demonstrate how domestic industry performance is shaped by forces entirely separate and distinct from imports. The Commission must fully consider these economic factors when assessing whether subject imports are a substantial cause of serious injury or threat thereof to the domestic industry.

**A. The Large Majority of the U.S. QSP Market Requires Imported Slabs**

As discussed in Section I, above, the domestic industry consists of slab manufacturers and fabricator manufacturers alike. The large majority of the domestic industry consists of fabricators, not slab producers. Total volume produced, jobs, and income from fabrication manufacturing dwarf slab manufacturing. Domestic slab production is just a fraction of total finished QSP demand in the U.S. market. This means that a massive supply of imported slabs is necessary for the entire domestic industry to be successful.

According to responses to the Commission's questionnaire, domestic slab producers collectively produced approximately 32.7 million square feet of slabs in 2024 and supported approximately 1,446 direct production jobs as of the end of the POI. 42/ By contrast, U.S.

41/ *See*, *e.g.*, *Fresh, Chilled, or Frozen Blueberries*, Inv. No. TA-201-77 (Final), USITC Pub. 5164 at 25-35 (March 2021); *Crystalline Silicon Photovoltaic Cells (Whether or not Partially or Fully Assembled into Other Products)*, Inv. No. TA-201-75 (Final), USITC Pub. 4739 (Nov. 2017) at 24-31; *Large Residential Washers*, Inv. No. TA-201-076 (Final), USITC Pub. 4745 (Dec. 2017) at 23-32; 19 U.S.C. § 2252(c)(1).

42/ Prehearing Staff Report at Tbl. C.1.

fabricators produce more than 180 million square feet of finished countertops annually and employ tens of thousands of workers in at least 2,000 establishments. 43/

The governing statute, 19 U.S.C. § 2252(c)(1), requires the Commission to evaluate supply conditions in the U.S. market, including whether domestic capacity is able to satisfy demand. 44/ Here, although domestic slab production increased over the POI due to new entrants, the gap between domestic QSP slab supply and downstream demand by fabricators is persistent and unchanging. Indeed, this is why fabricators are overwhelmingly opposed to safeguard measures on QSP imports. Approximately 750 individual fabricators and The Rockheads Group, representing approximately 110 large fabricators, declared their opposition to the Petition before this investigation was instituted. Fabricators have continued to oppose the imposition of trade restrictions on QSP, emphasizing that the risks posed by this case extend well beyond what they conveyed in their initial letters. More than 340 fabricators submitted new declarations, which are enclosed in **Exhibit 1-A**, to reiterate their opposition to the Petition and any trade restrictions on imported QSP with greater detail. 45/ They explain that QSP slabs are the most important input to U.S. fabrication manufacturing—absent a reliable supply of slabs to underpin the many and ever-changing designs demanded by consumers, fabricators will suffer.

---

43/ *Id.* at Tbl. C.2 (based on 2024 fabricator production), 1.33, n. 101 (stating that the record data on fabrication represents approximately 2.1 percent of U.S. fabrication of QSP in 2024); **Exh. 3-A**, U.S. Census Bureau, "*All Sectors: County Business Patterns, including ZIP Code Business Patterns, by Legal Form of Organization and Employment Size Class for the U.S., States, and Selected Geographies: 2023*," Economic Surveys, ECNSVY Business Patterns County Business Patterns, Table CB2300CBP, 2025, https://data.census.gov/table/CBP2023.CB2300CBP?q=327991 (last visited Jan. 29, 2026).;

44/ 19 U.S.C. § 2252(c)(1).

45/ **Exh. 1-A**, Fabricator Declarations. Numerous builders also submitted declarations expressing their opposition. *See* **Exh. 1-B**.

**Exhibit 13**

Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Quartz Surface Products Global Safeguard Investigation: Request That the Commission Extend the Injury Determination by 15 Additional Days and Allow for Final Comments*, Inv. No. TA-201-79 (Injury) (Mar. 11, 2026)

Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T +1 202 637 5600
F +1 202 637 5910
www.hoganlovells.com

March 11, 2026

Inv. No. TA-201-79 (Injury)
Pages: 8

**PUBLIC DOCUMENT**

***VIA ELECTRONIC FILING (EDIS)***

The Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, DC 20436

**Re: Quartz Surface Products Global Safeguard Investigation: Request That the Commission Extend the Injury Determination by 15 Additional Days and Allow for Final Comments**

Dear Secretary Barton:

On behalf of our clients, Elite Quartz Manufacturing ("Elite Quartz"), Arizona Tile LLC ("Arizona Tile"), and M S International, Inc. ("MSI"), American producers and distributors of the subject merchandise (collectively, "Respondents"), we respectfully submit this letter to address important developments in the factual record following the February 24, 2026 hearing conducted by the U.S. International Trade Commission (the "Commission") on the filing of posthearing briefs in the above-captioned proceeding. 1/ Due to the complexity of this safeguard investigation and material new information placed on the record since the filing of posthearing briefs, we respectfully request that the Commission – (1) extend its serious injury determination by an additional fifteen (15) days as expressly permitted in the governing safeguard statute and the

1/ *Quartz Surface Products; Institution of Investigation, Scheduling of Public Hearings, and Determination That the Investigation Is Extraordinarily Complicated*, 90 Fed. Reg. 55,166 (Int'l Trade Comm'n Dec. 1, 2025) ("*Institution Notice*").

Commission's regulations, 2/ and (2) permit interested parties to submit "final comments" following the record closing. These steps will further enable the Commission to make its important serious injury determination on the most complete and representative record possible.

## I. DATA SUBMITTED BY U.S. FABRICATORS MUST BE CONSIDERED IN THE COMMISSION'S SERIOUS INJURY INVESTIGATION

Fabricators of quartz surface products ("QSP") are members of the domestic QSP industry. 3/ They comprise the overwhelming majority of domestic productive resources, account for the bulk of employment and value-added manufacturing activity, and are directly affected by any safeguard remedy. 4/ Ms. Davis of Wisenbaker Building Services ("WBS") and Mr. Katzmann from The Rockheads explained at the February 24 hearing why their views and data are central to the Commission's injury analysis. 5/ In this regard, nearly 1,000 fabricators have expressed their strong opposition to any safeguard relief. 6/

---

2/ 19 U.S.C. § 2252(b)(2)(B); 19 C.F.R. § 206.18(a)(1).

3/ Letter from Hogan Lovells US LLP to USITC, *Quartz Surface Products Global Safeguard Investigation: Prehearing Brief of Arizona Tile LLC, Elite Quartz Manufacturing, and M S International, Inc.*, Inv. No. TA-201-79 (Feb. 17, 2026) ("Respondents' Prehearing Br.") at 13-14.

4/ Letter from Hogan Lovells US LLP to USITC, *Quartz Surface Products Global Safeguard Investigation: Posthearing Brief of Arizona Tile LLC, Elite Quartz Manufacturing, and M S International, Inc.*, Inv. No. TA-201-79 (Mar. 3, 2026) ("Respondents' Posthearing Br.") at 8-9.

5/ *Surface Products: Hearing Transcript*, Inv. No. TA-201-79 (Injury) (Feb. 24, 2026) ("Hrg. Tr.") at 216-217.

6/ *See* Respondents' Prehearing Br. at Exh. 1-A; see also Letter from Hogan Lovells US LLP to USITC, *Fabricator Opposition to Institution of Sections 201-202 Petition on Quartz Surface Products*, Inv. No. TA-201-79 (Injury) (Sep. 19, 2025); Letter from Hogan Lovells US LLP to USITC, *Further Evidence Demonstrating that the Commission Should Not Institute a Safeguard Investigation on Quartz Surface Products*, Inv. No. TA-201-79 (Injury) (Sep. 22, 2025).

QSP fabricators are small companies, which (except for WBS) are unrepresented in this proceeding. As such, it is unsurprising that there has been and remains trepidation and confusion in the fabricator community around the confidentiality of their commercially sensitive data submitted to the Commission. 7/ These factors have substantially limited the public participation of fabricators and have also significantly affected (delayed) the timing of fabricators' submittal of confidential responses to the Commission's questionnaires. 8/

## II. THE COMMISSION'S RECORD REFLECTS POST-HEARING U.S. PRODUCER QUESTIONNAIRES AND QUESTIONNAIRE REVISIONS

Material new information has been submitted to the Commission since the February 24 hearing. In particular, on March 10, Commission Staff released to interested parties – (A) 17 additional fabricator producer questionnaires or revisions to fabricator questionnaires, and (B) several revisions to U.S. slab producers' questionnaires. In fact, based on information and belief, we understand that since the hearing, in total, 25 or more new fabricator questionnaires have been submitted to the Commission.

The Commission must take into account all relevant evidence in making its serious injury determination. The post-hearing submissions made by domestic producers to the Commission are highly pertinent to the size, financial performance, and operational condition of the domestic QSP industry as a whole. 9/ Moreover, they bear directly on the statutory factors governing the Commission's serious injury determination, including employment, production operations, and the

---

7/ Respondents' Posthearing Br. at 68-69; *see also* Hrg. Tr. at 298-299 (Mr. Shah and Mr. Katzmann).

8/ *See* Respondents' Posthearing Br. at 68-69; *see also*, Hrg. Tr. at 299 (Mr. Katzmann).

9/ 19 U.S.C. § 2252(c)(1), (6).

ability of firms to operate at a reasonable level of profit. 10/ As such, the Commission thus must review, assess, and incorporate these post-hearing submissions into its serious injury analysis.

## III. THE COMMISSION SHOULD FURTHER EXTEND THE DEADLINE FOR ITS SERIOUS INJURY DETERMINATION AND PERMIT FINAL COMMENTS

The safeguard statute, 19 U.S.C. § 2252(b)(2)(B), and the Commission's regulations, 19 C.F.R. § 206.18(a)(1). permits the Commission to extend the deadline for its serious injury determination by up to thirty (30) days when an investigation is "extraordinarily complicated". The Commission has already recognized in its December 17, 2025 institution notice that this safeguard investigation is "extraordinarily complicated" and thus extended the deadline for its determination by fifteen (15) days, or until April 1, 2026. 11/ In light of the substantial additional information pertaining to the QSP domestic industry received by the Commission since the February 24 hearing, we respectfully request that the Commission extend the deadline again, by an additional fifteen (15) days, or until April 16, 2026. This further extension is consistent with the statute (and the regulations) and will permit both interested parties and the Commission to address fully the significant new factual information added to the record since the February 24 hearing.

Moreover, we respectfully request that the Commission permit interested parties to submit "final comments" on the record evidence compiled in this "extraordinarily complicated" investigation. This additional step is critical here as interested parties have not yet been afforded

---

10/ *Id.* § 2252(c)(1)(A).

11/ *Institution Notice*, 90 Fed. Reg. at 55,166 ("The statute permits the Commission to take up to 30 additional days to make its serious injury determination in an investigation where it determines that the investigation is extraordinarily complicated. In this instance, the Commission intends to take 15 additional days and make its serious injury determination by April 1, 2026.").

an opportunity to comment on the new fabricator producer questionnaires or the myriad revisions to producer questionnaires. Permitting final comments in this "extraordinarily complicated" investigation would also be consistent with Commission practice in Title VII investigations, in which interested parties are provided the opportunity to submit final comments after the record has closed. 12/ Finally, if the Commission further extends the deadline for its serious injury determination as set forth above, the provision of an opportunity for final comments will not delay the Commission's schedule.

* * *

For the foregoing reasons, Respondents respectfully request that the Commission – (1) extend its serious injury determination by an additional fifteen (15) days as expressly provided for in the governing safeguard statute and the Commission's regulations, and (2) permit interested parties to submit "final comments" following the record closing. Please contact the undersigned if there are questions about this submission.

Respectfully submitted,

**HOGAN LOVELLS US LLP**

/s/ Jonathan T. Stoel
Jonathan T. Stoel
Jared R. Wessel
Michael G. Jacobson
Maria A. Arboleda
Kelly Heesch Sharbo
Emma K. Peterson, Director of Int'l Trade Analytics

*Counsel to Elite Quartz Manufacturing, Arizona Tile LLC, and M S International, Inc.*

12/ 19 C.F.R. § 207.30(b).

**PUBLIC**
**CERTIFICATE OF SERVICE**

**Quartz Surface Products**
**Investigation No. TA-201-79 (Injury)**

I, Natalia Lopez, hereby certify that on March 11, 2026, a copy of the attached submission was served via email on the following parties:

**On Behalf of Quartz Manufacturing Alliance of America:**

Luke A. Meisner
SCHAGRIN ASSOCIATES
900 Seventh Street NW, Suite 500
Washington, District of Columbia 20001
lmeisner@schagrinassociates.com

**On Behalf of EOS Surfaces, LLC; MXM SURFACES INC.; MXM SURFACES SDN BHD:**

Jessica R. DiPietro
ARENTFOX SCHIFF LLP
1717 K Street NW
Washington, District of Columbia 20006
Jessica.dipietro@afslaw.com

**On Behalf of Global Surfaces FZE; Madhav Surfaces FZC LLC; Stone Showcase, Inc.:**

Robert LaFrankie
CROWELL & MORING
1001 Pennsylvania Avenue, N.W.
Washington, District of Columbia 20004
rlafrankie@crowell.com

**On Behalf of Government of the United Kingdom:**

Oliver Payne
DEPARTMENT OF BUSINESS AND TRADE
UK DEPARTMENT OF BUSINESS AND TRADE
Old Admiralty Building
London, Not Applicable, SW1A 2DY, United Kingdon
Oliver.payne@businessandtrade.gov.uk

**On Behalf of Government of India:**

Mayank Singhal
DUA ASSOCIATES
New Delhi, Not Applicable 110001, India
mayanksinghal@duaassociates.com

**On Behalf of Ministry of Trade of Indonesia:**

Reza Pahlevi Chairul
EMBASSY OF INDONESIA
2020 Massachusetts Ave NW
Washington, District of Columbia 20036
Reza.pahlevi@embassyofindonesia.org

**On Behalf of Government of Malaysia:**

Azyy Ati Ibrahim
EMBASSY OF MALAYSIA
Level 9, No. 7, Menara MITI
Jalan Sultan Haji Ahmad Shah
Kuala Lumpur, Not Applicable 50480, Malaysia

**On Behalf of Government of Spain:**

Maria Pilar de Carlos Villellas
EMBASSY OF SPAIN
2375 Pennsylvania Avenue, NW
Washington, District of Columbia 20037
mpcarlos@comercio.mineco.es

**On Behalf of Ermas Madencilik Tur. San. ve Tic. A.S.:**

Mustafa Ercan
Ermas Madencilik Tur. San. Ve Tic. A.S.
Hamidiye Mah. Selcuklu Cad. C Blok
No:IOC IC KAPI NO:14 Kagithane
Istanbul, Not Applicable 34400, Turkey
mustafa@ermas.com.tr

**On Behalf of Casablanca Vietnam Joint Stock Company; Pokarna Engineered Stone Limited; Wilsonart LLC:**

Brittney Powell
FOX ROTHSCHILD LLP
2020 K Street NW
Suite 500
Washington, District of Columbia 20006
bpowell@foxrothschild.com

**On Behalf of Government of Türkiye:**

Atilla Ugur Basbug
GOVERNMENT OF THE REPUBLIC OF TURKEY
T .C. Ticaret Bakanligi Sogutozu Mah. 2176. Sk. No: 63 06530 Cankaya Ankara, District of Columbia 06530, Turkey
basbuga@ticaret.gov.tr

**On Behalf of Royal House Manufacture and Investment Joint Stock Company:**

Matthew J. McConkey
MAYER BROWN LLP
1999 K Street, NW
Washington, District of Columbia 20006
mmcconkey@mayerbrown.com

**On Behalf of Government of Mexico:**

Rodrigo Andres Velazquez Garcia
MINISTRY OF ECONOMY MEXICO
Pachuca 189
Mexico City, Not Applicable 06140, Mexico
Rodrigo.velazquez@economia.gob.mx

**On Behalf of Federation of the Indian Quartz Industry:**

R. Will Planert
MORRIS, MANNING & MARTIN LLP
1333 New Hampshire Avenue, NW
Suite 800
Washington, District of Columbia 20036
wplanert@mmmlaw.com

**On Behalf of Lotte Chemical California, Inc.:**

Scott Maberry
SHEPPARD MULLIN LLP
2099 Pennsylvania Ave, NW
Suite 100
Washington, District of Columbia 20006
smaberry@sheppardmullin.com

**On Behalf of C&C North America, Inc.; Carrara Stone Systems of Chicago, LLC; Cosentino Industrial S.A.U.; Stone Made Products, Inc.; Stone Systems and Services, Inc.; Stone Systems of Atlanta, LLC; Stone Systems of Central Texas, LLC; Stone Systems of Houston, LLC; Stone Systems of New Jersey, LLC; Stone Systems of New Mexico, LLC; Stone Systems of Raleigh, LLC; Stone Systems of South Florida, LLC:**

Michael Murphy
SIDLEY AUSTIN LLP
1501 K Street, NW
Suite 100
Washington, District of Columbia 20005
Ted.murphy@sidley.com

**On Behalf of Benaa Surfaces; Century Stone Joint Stock Company; Government of Canada ; Grandhome Stone Vina Company Limited; New Stone Technology Joint Stock Company; Nhat Huy Stone Fabrication Manufacturer Joint Stock Company; Phu Son Joint Stock Company; Phutai Quartz Stone Company Limited; Vicostone JSC; Vicostone USA; Vietnam Quartz Joint Stock Company:**

Eric Emerson
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., N.W.
Washington, District of Columbia 20036
emerson@steptoe.com

**On Behalf of The Government of Vietnam:**

Tho Anh Nguyen
TRADE REMEDIES AUTHORITY OF VIETNAM
25 Ngo Quyen, Hanoi
Hanoi, Not Applicable 10000, Vietnam
thona@moit.gov.vn

**On Behalf of The Government of Korea:**

Dongwon Jung
YOON & YANG LLC
19TH FL. ASEM TOWER
517 Yeongdongdaero Gangnamgu
Seoul, Not Applicable 06164, Korea
dwjung@yoonyang.com

/s/ Natalia Lopez
Natalia Lopez

**HOGAN LOVELLS US LLP**

# Exhibit 14

Email from Alejandro Orozco, *RE: USITC Investigation No. TA-201-79 (Safeguard): Quartz Surface Products (Remedy)*, (Apr. 2, 2026)

**Orozco, Alejandro**

| | |
|---|---|
| **From:** | Orozco, Alejandro |
| **Sent:** | Thursday, April 2, 2026 5:20 PM |
| **To:** | lmeisner@schagrinassociates.com; jonathan.stoel@hoganlovells.com; jessica.dipietro@afslaw.com; bpowell@foxrothschild.com; llevinson@foxrothschild.com; eemerson@steptoe.com; washington@comercio.mineco.es; mpcarlos@comercio.mineco.es; TED.MURPHY@SIDLEY.COM; JOSEPH.OSCHRIN@SIDLEY.COM; Caitlin.Hickey@eeas.europa.eu; oliver.payne@businessandtrade.gov.uk; mayanksinghal@duaassociates.com; basbuga@ticaret.gov.tr; rodrigo.velazquez@economia.gob.mx; wplanert@mmmlaw.com; thona@moit.gov.vn; MMcConkey@mayerbrown.com; alltps@miti.gov.my; dirpp-daglu@kemendag.go.id; atdag-usa@kemendag.go.id; mustafa@ermas.com.tr; john.foote@sidley.com; smaberry@sheppardmullin.com; rlafrankie@crowell.com; reza.pahlevi@embassyofindonesia.org; tradeservice@taftlaw.com; smaberry@sheppardmullin.com; trade@steptoe.com; georgina.mack@businessandtrade.gov.uk; wangjianfeng@mofcom.gov.cn |
| **Cc:** | Comly, Nathanael N. |
| **Subject:** | USITC Investigation No. TA-201-79 (Safeguard): Quartz Surface Products (Remedy) |
| **Attachments:** | FR-USITC Institution.pdf |

Dear counsel,

I am writing to inform you that on April 1, 2026, the Commission made an affirmative injury determination in the safeguard investigation concerning *Quartz Surface Products*. For more details, please refer to the Commission's official news release, available here: https://www.usitc.gov/press_room/news_release/2026/er0401_68378.htm.

Following this determination, the investigation will now advance to the remedy phase. I have attached the Federal Register notice of institution for your reference, which contains important information on the remedy phase, as well as key dates and upcoming events including:

- Requests to appear at the remedy hearing: April 6, 2026
- Prehearing briefs from parties: April 7, 2026
- Prehearing conference (if necessary): April 10, 2026
- Remedy hearing: April 14, 2026, at 9:30 a.m.

**Prehearing Briefs (Remedy).—**For parties submitting remedy prehearing briefs, the Commission requests that you specifically address the following:

- Please address how a determination that independent fabricators are not part of the domestic industry would affect the remedy that the Commission recommends.

Should you have any questions, please feel free to contact me directly.

Thank you,
--
**Alejandro Orozco**

Investigator, Office of Investigations
U.S. International Trade Commission
alejandro.orozco@usitc.gov | (202) 205-3177